| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address<br><br>Lane M. Nussbaum SBN 264200<br>Nussbaum APC<br>27489 Agoura Rd. Ste. 102<br>Agoura Hills, CA 91301<br>Tel (818) 660-1919<br>Fax: (818) 864-3241<br><br><br><br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for:* Culver City Medical Tower, LLC | FOR COURT USE ONLY |
| --- | --- |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -** SAN FERNANDO

| In re:<br><br>MICHAEL B. KAMIEL | CASE NO.: 1:22-bk-10366-MB<br>CHAPTER: 7 |
| --- | --- |
| | **AMENDED NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY UNDER 11 U.S.C. § 362(I) (with supporting declarations) (UNLAWFUL DETAINER)** |
| Debtor(s). | DATE: July 6, 2022<br>TIME: 10:00 am<br>COURTROOM: 303 |

| **Movant**: Culver City Medical Tower, LLC |
| --- |

1. **Hearing Location**:

   ☐ 255 East Temple Street, Los Angeles, CA 90012      ☐ 411 West Fourth Street, Santa Ana, CA 92701
   ☒ 21041 Burbank Boulevard, Woodland Hills, CA 91367   ☐ 1415 State Street, Santa Barbara, CA 93101
   ☐ 3420 Twelfth Street, Riverside, CA 92501

2. Notice is given to the Debtor and trustee (*if any*)(Responding Parties), their attorneys (*if any*), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached Motion.

3. To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                Page 1                **F 4001-1.RFS.UD.MOTION**

100638585

4.    When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5.    If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6.    ☒    This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d).  If you wish to oppose this motion, you must file and serve a written response to this motion no later than 14 days before the hearing and appear at the hearing.

7.    ☐    This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b).  If you wish to oppose this motion, you must file and serve a response no later than (*date*) _____ and (*time*) _____; and, you may appear at the hearing.

   a.    ☐    An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

   b.    ☐    An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

   c.    ☐    An application for order setting hearing on shortened notice was filed and remains pending.  After the court rules on that application, you will be served with another notice or an order that specifies the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date:    June 16, 2022

Nussbaum APC
_____
Printed name of law firm (if applicable)

Lane Nussbaum
_____
Printed name of individual Movant or attorney for Movant


/s/ Lane Nussbaum
_____
Signature of individual Movant or attorney for Movant

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*    Page 2    **F 4001-1.RFS.UD.MOTION**

100638585

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER
## CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY
### (Unlawful Detainer)

**1.  Movant is the:**

a.  ☐  Owner of the Property
b.  ☒  Authorized Agent of the owner of the Property
c.  ☐  Other (*specify*):

**2.  The Property at Issue (Property):**

Type of Property:  ☐ Residential   ☒ Nonresidential

*Street Address*: 9808 Venice Blvd., Suite 503
*Unit/Suite Number*:
*City, State, Zip Code*: Los Angeles, CA, 90232

**3.  Bankruptcy Case History:**

a.  ☒  A voluntary   ☐ An involuntary   petition under chapter   ☒ 7  ☐ 11  ☐ 12  ☐ 13
was filed on (*date*): March 29, 2022

b.  ☐  An order to convert this case to chapter   ☐ 7  ☐ 11  ☐ 12  ☐ 13
was entered on (*date*):

c.  ☐  A plan was confirmed on (*date*):

**4.  Pursuant to 11.U.S.C. § 362(b)(22) and (23) there is no stay because (*check all that apply*):**

a.  ☒  Movant commenced an eviction, unlawful detainer action or similar proceeding against the Debtor involving
residential property in which the Debtor resides and:

(1)  ☒  The Debtor has not filed and served on Movant the certification required under 11 U.S.C. § 362(l)(1).

(2)  ☒  The Debtor or adult dependent of the Debtor has not deposited with the clerk any rent that would become
due during the 30-day period after the filing of the petition.

(3)  ☒  The Debtor or adult dependent of the Debtor has not filed and served on Movant the further certification
required under 11 U.S.C. § 362(l)(2) that the entire monetary default that gave rise to the judgment has
been cured.

(4)  ☐  Movant filed and served an objection to the Debtor's certification.  A copy of the objection is attached as
Exhibit _____.  A hearing on this objection is set for (*date*) _____.

**5.  Grounds for Relief from Stay: (*check all that apply*)**

a.  ☒  Pursuant to 11 U.S.C. § 362(d)(1), cause exists because, as of the bankruptcy petition date, the Debtor had
no right to continued occupancy of the premises, as follows:

(1)  ☒  Movant caused a notice to quit to be served on the Debtor.

(2)  ☒  An unlawful detainer proceeding was commenced on (*date*) February 10, 2022 .

(3)  ☐  An unlawful detainer judgment was entered on (*date*) _____.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

100638585

(4) ☐ Movant acquired title to the Property by foreclosure sale before the bankruptcy petition was filed and recorded the deed within the period provided by state law for perfection.

(5) ☐ Movant acquired title to the Property by foreclosure sale after the bankruptcy petition was filed and recorded the deed within the period provided by state law for perfection.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(1) the Debtor's right to possession should be terminated because (*check all that apply*):

(1) ☐ The lease or other right of occupancy expired by its terms on (*date*) _____.

(2) ☒ The lease has matured, been rejected or deemed rejected by operation of law on (*date*) _January 24, 2022_.

(3) ☒ Lease payments have not been made after the filing of the bankruptcy petition.

(4) ☐ An unlawful detainer action was filed to obtain possession of the Property on grounds of endangerment of the Property or because of illegal use of controlled substances on the Property and Movant filed and served upon the Debtor a certification that ☐ such an action was filed or ☐ that within the 30 days preceding the certification, the Debtor has endangered the subject Property or illegally allowed the use of controlled substances on the Property. A copy of Movant's certification is attached as Exhibit _____. The Debtor ☐ has ☐ has not filed an objection to Movant's certification. A copy of the Debtor's objection, if any, is attached as Exhibit _____. A hearing on this objection is set for (*date*) _____.

(5) ☐ The bankruptcy case was filed in bad faith:

(A) ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

(B) ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

(C) ☐ The Debtor filed only a few case commencement documents. No schedules or statement of financial affairs (or chapter 13 plan, if appropriate) has been filed.

(D) ☐ There was a recent transfer of all or part ownership of, or other interest in the Property without the consent of the Movant or court approval.

c. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and pursuant to 11 U.S.C. § 362(d)(2)(B), the Property is not necessary to an effective reorganization.

6. **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor:

a. ☒ These actions were taken before Movant knew the bankruptcy petition was filed, and Movant would have been entitled to relief from stay to proceed with these actions.

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c. ☐ Other:

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                    Page 4                    **F 4001-1.RFS.UD.MOTION**

100638585

7. **Evidence in Support of Motion:** (*Important Note: Declaration(s) in support of the Motion MUST be signed under penalty of perjury and attached to this motion.*)

    a.   The UNLAWFUL DETAINER DECLARATION on page 7.

    b.   ☒ Supplemental declaration(s).

    c.   ☐ Other (*specify*):

**Movant requests the following relief.**

1. Relief from stay pursuant to:   ☒ 11 U.S.C. § 362(d)(1)   ☒ 11 U.S.C. § 362(d)(2)

2. ☒ Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to obtain possession of the Property.

3. ☐ Confirmation that there is no stay in effect.

4. ☒ The stay is annulled retroactive to the bankruptcy petition date. Any postpetition acts taken by Movant to enforce its remedies regarding the Property shall not constitute a violation of the stay.

5. ☐ The co-debtor stay of 11 U.S.C. § 1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

6. ☒ The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

7. ☐ A designated law enforcement officer may evict the Debtor and any other occupant from the Property regardless of any future bankruptcy filing concerning the Property for a period of 180 days from the hearing of this motion:
    without further notice.
    ☐ upon recording of a copy of the order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

8. ☐ Relief from stay is granted under 11 U.S.C. § 362(d)(4), if the order granting this motion is recorded in compliance with state laws governing notices of interest or liens in real property, the order is binding in any other case under this title purporting to affect the Property filed not later than two years after the date of entry of such order, except that a debtor in a subsequent case under this title may move for relief from the order based upon changed circumstances or for good cause shown, after notice and a hearing.

9. ☐ The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days from the hearing of this Motion:
    ☐ without further notice.
    ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

10. ☐ The order is binding in any other bankruptcy case purporting to affect the Property filed not later than 2 years after the date of entry of such order, except that a debtor in a subsequent case may move for relief from the order based upon changed circumstances or for good cause shown, after notice and a hearing.

11. ☐ The order is binding and effective in any bankruptcy case commenced by or against the Debtor for a period of 180 days, so that no further automatic stay shall arise in that case as to the Property.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*            Page 5            **F 4001-1.RFS.UD.MOTION**

100638585

12. ☐ If relief from stay is not granted with respect to the Property because the Property is the subject of a lease that may be assumable;

    a. ☐ Establishment of a deadline for assumption or rejection of the lease.

    b. ☐ Adequate protection in the form of regular payments at the lease rate from petition date until assumption or rejection of the lease.

13. ☐ Other relief requested.

Date: June 15, 2022

                                    Nussbaum APC
                                    Print name of law firm (*if applicable*)

                                    Lane Nussbaum
                                    Print name of individual Movant or attorney for Movant (*if applicable*)

                                       /s/ Lane Nussbaum
                                    Signature of individual Movant or attorney for Movant

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

100638585

## UNLAWFUL DETAINER DECLARATION

I, (*name of declarant*) __Edward Hudson_____ , declare as follows:

1.  I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto.  I am over 18 years of age.  I have knowledge regarding Movant's interest in the Property because (*specify*):

    a.  ☐  I am the Movant and owner of the Property.

    b.  ☒  I manage the Property as the authorized agent for the Movant.

    c.  ☐  I am employed by Movant as (*title and capacity*):

    d.  ☐  Other (*specify*):

2.  a.  ☒  I am one of the custodians of the books, records and files of Movant as to those books, records and files that pertain to the rental of this Property.  I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event.  The business records are available for inspection and copies can be submitted to the court if required.

    b.  ☐  Other (see attached):

3.  The Property is:

    ☐ Residential  ☒ Nonresidential

    *Street Address*: 9808 Venice Blvd., Suite 503
    *Unit/Suite Number*:
    *City, State, Zip Code*: Los Angeles, CA, 90232

4.  Movant is the     legal owner of the Property, or  ☒ the owner's legally authorized agent.  A true and correct copy of the trustee's deed upon sale, lease, rental agreement, or other document evidencing Movant's interest in the Property is attached as Exhibit _1____.  A true and correct copy of the applicable document establishing Movant's authority as agent for the owner is attached as Exhibit _____.

5.  The Debtor asserts a possessory interest in the Property based upon:

    (1) ☐  a month-to-month tenancy

    (2) ☒  a lease that is in default

    (3) ☐  after a foreclosure sale that was held on (*date*): _____.

    (4) ☐  other (*specify*):

6.  The Debtor failed to pay:

    a.  ☒  The monthly rent of $_12,095.00_____ beginning on (*date*): _02/01/2021__.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

100638585

b. ☒ Other obligations including:

(1) ☒ Common area maintenance charges

(2) ☐ Property taxes

(3) ☐ Other obligations (*specify*):

7. Procedural status

a. ☐ The lease matured or was rejected on (*date*) _____:

(1) ☐ by operation of law.

(2) ☐ by order of the court.

b. ☒ Movant caused a notice to quit to be served upon the Debtor on (*date*) <u>January 19, 2022</u>, and a true and correct copy is attached as Exhibit <u>2</u>.

c. ☒ Before the bankruptcy petition was filed:

(1) ☒ Movant filed a complaint for unlawful detainer against the Debtor on (*date*) <u>February 10, 2022</u>, and a true and correct copy is attached as Exhibit <u>3</u>.

(2) ☐ Trial was held on (*date*) _____.

(3) ☐ Trial was continued to (*date*) _____.

(4) ☒ An unlawful detainer judgment against the Debtor was entered on the complaint for unlawful detainer on (*date*) <u>03/31/2022</u>, and a true and correct copy is attached as Exhibit <u>4</u>.

(5) ☐ A writ of possession for the Property was issued on (*date*) _____, and a true and correct copy is attached as Exhibit _____.

d. After the bankruptcy petition was filed:

(1) ☒ The Debtor has not filed and served on the Movant the certification required under 11 U.S.C. § 362(l)(1).

(2) ☒ The Debtor or adult dependent of the Debtor has not deposited with the clerk any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

(3) ☒ The Debtor or adult dependent of the Debtor has not filed and served on the Movant the further certification required under 11 U.S.C. § 362(l)(2) that the entire monetary default that gave rise to the judgment has been cured.

(4) ☐ The Debtor filed and served on the Movant the certification required under 11 U.S.C. § 362(d)(1).

(A) ☐ Movant filed and served an objection a copy of which is attached as Exhibit _____. A hearing on this objection is set for (*date*) _____.

(B) ☐ Movant has not filed and served an objection.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                    Page 8                    **F 4001-1.RFS.UD.MOTION**

100638585

(5) ☐ An unlawful detainer action was filed to obtain possession of the Property on grounds of endangerment of the Property or because of illegal use of controlled substances on the Property and Movant has filed a certification that ☐ such action was filed or ☐ that the Debtor has endangered the Property within 30 days preceding the certification or allowed the illegal use of controlled substances on the Property. A copy of Movant's certification is attached hereto as Exhibit _____. The Debtor ☐ has ☐ has not filed an objection to Movant's certification. A copy of the Debtor's objection, if filed, is attached as Exhibit ____. A hearing on this objection is set for: _____.

(6) ☒ Regular lease payments have not been made after the bankruptcy petition was filed.

8.  ☒ The Debtor does not have an interest in the Property that could be assumed or assigned under 11 U.S.C. § 365.

9.  ☒ The Property is not necessary to an effective reorganization because it is:

   a.  ☐ Residential, and is not producing income for the Debtor.

   b.  ☒ Commercial, but no reorganization is reasonably in prospect.

   c.  ☐ No longer property of the estate.

   d.  ☐ Other (specify):


10. ☐ The bankruptcy case was filed in bad faith:

   a.  ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

   b.  ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

   c.  ☐ The Debtor filed only a few case commencement documents. Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

   d.  ☐ Other (specify):


11. ☐ The filing of the bankruptcy petition was part of a scheme to delay, hinder or defraud creditors that involved:

   a.  ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page of facts establishing the scheme.

   b.  ☐ Multiple bankruptcy cases affecting the Property include:

   (1) Case name: _____
       Chapter: _____    Case number: _____
       Date filed: _____        Date discharged: _____    Date dismissed: _____
       Relief from stay regarding the Property ☐ was ☐ was not granted.

   (2) Case name: _____
       Chapter: _____    Case number: _____
       Date filed: _____        Date discharged: _____    Date dismissed: _____
       Relief from stay regarding the Property ☐ was ☐ was not granted.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

100638585

(3) Case name: _____

    Chapter: _____    Case number: _____

    Date filed: _____    Date discharged: _____    Date dismissed: _____

    Relief from stay regarding the Property ☐ was ☐ was not granted.

☐ See attached continuation page for information about other bankruptcy cases affecting the Property.

☐ See attached continuation page for additional facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, or defraud creditors.

12. ☒ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

  a. ☒ These actions were taken before Movant knew the bankruptcy petition was filed, and Movant would have been entitled to relief from stay to proceed with these actions.

  b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

  c. ☒ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| Apr 27, 2022 | Edward Hudson | _signature_ |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 10                        F 4001-1.RFS.UD.MOTION

100638585

# EXHIBIT 1

100638585

> *This First Amendment to Lease is non-binding unless signed by both Lessor and Lessee and further,
> unless signed by Lessee and delivered to Lessor by Friday, January 15, 2021 at 5:00 pm,
> the terms and conditions offered herein shall be withdrawn and become null and void.*

## FIRST AMENDMENT TO LEASE

This First Amendment to Lease (this "Amendment") dated as of December 5, 2020 is entered into by and between Culver City Medical Tower, LLC, a Delaware limited liability company doing business as Brotman Physicians Plaza ("Lessor") and Henry Louis Kirsch, M.D., an individual and Michael B. Kamiel, M.D., an individual ("Lessee"), with reference to the following:

A. Lessor and Lessee have entered into that certain Lease dated January 21, 2016 (the "Lease"), with reference to **Suite 503** (the "Premises") of the building located at 9808 Venice Boulevard, Los Angeles, California (the "Building").

B. Effective November 1, 2020 (the "Effective Date"), the parties hereto desire to modify the Lease in the respects hereinafter set forth. This Amendment shall supplement and amend the Lease and the provisions set forth below shall supersede any inconsistent provisions set forth in the Lease. All other terms and conditions of the Lease shall be in full force and effect. Except as may be otherwise specifically provided below, any terms used below which are defined in the Lease shall have their respective meanings set forth in the Lease. This Amendment shall become binding upon Lessor and Lessee only if fully executed by both parties.

NOW, THEREAFTER, in consideration of the foregoing, the parties hereto agree as follows:

1. **Lessee (Section 1.1).** Commencing February 1, 2021, Lessee shall be Michael B. Kamiel, M.D., an individual. Henry Louis Kirsch, M.D., an individual shall be released of all obligations under the Lease.

2. **Lease Term (Paragraph 1.5).** The Term of the Lease shall expire on January 31, 2026.

3. **Base Rent (Paragraph 1.6).** Commencing February 1, 2021, the Base Rent shall be $12,095.00 per month, plus all applicable rent increases.

4. **Base Rent (Paragraph 1.6).** Provided Lessee is not in default of the Lease, the monthly Base Rent for February and August 2021, February and August 2022, February and August 2023, February and August 2024, and February and August 2025 shall be discounted by fifty percent (50%) for these months only.

5. **Base Year (Paragraph 4.2b).** Commencing January 1, 2021, the Base Year shall be 2021.

6. **Guaranty of Lease.** Concurrently with the execution of this First Amendment to Lease, Michael B. Kamiel, M.D. shall execute a replacement Guaranty of Lease, attached hereto as Exhibit "A" and made part of this Amendment. Effective as of February 1, 2021, Henry Louis Kirsch, M.D. shall be released of all obligations as Guarantor.

7. **Lessee's Obligation (Section 7.2).**

   7.1. **Lessee's Medical Equipment.** Notwithstanding anything to the contrary contained in this Section 7 of the Lease, all of Lessee's medical equipment, including but not limited to any, surgical equipment, gas and/or water lines, compressor systems, dental chairs, battery back-up systems, and/or any other medical equipment exclusive to Lessee shall be the sole responsibility of Lessee. Any costs of repair, maintenance, and/or replacement of said medical equipment shall be exclusively borne by Lessee. Lessee must maintain said equipment in good working order with periodic inspection of equipment to verify equipment is functioning appropriately and free from leaks.

   7.2. **Plumbing.** Plumbing fixtures in the Premises for the sole use of Lessee, including but not limited to toilets, sinks, and floor drains, (hereby called "Plumbing Fixtures") shall be used only for purposes for which constructed, and any damage resulting to any Plumbing Fixtures from misuse by Lessee shall be paid by Lessee and Lessor shall not in any case be responsible therefore. Any and all costs in connection with the repairs, maintenance, and/or replacement of said Plumbing Fixtures, beyond normal wear and tear, will be Lessee's sole responsibility. Lessee shall cause to be performed periodic inspection of plumbing connections by certified plumber within the Premises to ensure that all Plumbing Fixtures are in good working order. Plumbing Fixtures Lessee must observe strict care and caution that all water faucets and water apparatus (including water shut-off valves) are shut off before Lessee or its employees leave the Premises.

   7.3. **Independent/Supplement HVAC Systems.** In the event there is an independent/supplemental HVAC system installed in the Premises for the exclusive use of Lessee, or should an independent/supplemental be HVAC installed any time during the Term of the Lease, any and all costs associated with the maintenance, repairs, and/or replacement of the independent/supplemental HVAC system shall be borne by Lessee. Lessor shall retain a maintenance and service contract with Lessor's approved HVAC vendor

at Lessee's sole expense (the "Maintenance Contract") for the independent/supplemental HVAC system and bill Lessee accordingly. Additionally, in consideration of the excess utility usage, Lessee shall pay to Lessor as additional rent on the 1st of each month, an amount Lessor deems reason for the cost of said excess utility usage.

8. **Notices (Paragraph 23).** Notwithstanding anything to the contrary contained in Paragraph 23 of the Lease, Lessor at its option shall also send notices regarding rent to the following email address: or to another email address, as specified by Lessee to Lessor.

9. **ACH/Direct Deposit Transactions (Paragraph 4.1).** Lessee shall pay Base Rent directly to Lessor electronically via either Automated Clearing House (ACH) payment or via Lessee initiated direct deposit payment into a bank account specified by Lessor, as may be updated from time to time. Lessee may make arrangements with Lessor to pay Base Rent through other agreed upon methods.

No further text on this page.





WITNESS WHEREOF, the parties have hereunder set their hands and seals this _____ day of _____, 20___.

**"LESSOR"**

Culver City Medical Tower, LLC,
a Delaware limited liability company

By:    Vendel Equities, LLC
        a California limited liability company
Its:    Sole Member


By:    _Edward G. Hudson_
Its:    Manager

Executed at: _____

On: _____

Address: _____

_____

**"LESSEE"**

Michael B. Kamiel, M.D., an individual


By: _____
        Michael B. Kamiel, M.D.
Its: _____

Executed on: _____

*Acknowledged and Accepted by:*
Henry Louis Kirsch, M.D., an individual


By: _____
        Henry Louis Kirsch, M.D.
Its: _____

Executed on: Dec 17, 2020

**GUARANTY OF LEASE**

WHEREAS, Culver City Medical Tower, LLC a Delaware limited liability company, DBA Brotman Physicians Plaza, hereinafter Lessor, and Michael B. Kamiel, M.D., an individual, hereinafter Lessee, are about to execute a document entitled First Amendment to Lease dated December 5 2020 concerning the Premises commonly known as Suite 503 located at 11645 Wilshire Boulevard, Los Angeles, California, wherein Lessor has leased the Premises to Lessee, and

WHEREAS, Michael B. Kamiel, M.D., hereinafter Guarantor has a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantor did not execute and deliver to Lessor this Guaranty of Lease.

NOW THEREFORE, in consideration of the execution of the forgoing Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantor hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed that the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a course of conduct, and said Lease may be assigned by Lessor or any assignee of Lessor without consent or notice to Guarantor and that this Guaranty shall guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantor, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantor following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantor hereunder following any breach or default by Lessee without first proceeding against Lessee and without previous notice to or demand upon either Lessee or Guarantor.

Guarantor hereby waives (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantor or any other person or entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantor, (g) any right of subrogation.

Guarantor does hereby subrogate all existing or future indebtedness of Lessee to Guarantor to the obligations owed to Lessor under the Lease and this Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided shall be deemed to also require the Guarantor hereunder to do and provide the same.

The term Lessor refers to and means the Lessor named in the Lease and also Lessor's successors and assigns. So long as Lessor's interest in the Lease, the leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantor of the Lessor's interest shall affect the continuing obligation of Guarantor under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term Lessee refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

In the event any action be brought by said Lessor against Guarantor hereunder to enforce the obligation of Guarantor hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee which shall be fixed by the court.

**"GUARANTOR"**
Michael B. Kamiel, M.D.

By: _____
Michael B. Kamiel, M.D.

Date: _____

*The terms offered herein shall expire if a Lease is not executed by Lessee and delivered to Lessor by Friday, January 29, 2016*

# MEDICAL OFFICE LEASE

1.    **Basic Lease Provisions** ("Basic Lease Provisions")

1.1    **Parties:**  This Lease, dated, for reference purposes only, JANUARY 21, 2016, is made by and between CULVER CITY MEDICAL TOWER, LLC A DELAWARE LIMITED LIABILITY COMPANY, DBA BROTMAN PHYSICIANS PLAZA (herein called "Lessor") and HENRY LOUIS KIRSCH, M.D., AN INDIVIDUAL AND MICHAEL B. KAMIEL, M.D., AN INDIVIDUAL (herein called "Lessee").

1.2    **Premises:**  Suite Number 503, consisting of approximately not less than 2,419 rentable square feet, more or less, as defined in Paragraph 2 and as shown on Exhibit "A" hereto (the "Premises").

1.3    **Building:**  Commonly described as being located at 9808 VENICE BOULEVARD, in the City of LOS ANGELES, County of LOS ANGELES, State of CALIFORNIA, as defined in Section 2.

1.4    **Use:**  MEDICAL OFFICE, subject to Paragraph 6.

1.5    **Term:**  FIVE years commencing FEBRUARY 1, 2016 ("Commencement Date") and ending JANUARY 31, 2021 as defined in Paragraph 3.

1.6    **Base Rent:**  $9,202.95 per month, payable on the FIRST day of each month, commencing FEBRUARY 1, 2016 per Paragraph 4.1.

1.7    **Base Rent Increase:**  On EACH ANNUAL ANNIVERSARY OF THE COMMENCEMENT DATE OF THIS LEASE the monthly Base Rent payable under Paragraph 1.6 above shall be adjusted as provided in Paragraph 4.3 below.

1.8    **Rent Paid Upon Execution:**  $9,202.95 for the first month's Base Rent.

1.9    **Security Deposit:**  $0.00 due upon Lease execution.

1.10    **Lessee's Share of Operating Expense Increase:**  4.9% as defined in Paragraph 4.2.

2.    **Premises, Parking and Common Areas.**

2.1    **Premises.**

2.1.1    The Premises are a portion of a building, herein sometimes referred to as the "Building" identified in paragraph 1.3 of the Basic Lease Provisions.  "Building" shall include adjacent parking structures used in connection therewith.  The Premises, the Building, the Common Areas, the land upon which the same are located, along with all other buildings and improvements thereon or thereunder, are herein collectively referred to as the "Office Building Project."  Lessor hereby leases to Lessee and Lessee leases from Lessor for the term, at the rental, and upon all of the conditions set forth herein, the real property referred to in the Basic Lease Provisions, paragraph 1.2, as the "Premises," including rights to the Common Areas as hereinafter specified.

2.1.2    Lessor's architect or space planner shall determine and certify in writing to Lessor the actual rentable area of the Premises and the Building, respectively, in accordance with then current Standard Methods of Measuring Floor Area in Office Buildings, as promulgated by the Building Owners and Management Association (BOMA) and the Base Rent, Lessee's Share of Operating Expense Increase, Vehicle Parking or any other provision of the Lease based on the size of the Premises shall be adjusted accordingly.

2.2    **Vehicle Parking.**  So long as Lessee is not in default, and subject to the rules and regulations attached hereto, and as established by Lessor from time to time, Lessee shall be entitled to rent and use FIVE (5) parking spaces in the Office Building Project at the monthly rate applicable from time to time for monthly parking as set by Lessor and/or its licensee.

2.2.1    If Lessee commits, permits or allows any of the prohibited activities described in the Lease or the rules then in effect, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.2.2    The monthly parking rate per parking space will be MARKET RATE per month at the commencement of the term of this Lease, and is subject to change upon five (5) days prior written notice to Lessee.  Monthly parking fees shall be payable one month in advance prior to the first day of each calendar month.

2.3    **Common Areas-Definition.**  The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Office Building Project that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and of other lessees of the Office Building Project and their respective employees, suppliers, shippers, customers and invitees, including but not limited to common entrances, lobbies, corridors, stairways and stairwells, public restrooms, elevators, escalators, parking areas to the extent not otherwise prohibited by this Lease, loading and unloading areas, trash areas, roadways, sidewalks, walkways, parkways, ramps, driveways, landscaped areas and decorative walls.

2.4    **Common Areas-Rules and Regulations.**  Lessee agrees to abide by and conform to the rules and regulations attached hereto as Exhibit B with respect to the Office Building Project and Common Areas, and to cause its employees, suppliers, shippers, customers, and invitees to so abide and conform.  Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to modify, amend and enforce said rules and regulations.  Lessor shall not be responsible to Lessee for the non-compliance with said rules and regulations by other lessees, their agents, employees and invitees of the Office Building Project;

2.5    **Common Areas-Changes.**  Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)    To make changes to the Building interior and exterior and Common Areas, including, without limitation, changes in the location, size, shape, number, and appearance thereof, including but not limited to the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, decorative walls, landscaped areas and walkways; provided, however, Lessor shall at all times provide the parking facilities required by applicable law;

(b) To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)    To designate other land and improvements outside the boundaries of the Office Building Project to be a part of the Common Areas, provided that such other land and improvements have a reasonable and functional relationship to the Office Building Project;

(d)    To add additional buildings and improvements to the Common Areas;

(e)    To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Office Building Project, or any portion thereof;

(f)    To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Office Building Project as Lessor may, in the exercise of sound business judgment deem to be appropriate.

3.    **Term.**

3.1    **Term.**  The term and Commencement Date of this Lease shall be as specified in paragraph 1.5 of the Basic Lease Provisions.

3.2    **Delay in possession.**  Notwithstanding said Commencement Date, if for any reason Lessor cannot deliver possession of the Premises to Lessee on said date and subject to paragraph 3.2.2, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Lessee hereunder or extend the term hereof; but, in such case, Lessee shall not be obligated to pay rent or perform any other obligation of Lessee under the terms of this Lease, except as may be otherwise provided in this Lease, until possession of the Premises is tendered to Lessee, as hereinafter defined; provided, however, that if Lessor shall not have delivered possession of the Premises within sixty (60) days following said Commencement Date, as the same may be extended under the terms of a Work Letter executed by Lessor and Lessee, Lessee may, at Lessee's option, by notice in writing to Lessor within ten (10) days thereafter, cancel this Lease, in which event the parties shall be discharged from all obligations hereunder;

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Page 1 of 12

Initial: _____

provided, however, that, as to Lessee's obligations, Lessee first reimburses Lessor for all costs incurred for Non-Standard Improvements and, as to Lessor's obligations, Lessor shall return any money previously deposited by Lessee (less any offsets due Lessor for Non-Standard Improvements); and provided further, that if such written notice by Lessee is not received by Lessor within said ten (10) day period, Lessee's right to cancel this Lease hereunder shall terminate and be of no further force or effect.

3.2.1    **Possession Tendered-Defined.**  Possession of the Premises shall be deemed tendered to Lessee ("Tender of Possession") when (1) the improvements to be provided by Lessor under this Lease are substantially completed, (2) the Building utilities are ready for use in the Premises, (3) Lessee has reasonable access to the Premises, and (4) ten (10) days shall have expired following advance written notice to Lessee of the occurrence of the matters described in (1), (2) and (3), above in this Paragraph 3.2.1.

3.2.2    **Delays Caused by Lessee.**  There shall be no abatement of rent for any delay caused by Lessee.  If there is any delay caused by the acts or omissions of Lessee, Lessee's agents, employees or contractors, and that delay in the aggregate exceeds fifteen (15) days, Lessee's right to terminate the Lease, if any, under Paragraph 3.2, or otherwise, is terminated and waived and of no force or effect and Lessee waives any and all claims against Lessor in connection with any delay caused by Lessee.

3.3    **Early Possession.**  If Lessee occupies the Premises prior to said Commencement Date, such occupancy shall be subject to all provisions of this Lease, such occupancy shall not change the termination date, and Lessee shall pay rent for such occupancy.

3.4    **Uncertain Commencement.**  In the event commencement of the Lease term is defined as the completion of the improvements, Lessee and Lessor shall execute an amendment to this Lease establishing the date of Tender of Possession (as defined in paragraph 3.2.1) or the actual taking of possession by Lessee, whichever first occurs, as the Commencement Date.

3.5    **Reversion.**  Lessee acknowledges that the Premises and Project are subject to a Declaration of Covenants, Conditions and Restrictions (the "CC&R's), a copy of which has been provided to Lessee by Lessor, in favor of  Brotman Medical Center, Inc., a California Corporation (the "Declarant") with regard to the Premises and the Office Building Project. Lessee agrees that it will do not anything which will constitute a violation of the CC&Rs.

**4.    Rent.**

4.1    **Base Rent.**  Subject to adjustment as hereinafter provided in Paragraph 4.3, and except as may be otherwise expressly provided in this Lease, Lessee shall pay to Lessor the Base Rent for the Premises set forth in paragraph 1.6 of the Basic Lease Provisions, without offset or deduction. Lessee shall pay Lessor upon execution hereof the advance Base Rent described in paragraph 1.8 of the Basic Lease Provisions.  Rent for any period during the term hereof which is for less than one month shall be prorated based upon the actual number of days of the calendar month involved.  Rent shall be payable in lawful money of the United States to Lessor at the address stated herein or to such other persons or at such other places as Lessor may designate in writing.

4.2    **Operating Expense Increase.**  Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share, as hereinafter defined, of the amount by which all Operating Expenses, as hereinafter defined, for each Comparison Year exceeds the amount of all Operating Expenses for the Base Year such excess being hereinafter referred to as the "Operating Expense Increase," in accordance with the following provisions:

(a)    "Lessee's Share" is defined, for purposes of this Lease, as the percentage set forth in paragraph 1.10 of the Basic Lease Provisions, which percentage has been determined by dividing the approximate square footage of the Premises by the total approximate square footage of the rentable space contained in the Office Building Project.  It is understood and agreed that the square footage figures set forth in the Basic Lease Provisions are approximations, which Lessor and Lessee agree are reasonable and shall not be subject to revision except in connection with an actual change in the size of the Premises or a change in the space available for lease in the Office Building Project.

(b)    "Base Year" is defined as the calendar year in which the Lease term commences.

(c)    "Comparison Year" is defined as each calendar year during the term of this Lease subsequent to the Base Year.  Lessee's Share of the Operating Expense Increase for the last Comparison Year of the Lease Term shall be prorated according to that portion of such Comparison Year as to which Lessee is responsible for a share of such increase.

(d)    "Operating Expenses" is defined, for purposes of this Lease, to include all costs, if any, incurred by Lessor in the exercise of its reasonable discretion, for:

(i)    The operation, repair, maintenance, and replacement, in neat, clean, safe, good order and condition, of the Office Building Project, including but not limited to, the following:

(aa)    The Common Areas, including their surfaces, coverings, decorative items, carpets, drapes and window coverings, and including parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, stairways, parkways, driveways, landscaped areas, striping, bumpers, irrigation systems, Common Area lighting facilities, building exteriors and roofs, fences and gates;

(bb)    All heating, air conditioning, plumbing, electrical systems, life safety equipment, telecommunication and other equipment used in common by, or for the benefit of, lessees or occupants of the Office Building Project, including elevators and escalators, tenant directories, fire detection systems including sprinkler system maintenance and repair.

(ii)    Trash disposal, janitorial and security services;

(iii)    Any other service to be provided by Lessor that is elsewhere in this Lease stated to be an "Operating Expense";

(iv)    The cost of the premiums for the liability and property insurance policies to be maintained by Lessor under Paragraph 8 hereof;

(v)    The amount of the real property taxes to be paid by Lessor under paragraph 10.1 hereof;

(vi)    The cost of water, sewer, gas, electricity, and other publicly mandated services to the Office Building Project;

(vii)    Labor, salaries and applicable fringe benefits and costs, materials, supplies and tools, used in maintaining and/or cleaning the Office Building Project and accounting and a management fee attributable to the operation of the Office Building Project;

(viii)    Replacing and/or adding improvements mandated by any governmental agency and any repairs or removals necessitated thereby amortized over its useful life according to Federal income tax regulations or guidelines for depreciation thereof (including interest on the unamortized balance as is then reasonable in the judgment of Lessor's accountants);

(ix)    Replacements of equipment or improvements that have a useful life for depreciation purposes according to Federal income tax guidelines of five (5) years or less, as amortized over such life.

(e)    Operating Expenses shall not include the costs of replacements of equipment or improvements that have a useful life for Federal income tax purposes in excess of five (5) years unless it is of the type described in paragraph 4.2(d)(viii), in which case their cost shall be included as above provided.

(f)    Operating Expenses shall not include any expenses paid by any lessee directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or by insurance proceeds.

(g)    Lessee's Share of Operating Expense Increase shall be payable by Lessee within ten (10) days after a reasonably detailed statement of actual expenses is presented to Lessee by Lessor.  At Lessor's option, however, an amount may be estimated by Lessor from time to time in advance of Lessee's Share of the Operating Expense Increase for any Comparison Year, and the same shall be payable monthly or quarterly, as Lessor shall designate, during each Comparison Year of the Lease term, on the day as the Base Rent is due hereunder.  In the event that Lessee pays Lessor's estimate of Lessee's Share of Operating Expense Increase as aforesaid, Lessor shall deliver to Lessee within ninety (90) days after the expiration of each Comparison Year a reasonably detailed statement showing Lessee's Share of the actual Operating Expense Increase incurred during such year.  If Lessee's payments under this paragraph 4.2(g) during said Comparison Year exceed Lessee's Share as indicated on said statement, Lessee shall be entitled to credit the amount of such overpayment against Lessee's Share of Operating Expense Increase next falling due.  If Lessee's payments under this paragraph during said Comparison Year were less than Lessee's Share as indicated on said statement, Lessee shall pay to Lessor the amount of the deficiency within ten (10) days after delivery by Lessor to Lessee of said statement.  Lessor and Lessee shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last Comparison Year for which Lessee is responsible as to Operating Expense Increases, notwithstanding that the Lease term may have terminated before the end of such Comparison Year.

4.3    **Base Rent Increase.**

Initial

4.3.1    At the times set forth in Paragraph l.7 of the Basic Lease Provisions, the monthly Base Rent payable under Paragraph 4.1 of this Lease shall be adjusted by the increase, if any, in the Consumer Price Index of the Bureau of Labor Statistics of the Department of Labor for All Urban Consumers, (1982-84=100), "All items" for the city nearest the location of the Building, herein referred to as "C.P.I." since the date of this Lease.

4.3.2    The monthly Base Rent payable pursuant to Paragraph 4.3.1 shall be calculated as follows: the Base Rent payable for the first month of the term of this Lease, as set forth in paragraph 4.1 of this Lease, shall be multiplied by a fraction the numerator of which shall be the C.P.I. of the calendar month during which the adjustment is to take effect, and the denominator of which shall be the C.P.I. for the calendar month during which the original Lease term commences. The sum so calculated shall constitute the new monthly Base Rent hereunder, but, in no event, shall such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the date for the rent adjustment.

4.3.3    In the event the compilation and/or publication of the C.P.I. shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the Index most nearly the same as the C.P.I. shall be used to make such calculations. In the event that Lessor and Lessee cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in the County in which the Premises are located, in accordance with the then rules of said association and the decision of the arbitrators shall be binding upon the parties, notwithstanding one party failing to appear after due notice of the proceeding. The cost of said Arbitrators shall be paid equally by Lessor and Lessee.

4.3.4    Lessee shall continue to pay the Base Rent at the rate previously in effect until the increase, if any is determined. Within five (5) days following the date on which the increase is determined, Lessee shall make such payment to Lessor as will bring the increased rental current, commencing with the effective date of such increase through the date of any rental installments then due. Thereafter the rental shall be paid at the increased rate.

4.3.5    At such time as the amount of any change in rental required by this Lease is known or determined, Lessor and Lessee shall execute an amendment to this Lease setting forth such change.

**5.    Security Deposit.**  Lessee shall deposit with Lessor upon execution hereof the security deposit set forth in paragraph 1.9 of the Basic Lease Provisions as security for Lessee's faithful performance of Lessee's obligations hereunder. If Lessee fails to pay rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, Lessor may use, apply or retain all or any portion of said deposit for the payment of any rent or other charge in default for the payment of any other sum to which Lessor may become obligated by reason of Lessee's default, or to compensate Lessor for any loss or damage which Lessor may suffer thereby. If Lessor so uses or applies all or any portion of said deposit, Lessee shall within ten (10) days after written demand therefor deposit cash with Lessor in an amount sufficient to restore said deposit to the full amount then required of Lessee. If the monthly Base Rent shall, from time to time, increase during the term of this Lease, Lessee shall, at the time of such increase, deposit with Lessor additional money as a security deposit so that the total amount of the security deposit held by Lessor shall at all times bear the same proportion to the then current Base Rent as the initial security deposit bears to the initial Base Rent set forth in paragraph 1.6 of the Basic Lease Provisions. Lessor shall not be required to keep said security deposit separate from its general accounts. If Lessee performs all of Lessee's obligations hereunder, said deposit, or so much thereof as has not heretofore been applied by Lessor, shall be returned, without payment of interest or other increment for its use, to Lessee (or, at Lessor's option, to the last assignee, if any, of Lessee's interest hereunder) at the expiration of the term hereof, and after Lessee has vacated the Premises. No trust relationship is created herein between Lessor and Lessee with respect to said Security Deposit.

**6.    Use.**

6.1    **Primary Uses.**  For so long as an acute care hospital (the "Hospital") is operated on the real property adjacent to the Office Building Project described in Exhibit "2" of the CC&R's ("Hospital Land"):  Lessee shall use the Premises solely for purposes permitted under the CC&Rs without the consent of Declarant and which    are not prohibited under the Use Restrictions (as defined in below) As used herein, the term "Use Restrictions" shall refer collectively to the restrictions on the use of the Premises set forth in Paragraph 1.4 of the Basic Lease Provisions, the CC&Rs and to the use restrictions as defined in paragraph 6.2 below.  All subleases, and any assignments of this Lease or any subleases hereunder, shall contain provisions requiring compliance with the Use Restrictions.

6.2    **Use Restrictions.**  Subject to the provisions of the CC&R's Lessee agrees that, for so long as there is an acute care hospital operating on the Hospital Land, the following existing and projected services shall, as free-standing services, be reserved exclusively to the Hospital and excluded as permissible uses within the Office Building Project, unless the Declarant, consents to such use as provided herein: (i) ambulatory or out-patient surgery center (including endoscopy); (ii) radiological services, including radiation and nuclear medicinal therapy, computerized tomography, ultrasound and nuclear diagnostic imaging, mammography, PET Scanner, CT and MRI (collectively, "Imaging Services"); (iii) cardiac catheterization laboratory; (iv) physical therapy; (v) occupational and respiratory therapy; (vi) drug and alcohol abuse and addiction clinic; (vii) emergency care center; (viii) cardiac rehabilitation center; (ix) pulmonary function testing center; (x) speech therapy center; (xi) wound care center; (xii) infusion center; (xiii) outpatient rehabilitation center; (xiv) urgent care center; (xv) psychiatric urgent care center; (xvi) outpatient psychiatric programs that are not normally provided by individual psychiatrists in their individual offices as a customary part of their practice; (xvii) adult daycare center; (xviii) Alzheimer's center; (xix) arthritis treatment center; (xx) independent alternative medicine center; (xxi) sleep center; and (xxii) laboratories other than laboratories that are "drawing stations".

6.3    **Release of Prohibitions.**  Notwithstanding the provisions of paragraphs 6.1 and 6.2 above, the Use Restrictions shall not be construed to prohibit Lessee (or sublessees and/or proper occupants) of the Premises from performing laboratory, diagnostic or treatment services of a type listed in 6.2 of the Lease,  provided such services are provided by Lessee (or sublessees and/or proper occupants) to perform on its private patients within its offices in the ordinary course of treatment within its practice and further provided that such services are actually performed by Lessee (or sublessees and/or proper occupants) or its employees or affiliated companies (and not other occupants or  contractors) within its offices for its private patients.

6.4    **Termination of CC&Rs.**  In the event that the CC&Rs are terminated for any reason, the restrictions contained therein will continue to apply under this Lease, unless Lessor, in its sole discretion, waives them.

6.5    **Hazardous Materials.**  As used herein, "Hazardous Materials" shall mean any material, substance or waste that is or has the characteristic of being hazardous, toxic, ignitable, reactive or corrosive, including, without limitation, petroleum, PCBs, asbestos, materials known to cause cancer or reproductive problems and those materials, substances and/or wastes, including infectious waste, medical waste, and potentially infectious biomedical waste, which are or later become regulated by any governmental authority or agency of the United States, the State, the County, the City or any other local governmental authority or agency, including without limitation, substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "hazardous wastes" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §1801, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §6901, et seq.; and all corresponding and related statutes, ordinances and regulations of the State, County, City or other local governmental authority or agency, including without limitation, any such statutes, ordinances or regulations addressing underground storage tanks; and any other substances, materials law, regulation or ordinance now existing or hereinafter enacted (collectively, "Hazardous Materials Laws").  Lessee hereby agrees that Lessee and Lessee's officers, directors, employees, representatives, agents, contractors, subcontractors, successors, assigns, lessees, sublessees, concessionaires, invitees and any other tenants or occupants of the Premises (for purpose of this Section 6.5, singularly a "Lessee Representative" and collectively "Lessee Representatives") shall not use, generate, manufacture, refine, produce, process, store, handle or dispose of, on, under or about the Premises or the Office Building Project, or transport to or from the Premises or the Office Building Project for the purpose of using, generating, manufacturing, refining, producing, processing, storing, handling, disposing of or transporting on, under or about the Premises or the Office Building Project, any Hazardous Materials, except in compliance with all applicable Hazardous Materials Laws.  Lessee shall, at its own expense, procure, maintain in effect and comply with all conditions of any and all permits, licenses and other governmental and regulatory approvals required for the storage or use by Lessee or any Lessee Representative of Hazardous Materials on the Premises or in the Building, including without limitation, the discharge of materials or wastes into or through any sanitary sewer serving the Premises or the Office Building Project.  It shall be the sole responsibility of Lessee to have any Hazardous Materials removed from the Premises and the Office Building Project via a licensed bio-hazardous waste removal service.  All subleases of space within the Premises will contain use restrictions and limitations conforming to the terms of this Section 6.5, in form reasonably satisfactory to Lessor and Master Lessor.

6.6    **Compliance with Law.**

(a)    Lessor warrants to Lessee that the Premises, in the state existing on the Commencement Date, but without regard to alterations or improvements made by Lessee or the use for which Lessee will occupy the Premises, does not violate any covenants or restrictions of record, or any applicable building code, regulation or ordinance in effect on such Lease term Commencement Date.  In the event it is determined that this warranty has been violated, then it shall be the obligation of the Lessor, after written notice from Lessee, to promptly, at Lessor's sole cost and expense, rectify any such violation.

(b)    Except as provided in paragraph 6.6 (a) Lessee shall, at Lessee's expense, promptly comply with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements of any fire insurance underwriters or rating bureaus, now in effect or which may hereafter come into effect, whether or not they reflect a change in policy from that now existing, during the term or any part of the term hereof, relating in any manner to the Premises and the occupation and use by Lessee of the Premises.  Lessee shall conduct its business in a lawful manner and shall not use or permit the use of the Premises or the Common Areas in any manner that will tend to create waste or a nuisance or shall tend to disturb other occupants of the Office Building Project.

6.7    **Condition of Premises.**

(a)    Lessor shall deliver the Premises to Lessee in clean condition on the Lease Commencement Date (unless Lessee is already in possession) and Lessor warrants to Lessee that the plumbing, lighting, air conditioning, and heating system in the Premises shall be in good operating

**BROTMAN PHYSICIANS PLAZA**
**HENRY LOUIS KIRSCH, M.D. AND**
**MICHAEL B. KAMIEL, M.D.**

Initial: ___

condition. In the event that it is determined that this warranty has been violated, then it shall be the obligation of Lessor, after receipt of written notice from Lessee setting forth with specificity the nature of the violation, to promptly, at Lessor's sole cost, rectify such violation.

(b)     Except as otherwise provided in this Lease, Lessee hereby accepts the Premises and the Office Building Project in their condition existing as of the Lease Commencement Date or the date that Lessee takes possession of the Premises, whichever is earlier, subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Premises, and any easements, covenants or restrictions of record, and accepts this Lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto. Lessee acknowledges that it has satisfied itself by its own independent investigation that the Premises are suitable for its intended use, and that neither Lessor nor Lessor's agent or agents has made any representation or warranty as to the present or future suitability of the Premises, Common Areas, or Office Building Project for the conduct of Lessee's business.

**7.     Maintenance, Repairs, Alterations and Common Area Services.**

7.1     **Lessor's Obligations.** Lessor shall keep the Office Building Project, including the Premises, interior and exterior walls, roof, and common areas, and the equipment whether used exclusively for the Premises or in common with other premises, in good condition and repair; provided, however, Lessor shall not be obligated to paint, repair or replace wall coverings, or to repair or replace any improvements that are not ordinarily a part of the Building or are above then Building standards. Except as provided in paragraph 9.5, there shall be no abatement of rent or liability of Lessee on account of any injury or interference with Lessee's business with respect to any improvements, alterations or repairs made by Lessor to the Office Building Project or any part thereof. Lessee expressly waives the benefits of any statute now or hereafter in effect which would otherwise afford Lessee the right to make repairs at Lessor's expense or to terminate this Lease because of Lessor's failure to keep the Premises in good order, condition and repair.

7.2     **Lessee's Obligations.**

(a)     Notwithstanding Lessor's obligation to keep the Premises in good condition and repair, Lessee shall be responsible for payment of the cost thereof to Lessor as additional rent for that portion of the cost of any maintenance and repair of the Premises, or any equipment (wherever located) that serves only Lessee or the Premises, to the extent such cost is attributable to causes beyond normal wear and tear. Lessee shall be responsible for the cost of painting, repairing or replacing wall coverings, and to repair or replace any Premises improvements that are not ordinarily a part of the Building or that are above then Building standards. Lessor may, at its option, upon reasonable notice, elect to have Lessee perform any particular such maintenance or repairs the cost of which is otherwise Lessee's responsibility hereunder.

(b)     On the last day of the term hereof, or on any sooner termination, Lessee shall surrender the Premises to Lessor in the same condition as received, ordinary wear and tear excepted, clean and free of debris. Any damage or deterioration of the Premises shall not be deemed ordinary wear and tear if the same could have been prevented by good maintenance practices by Lessee. Lessee shall repair any damage to the Premises occasioned by the installation or removal of Lessee's trade fixtures, alterations, furnishings and equipment. Except as otherwise stated in this Lease, Lessee shall leave the air lines, power panels, electrical distribution systems, lighting fixtures, air conditioning, window coverings, wall coverings, carpets, wall paneling, ceilings and plumbing on the Premises and in good operating condition.

7.3     **Alterations and Additions.**

(a)     Lessee shall not, without Lessor's prior written consent make any alterations, improvements, additions, Utility Installations or repairs in, on or about the Premises, or the Office Building Project. As used in this paragraph 7.3 the term "Utility Installation" shall mean carpeting, window and wall coverings, power panels, electrical distribution systems, lighting fixtures, air conditioning, plumbing, and telephone and telecommunication wiring and equipment. At the expiration of the term, Lessor may require the removal of any or all of said alterations, improvements, additions or Utility Installations, and the restoration of the Premises and the Office Building Project to their prior condition, at Lessee's expense. Should Lessor permit Lessee to make its own alterations, improvements, additions or Utility Installations, Lessee shall use only such contractor as has been expressly approved by Lessor, and Lessor may require Lessee to provide Lessor, at Lessee's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of such improvements, to insure Lessor against any liability for mechanic's and materialmen's liens and to insure completion of the work. Should Lessee make any alterations, improvements, additions or Utility Installations without the prior approval of Lessor, or use a contractor not expressly approved by Lessor. Lessor may, at any time during the term of this Lease, require that Lessee remove any part or all of the same.

(b)     Any alterations, improvements, additions or Utility Installations in or about the Premises or the Office Building Project that Lessee shall desire to make shall be presented to Lessor in written form, with proposed detailed plans. If Lessor shall give its consent to Lessee's making such alteration, improvement, addition or Utility Installation, the consent shall be deemed conditioned upon Lessee acquiring a permit to do so from the applicable governmental agencies, furnishing a copy thereof to Lessor prior to the commencement of the work, and compliance by Lessee with all conditions of said permit in a prompt and expeditious manner.

(c)     Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use in the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises, the Building or the Office Building Project, or any interest therein.

(d)     Lessee shall give Lessor not less than ten (10) days' notice prior to the commencement of any work in the Premises by Lessee, and Lessor shall have the right to post notices of non -responsibility in or on the Premises or the Building as provided by law. If Lessee shall, in good faith, contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend itself and Lessor against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof against the Lessor or the Premises, the Building or the Office Building Project, upon the condition that if Lessor shall require, Lessee shall furnish to Lessor a surety bond satisfactory to Lessor in an amount equal to such contested lien claim or demand indemnifying Lessor against liability for the same and holding the Premises, the Building and the Office Building Project free from the effect of such lien or claim. In addition, Lessor may require Lessee to pay Lessor's reasonable attorneys' fees and costs in participating in such action if Lessor shall decide it is to Lessor's best interest so to do.

(e)     All alterations, improvements, and additions and Utility Installations (whether or not such Utility Installations constitute trade fixtures of Lessee), which may be made to the Premises by Lessee, including but not limited to, floor coverings, paneling, doors, drapes, built-ins, moldings, sound attenuation, and lighting and telephone or communication systems, conduit, wiring and outlets, shall be made and done in a good and workmanlike manner and of good and sufficient quality and materials and shall be the property of Lessor and remain upon and be surrendered with the Premises at the expiration of the Lease term, unless Lessor requires their removal pursuant to paragraph 7.3(a). Provided Lessee is not in default, notwithstanding the provisions of this paragraph 7.3(e), Lessee's personal property and equipment, other than that which is affixed to the Premises so that it cannot be removed without material damage to the Premises or the Building, and other than Utility Installations, shall remain the property of Lessee and may be removed by Lessee subject to the provisions of paragraph 7.2.

(f)     Lessee shall provide Lessor with as-built plans and specifications for any alterations, improvements, additions or Utility Installations.

7.4     **Utility Additions.** Lessor reserves the right to install new or additional utility facilities throughout the Office Building Project for the benefit of Lessor or Lessee, or any other lessee of the Office Building Project, including, but not by way of limitation, such utilities as plumbing, electrical systems, communication systems, and fire protection and detection systems, so long as such installations do not unreasonably interfere with Lessee's use of the Premises.

**8.     Insurance; Indemnity.**

8.1     **Liability Insurance-Lessee.** Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease a policy of Comprehensive General Liability insurance utilizing an Insurance Services Office standard form with Broad Form General Liability Endorsement (GL0404), or equivalent, in an amount of not less than $1,000,000 per occurrence of bodily injury and property damage combined or in a greater amount as reasonably determined by Lessor and shall insure Lessee with Lessor as an additional insured against liability arising out of the use, occupancy or maintenance of the Premises. Compliance with the above requirement shall not, however, limit the liability of Lessee hereunder.

8.2     **Liability Insurance-Lessor.** Lessor shall obtain and keep in force during the term of this Lease a policy of Combined Single Limit Bodily Injury and Broad Form Property Damage Insurance, plus coverage against such other risks Lessor deems advisable from time to time, insuring Lessor, but not Lessee, against liability arising out of the ownership, use, occupancy or maintenance of the Office Building Project in an amount not less than $5,000,000.00 per occurrence.

8.3     **Property Insurance-Lessee.** Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease for the benefit of Lessee, replacement cost fire and extended coverage insurance, with vandalism and malicious mischief, sprinkler leakage and earthquake sprinkler leakage endorsements, in an amount sufficient to cover not less than 100% of the full replacement cost, as the same may exist from time to time, of all of Lessee's personal property, fixtures, equipment and tenant improvements.

8.4     **Property Insurance-Lessor.** Lessor shall obtain and keep in force during the term of this Lease a policy or policies of insurance loss or damage to the Office Building Project improvements, but not Lessee's personal property, fixtures, equipment or tenant improvements, in the amount of the full replacement cost thereof, as the same may exist from time to time, utilizing Insurance Services Office standard form, or equivalent, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, plate glass, and such other perils as Lessor deems advisable or may be required by a lender having a lien on the Office Building Project. In addition, Lessor shall obtain and keep in force, during the term of this Lease, a policy of rental value insurance covering a period of one year, with loss payable to Lessor, which insurance shall also cover

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Page 4 of 12

Initial ___

all Operating Expenses for said period. Lessee will not be named in any such policies carried by Lessor and shall have no right to any proceeds therefrom. The policies required by these paragraphs 8.2 and 8.4 shall contain such deductibles as Lessor or the aforesaid lender may determine. In the event that the Premises shall suffer an insured loss as defined in paragraph 9.1(f) hereof, the deductible amounts under the applicable insurance policies shall be deemed an Operating Expense. Lessee shall not do, or permit to be done anything which shall invalidate the insurance policies carried by Lessor. Lessee shall pay the entirety of any increase in the property insurance premium for the Office Building Project over what it was immediately prior to the commencement of the term of this Lease if the increase is specified by Lessor's insurance carrier as being caused by the nature of Lessee's occupancy or any act or omission of Lessee.

8.5    **Insurance Policies.** Lessee shall deliver to Lessor copies of liability insurance policies required under paragraph 8.1 or certificates evidencing the existence and amounts of such insurance within seven (7) days after the Commencement Date of this Lease. No such policy shall be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Lessor. Lessee shall, at least thirty (30) days prior to the expiration of such policies, furnish Lessor with renewals thereof.

8.6    **Waiver of Subrogation.** Lessee and Lessor each hereby release and relieve the other and waive their entire right of recovery against the other, for direct or consequential loss or damage arising out of or incident to the perils covered by property insurance carried by such party, whether due to the negligence of Lessor or Lessee or their agents, employees, contractors and/or invitees. If necessary all property insurance policies required under this Lease shall be endorsed to so provide.

8.7    **Indemnity.** Lessee shall indemnify and hold harmless Lessor and its agents, Lessor's master or ground lessor partners and lenders, from and against any and all claims for damage to the person or property of anyone or any entity arising from Lessee's use of the Office Building Project, or from the conduct of Lessee's business or from any activity, work or things done, permitted or suffered by Lessee in or about the Premises or elsewhere and shall further indemnify and hold harmless Lessor from and against any and all claims, costs and expenses arising from any breach or default in the performance of any obligation on Lessee's part to be performed under the terms of this Lease, or arising from any act or omission of Lessee, or any of Lessee's agents, contractors, employees, or invitees, and from and against all costs, attorney's fees, expenses and liabilities incurred by Lessor as the result of any such use, conduct, activity, work, things done, permitted or suffered, breach, default or negligence, and in dealing reasonably therewith, including but not limited to the defense or pursuit of any claim or any action or proceeding involved therein; and in case any action or proceeding be brought against Lessor by reason of any such matter, Lessee upon notice from Lessor shall defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be so indemnified. Lessee, as a material part of the consideration to Lessor, hereby assumes all risk of damage to property of Lessee or injury to persons, in, upon or about the Office Building Project arising from any cause and Lessee hereby waives all claims in respect thereof against Lessor.

8.8    **Exemption of Lessor from Liability.** Lessee hereby agrees that Lessor shall not be liable for injury to Lessee's business or any loss of income therefrom or for loss of or damage to the goods, wares, merchandise or other property of Lessee, Lessee's employees, invitees, customers, or any other person in or about the Premises or the Office Building Project, nor shall Lessor be liable for injury to the person of Lessee, Lessee's employees, agents or contractors, whether such damage or injury is caused by or results from theft, fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures, or from any other cause, whether said damage or injury results from conditions arising upon the Premises or upon other portions of the Office Building Project, or from other sources or places, or from new construction or the repair, alteration or improvement of any part of the Office Building Project, or of the equipment, fixtures or appurtenances applicable thereto, and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible, Lessor shall not be liable for any damages arising from any act or neglect of any other lessee, occupant or user of the Office Building Project, nor from the failure of Lessor to enforce the provisions of any other lease of the Office Building Project.

8.9    **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified in this Paragraph 8 are adequate to cover Lessee's property or obligations under this Lease.

**9.    Damage or Destruction.**

9.1    **Definitions.**

(a)    "Premises Damage" shall mean if the Premises are damaged or destroyed to any extent.

(b)    "Premises Building Partial Damage" shall mean if the Building of which the Premises are a part is damaged or destroyed to the extent that the cost to repair is less than fifty percent (50%) of the then Replacement Cost of the building.

(c)    "Premises Building Total Destruction" shall mean if the Building of which the Premises are a part is damaged or destroyed to the extent that the cost to repair is fifty percent (50%) or more of the then Replacement Cost of the Building.

(d)    "Office Building Project Buildings" shall mean all of the buildings on the Office Building Project site.

(e)    "Office Building Project Buildings Total Destruction" shall mean if the Office Building Project Buildings are damaged or destroyed to the extent that the cost of repair is fifty percent (50%) or more of the then Replacement Cost of the Office Building Project Buildings.

(f)    "Insured Loss" shall mean damage or destruction which was caused by an event required to be covered by the insurance described in paragraph 8. The fact that an Insured Loss has a deductible amount shall not make the loss an uninsured loss.

(g)    "Replacement Cost" shall mean the amount of money necessary to be spent in order to repair or rebuild the damaged area to the condition that existed immediately prior to the damage occurring, excluding all improvements made by lessees, other than those installed by Lessor at Lessee's expense.

9.2    **Premises Damage; Premises Building Partial Damage.**

(a)    Insured Loss: Subject to the provisions of Paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage which is an Insured Loss and which falls into the classification of either Premises Damage or Premises Building Partial Damage, then Lessor shall, as soon as reasonably possible and to the extent the required materials and labor are readily available through usual commercial channels, at Lessor's expense, repair such damage (but not Lessee's fixtures, equipment or tenant improvements originally paid for by Lessee) to its condition existing at the time of the damage, and this Lease shall continue in full force and effect.

(b)    Uninsured Loss: Subject to the provisions of paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage which is not an Insured Loss and which falls within the classification of Premises Damage or Premises Building Partial Damage, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), which damage prevents Lessee from making any substantial use of the Premises, Lessor may at Lessor's option either (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) give written notice to Lessee within thirty (30) days after the date of the occurrence of such damage of Lessor's intention to cancel and terminate this Lease as of the date of the occurrence of such damage, in which event this Lease shall terminate as of the date of the occurrence of such damage.

9.3    **Premises Building Total Destruction; Office Building Project Total Destruction.** Subject to the provisions of paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage, whether or not it is an Insured Loss, which falls into the classifications of either (i) Premises Building Total Destruction, or (ii) Office Building Project Total Destruction, then Lessor may at Lessor's option either (i) repair such damage or destruction as soon as reasonably possible at Lessor's expense (to the extent the required materials are readily available through usual commercial channels) to its condition existing at the time of the damage, but not Lessee's fixtures, equipment or tenant improvements, and this Lease shall continue in full force and effect, or (II) give written notice to Lessee within thirty (30) days after the date of occurrence of such damage of Lessor's intention to cancel and terminate this Lease, in which case this Lease shall terminate as of the date of the occurrence of such damage.

9.4    **Damage Near End of Term.**

(a)    Subject to Paragraph 9.4(b), if at any time during the last twelve (12) months of the term of this Lease there is substantial damage to the Premises, Lessor may at Lessor's option cancel and terminate this Lease as of the date of occurrence of such damage by giving written notice to Lessee of Lessor's election to do so within 30 days after the date of occurrence of such damage.

(b)    Notwithstanding paragraph 9.4(a), in the event that Lessee has an option to extend or renew this Lease, and the time within which said option may be exercised has not yet expired, Lessee shall exercise such option, if it is to be exercised at all, no later than twenty (20) days after the occurrence of an Insured Loss falling within the classification of Premises Damage during the last twelve (12) months of the term of this Lease. If Lessee duly exercises such option during said twenty (20) day period, Lessor shall, at Lessor's expense, repair such damage, but not Lessee's fixtures, equipment or tenant improvements, as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option during said twenty (20) day period, then Lessor may at Lessor's option terminate and cancel this Lease as of the expiration of said twenty (20) day period by giving written notice to Lessee of Lessor's election to do so within ten (10) days after the expiration of said twenty (20) day period, notwithstanding any term or provision in the grant of option to the contrary.

9.5    **Abatement of Rent; Lessee's Remedies.**

(a)    In the event Lessor repairs or restores the Building or Premises pursuant to the provisions of this Paragraph 9, and any part of the Premises are not usable (including loss of use due to loss of access or essential services), the rent payable hereunder (including Lessee's Share of Operating Expense Increase) for the period during which such damage, repair or restoration continues shall be abated, provided (1) the damage was not the result of the negligence of Lessee, and (2) such abatement shall only be to the extent the operation and profitability of Lessee's business as operated from the Premises is adversely affected.  Except for said abatement of rent, if any, Lessee shall have no claim against Lessor for any damage suffered by reason of any such damage, destruction, repair or restoration.

(b)    If Lessor shall be obligated to repair or restore the Premises or the Building under the provisions of this Paragraph 9 and shall not commence such repair or restoration within ninety (90) days after such occurrence, or if Lessor shall not complete the restoration and repair within six (6) Months after such occurrence, Lessee may at Lessee's option cancel and terminate this Lease by giving Lessor written notice of Lessee's election to do so at any time prior to the commencement or completion, respectively, of such repair or restoration.  In such event this Lease shall terminate as of the date of such notice.

(c)    Lessee agrees to cooperate with Lessor in connection with any such restoration and repair, including but not limited to the approval and/or execution of plans and specifications required.

9.6    **Termination-Advance Payments.**  Upon termination of this Lease pursuant to this paragraph 9, an equitable adjustment shall be made concerning advance rent and any advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's security deposit as has not theretofore been applied by Lessor.

9.7    **Waiver.**  Lessor and Lessee waive the provisions of any statute which relate to termination of leases when leased property is destroyed and agree that such event shall be governed by the terms of this Lease.

**10.    Real Property Taxes.**

10.1    **Payment of Taxes.**  Lessor shall pay the real property tax, as defined in paragraph 10.3, applicable to the Office Building Project subject to reimbursement by Lessee of Lessee's Share of such taxes in accordance with the provisions of paragraph 4.2, except as otherwise provided in paragraph 10.2.

10.2    **Additional Improvements.**  Lessee shall not be responsible for paying any increase in real property tax specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Office Building Project by other lessees or by Lessor for the exclusive enjoyment of any other lessee.  Lessee shall, however, pay to Lessor at the time that Operating Expenses are payable under paragraph 4.2(c) the entirety of any increase in real property tax if assessed solely by reason of additional improvements placed upon the Premises by Lessee or at Lessee's request.

10.3    **Definition of "Real Property Tax."**  As used herein, the term "real property tax" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, and any license fee, commercial rental tax, improvement bond or bonds, levy or tax (other than inheritance, personal income or estate taxes) imposed on the Office Building Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Lessor in the Office Building Project or in any portion thereof, as against Lessor's right to rent or other income therefrom, and as against Lessor's business of leasing the Office Building Project.  The term "real property tax" shall also include any tax, fee, levy, assessment or charge (i) in substitution of, partially or totally, any tax, fee, levy, assessment or charge hereinabove included within the definition of "real property tax." or (ii) the nature of which was hereinbefore included within the definition of "real property tax." or (iii) which is imposed for a service or right not charged prior to June 1, 1978, or, if previously charged, has been increased since June 1, 1978, or (iv) which is imposed as a result of a change in ownership, as defined by applicable local statutes for property tax purposes, of the Office Building Project or which is added to a tax or charge hereinbefore included within the definition of real property tax by reason of such change of ownership, or (v) which is imposed by reason of this transaction, any modifications or changes hereto, or any transfers hereof.

10.4    **Joint Assessment.**  If the improvements or property, the taxes for which are to be paid separately by Lessee under paragraph 10.2 or 10.5 are not separately assessed, Lessee's portion of that tax shall be equitably determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information (which may include the cost of construction) as may be reasonably available.  Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5    **Personal Property Taxes.**

(a)    Lessee shall pay prior to delinquency all taxes assessed against and levied upon trade fixtures, furnishings, equipment and all other personal property of Lessee contained in the Premises or elsewhere.

(b)    If any of Lessee's said personal property shall be assessed with Lessor's real property, Lessee shall pay to Lessor the taxes attributable to Lessee within ten (10) days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

**11.    Services and Utilities.**

11.1    **Services and Utilities Provided by Lessor.**  Lessor shall provide heating, ventilation, air conditioning, and janitorial services during the times and in the manner that such services are customarily furnished in comparable medical office buildings in the immediate market area, reasonable amounts of electricity for normal lighting and office machines, water for reasonable and normal drinking and lavatory use, and replacement light bulbs and/or fluorescent tubes and ballasts for standard overhead fixtures.

11.2    **Services Exclusive to Lessee.**  Lessee shall pay for all water, gas, heating, ventilation, air conditioning, light, power, telephone, janitorial services and other utilities and services specially or exclusively supplied and/or metered exclusively to the Premises or to Lessee, together with any taxes thereon.  If any such services and utilities are not separately metered to the Premises, Lessee shall pay at Lessor's option, either Lessee's Share or a reasonable proportion to be determined by Lessor of all charges jointly metered with and/or provided to other premises in the Building.

11.3    **Hours of Service.**  Said services and utilities shall be provided during generally accepted business days and hours or such other days or hours as may hereafter be set forth.  Utilities and services required at other times shall be subject to advance request and reimbursement by Lessee to Lessor of the cost thereof.

11.4    **Excess Usage by Lessee.**  Lessee shall not make connection to the utilities except by or through existing outlets and shall not install or use machinery or equipment in or about the Premises that uses excess water, lighting or power, or suffer or permit any act that causes extra burden upon the utilities or services, including but not limited to security services, over standard office usage for the Office Building Project.  Lessor shall require Lessee to reimburse Lessor for any excess expenses or costs that may arise out of a breach of this subparagraph by Lessee.  Lessor may, in its sole discretion, install at Lessee's expense supplemental equipment and/or separate metering applicable to Lessee's excess usage or loading.

11.5    **Interruptions.**  There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

**12.    Assignment and Subletting.**

12.1    **Lessor's Consent Required.**  Lessee shall not voluntarily or by operation of law assign, transfer, mortgage, sublet, or otherwise transfer or encumber all or any part of Lessee's interest in the Lease or in the Premises, without Lessor's prior written consent, which Lessor shall not unreasonably withhold.  Lessor shall respond to Lessee's request for consent hereunder in a timely manner and any attempted assignment, transfer, mortgage, encumbrance or subletting without such consent shall be void, and shall constitute a material default and breach of this Lease without the need for notice to Lessee under paragraph 13.1.  "Transfer" within the meaning of this paragraph 12 shall include the transfer or transfers aggregating: (a) if Lessee is a corporation, more than twenty-five percent (25%) of the voting stock of such corporation, or (b) if Lessee is a partnership, more than twenty-five percent (25%) of the profit and loss participation in such partnership.

12.2    **Lessee Affiliate.**  Notwithstanding the provisions of paragraph 12.1 hereof, Lessee may assign or sublet the Premises, or any portion thereof, without Lessor's consent, to any corporation which controls, is controlled by or is under common control with Lessee, or to any corporation resulting from the merger or consolidation with Lessee, or to any person or entity which acquires all the assets of Lessee as a going concern of the business that is being conducted on the Premises, all of which are referred to as "Lessee Affiliate"; provided that before such assignment shall be effective, (a) said assignee shall assume, in full, the obligations of Lessee under this Lease and (b) Lessor shall be given written notice of such assignment and assumption.  Any such assignment shall not, in any way, affect or limit the liability of Lessee under the terms of this Lease even if after such assignment or subletting the terms of this Lease are materially changed or altered without the consent of Lessee, the consent of whom shall not be necessary.

12.3    **Terms and Conditions Applicable to Assignment and Subletting.**

(a)    Regardless of Lessor's consent, no assignment or subletting shall release Lessee of Lessee's obligations hereunder or alter the primary liability of Lessee to pay the rent and other sums due Lessor hereunder including Lessee's Share of Operating Expense Increase, and to perform all other obligations to be performed by Lessee hereunder.

(b)    Lessor may accept rent from any person other than Lessee pending approval or disapproval of such assignment.

(c)    Neither a delay in the approval or disapproval of such assignment or subletting, nor the acceptance of rent, shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for the breach of any of the terms or conditions of this paragraph 12 or this Lease.

(d)    If Lessee's obligations under this Lease have been guaranteed by third parties, then an assignment or sublease, and Lessor's consent thereto, shall not be effective unless said guarantors give their written consent to such sublease and the terms thereof.

(e)    The consent by Lessor to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting by Lessee or to any subsequent or successive assignment or subletting by the sublessee. However, Lessor may consent to subsequent sublettings and assignments of the sublease or any amendments or modifications thereto without notifying Lessee or anyone else liable on the Lease or sublease and without obtaining their consent and such action shall not relieve such persons from liability under this Lease or said sublease; however, such persons shall not be responsible to the extent any such amendment or modification enlarges or increases the obligations of the Lessee or sublessee under this Lease or such sublease.

(f)    In the event of any default under this Lease, Lessor may proceed directly against Lessee, any guarantors or any one else responsible for the performance of this Lease, including the sublessee, without first exhausting Lessor's remedies against any other person or entity responsible thereto to Lessor, or any security held by Lessor or Lessee.

(g)    Lessor's written consent to any assignment or subletting of the Premises by Lessee shall not constitute an acknowledgement that no default then exists under this Lease of the obligations to be performed by Lessee nor shall such consent be deemed a waiver of any then existing default, except as may be otherwise stated by Lessor at the time.

(h)    The discovery of the fact that any financial statement relied upon by Lessor in giving its consent to an assignment or subletting was materially false shall, at Lessor's election, render Lessor's said consent null and void.

12.4    **Additional Terms and Conditions Applicable to Subletting.**  Regardless of Lessor's consent, the following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)    Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all rentals and income arising from any sublease heretofore or hereafter made by Lessee, and Lessor may collect such rent and income and apply same toward Lessee's obligations under this Lease; provided, however, that until a default shall occur in the performance of Lessee's obligations under this Lease, Lessee may receive, collect and enjoy the rents accruing under such sublease. Lessee shall not, by reason of this or any other assignment of such sublease to Lessor nor by reason of the collection of the rents from a sublessee, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee under such sublease. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a default exists in the performance of Lessee's obligations under this Lease, to pay to Lessor the rents due and to become due under the sublease Lessee agrees that such sublessee shall have the right to rely upon any such statement and request from Lessor, and that such sublessee shall pay such rents to Lessor without any obligation or right to inquire as to whether such default exists and notwithstanding, any notice from or claim from Lessee to the contrary.  Lessee shall have no right or claim against said sublessee or Lessor for any such rents so paid by said sublessee to Lessor.

(b)    No sublease entered into by Lessee shall be effective unless and until it has been approved in writing by Lessor.  In entering into any sublease, Lessee shall use only such form of sublessee as is satisfactory to Lessor, and once approved by Lessor, such sublease shall not be changed or modified without Lessor's prior written consent.  Any sublease shall, by reason of entering into a sublease under this Lease, be deemed, for the benefit of Lessor, to have assumed and agreed to conform and comply with each and every obligation herein to be performed by Lessee other than such obligations as are contrary to or inconsistent with provisions contained in a sublease to which Lessor has expressly consented in writing.

(c)    In the event Lessee shall default in the performance of its obligations under this Lease, Lessor at its option and without any obligation to do so, may require any sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of Lessee under such sublease from the time of the exercise of said option to the termination of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to Lessee or for any other prior defaults of Lessee under such sublease.

(d)    No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)    With respect to any subletting to which Lessor has consented, Lessor agrees to deliver a copy of any notice of default by Lessee to the sublessee.  Such sublessee shall have the right to cure a default of Lessee within three (3) days after service of said notice of default upon such sublessee, and the sublessee shall have a right of reimbursement and offset from and against Lessee for any such defaults cured by the sublessee.

12.5    **Lessor's Expenses.**  In the event Lessee shall assign or sublet the Premises or request the consent of Lessor to any assignment or subletting or if Lessee shall request the consent of Lessor for any act Lessee proposes to do then Lessee shall pay Lessor's reasonable costs and expenses incurred in connection therewith, including attorneys', architect's, engineers', or other consultants' fees.

12.6    **Conditions to Consent.**  Lessor reserves the right to condition any approval to assign or sublet upon Lessor's determination that (a) the proposed assignee or sublessee shall conduct a business on the Premises of a quality substantially equal to that of Lessee and consistent with the general character of the other occupants of the Office Building Project and not in violation of any exclusives or rights then held by other tenants, and (b) the proposed assignee or sublessee be at least as financially responsible as Lessee was expected to be at the time of the execution of this Lease or of such assignment or subletting, whichever is greater.

**13.    Default; Remedies.**

13.1    **Default.**  The occurrence of any one or more of the following events shall constitute a material default of this Lease by Lessee:

(a)    The vacation or abandonment of the Premises by Lessee.  Vacation of the Premises shall include the failure to occupy the Premises for a continuous period of sixty (60) days or more, whether or not the rent is paid.

(b)    The breach by Lessee of any of the covenants, conditions or provisions of paragraphs 7.3(a), (b) or (d) (alterations), 12.1 (assignment or subletting). 13.1(a) (vacation or abandonment), 13.1(e) (insolvency), 13.1(f) (false statement), 16(a) (estoppel certificate), 30(b) (subordination), 33 (auctions), or 41.1 (easements), all of which are hereby deemed to be material, non-curable defaults without the necessity of any notice by Lessor to Lessee thereof.

(c)    The failure by Lessee to make any payment of rent or any other payment required to be made by Lessee hereunder, as and when due, where such failure shall continue for a period of three (3) days after written notice thereof from Lessor to Lessee.  In the event that Lessor serves Lessee with a Notice to Pay Rent or Quit pursuant to applicable Unlawful Detainer statutes such Notice to Pay Rent or Quit shall also constitute the notice required by this subparagraph.

(d)    The failure by Lessee to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Lessee other than those referenced in subparagraphs (b) and (c), above, where such failure shall continue for a period of thirty (30) days after written notice thereof from Lessor to Lessee; provided, however, that if the nature of Lessee's noncompliance is such that more than thirty (30) days are reasonably required to its cure, then Lessee shall not be deemed to be in default if Lessee commenced such cure within said thirty (30) day period and thereafter diligently pursues such cure to completion.  To the extent permitted by law, such thirty (30) day notice shall constitute the sole and exclusive notice required to be given to Lessee under applicable Unlawful Detainer statutes.

(e)    (i) The making by Lessee of any general arrangement or general assignment for the benefit of creditors; (ii) Lessee becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within sixty (60) days (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within thirty (30) days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within thirty (30) days.  In the event that any provision of this paragraph 13.1(e) is contrary to any applicable law, such provision shall be of no force or effect.

(f)    The discovery by Lessor that any financial statement given to Lessor by Lessee, or its successor in interest or by any guarantor of Lessee's obligation hereunder, was materially false.

13.2    **Remedies.**  In the event of any material default or breach of this Lease by Lessee, Lessor may at any time thereafter, with or without notice or demand and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such default:

(a)    Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease and the term hereof shall terminate and Lessee shall immediately surrender possession of the Premises to Lessor.  In such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including, but not limited to, the cost of recovering possession of the Premises; expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and any real estate commission actually paid; the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent for the balance of the term after the time of such award

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Page 7 of 12

Initial

exceeds the amount of such rental loss for the same period that Lessee proves could be reasonably avoided; that portion of the leasing commission paid by Lessor pursuant to paragraph 15 applicable to the unexpired term of this Lease.

(b)    Maintain Lessee's right to possession in which case this Lease shall continue in effect whether or not Lessee shall have vacated or abandoned the Premises. In such event Lessor shall be entitled to enforce all of Lessor's rights and remedies under this Lease, including the right to recover the rent as it becomes due hereunder.

(c)    Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the state wherein the Premises are located. Unpaid installments of rent and other unpaid monetary obligations of Lessee under the terms of this Lease shall bear interest from the date due at the maximum rate then allowable by law.

13.3    **Default by Lessor.** Lessor shall not be in default unless Lessor fails to perform obligations required of Lessor within a reasonable time, but in no event later than thirty (30) days after written notice by Lessee sent simultaneously to Lessor, to Master Lessor and to the holder of any first mortgage or deed of trust covering the Premises whose name and address shall have theretofore been furnished to Lessee in writing, specifying wherein Lessor has failed to perform such obligation(s); provided, however, that if the nature of Lessor's obligation(s) is such that more than thirty (30) days are required for performance, then Lessor shall not be in default if Lessor commences performance within such 30-day period and thereafter diligently pursues the same to completion.

13.4    **Late Charges.** Lessee hereby acknowledges that late payment by Lessee to Lessor of Base Rent, Lessee's Share of Operating Expense Increase or other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Lessor by the terms of any mortgage or trust deed covering the Office Building Project. Accordingly, if any installment of Base Rent, Operating Expense Increase, or any other sum due from Lessee shall not be received by Lessor or Lessor's designee within *five (5) days* after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a late charge equal to twelve percent *(12%)* of such overdue amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of late payment by Lessee. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's default with respect to such overdue amount, nor prevent Lessor from exercising any of the other rights and remedies granted hereunder.

**14.    Condemnation.** If the Premises or any portion thereof or the Office Building Project are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs; provided that if so much of the Premises or the Office Building Project are taken by such condemnation as would materially and adversely affect the operation and profitability of Lessee's business conducted from the Premises, Lessee shall have the option, to be exercised only in writing within thirty (30) days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the rent and Lessee's Share of Operating Expense Increase shall be reduced in the proportion that the floor area of the Premises taken bears to the total floor area of the Premises. Common Areas taken shall be excluded from the Common Areas usable by Lessee and no reduction of rent shall occur with respect thereto or by reason thereof. Lessor shall have the option in its sole discretion to terminate this Lease as of the taking of possession by the condemning authority, by giving written notice to Lessee of such election within thirty (30) days after receipt of notice of a taking by condemnation of any part of the Premises or the Office Building Project. Any award for the taking of all or any part of the Premises or the Office Building Project under the power of eminent domain or any temporary taking shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided, however that Lessee shall be entitled to any separate award for loss of or damage to Lessee's trade fixtures, removable personal property and unamortized tenant improvements that have been paid for by Lessee. For that purpose the cost of such improvements shall be amortized over the original term of this Lease excluding any options. In the event that this Lease is not terminated by reason of such condemnation, Lessor shall to the extent of severance damages received by Lessor in connection with such condemnation, repair any damage to the Premises caused by such condemnation except to the extent that Lessee has been reimbursed therefor by the condemning authority. Lessee shall pay any amount in excess of such severance damages required to complete such repair.

**15.    Broker's Fee.** Intentionally omitted.

**16.    Tenant Estoppel Certificate/Financial Statements.**

(a)    Lessee shall at any time upon not less than seven (7) days' prior written notice from Lessor execute, acknowledge and deliver to the requesting party a statement in writing in (the "Certificate") (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the rent and other charges are paid in advance, if any, and (ii) acknowledging that there are not, to the responding party's knowledge any uncured defaults on the part of the requesting party, or specifying such defaults if any are claimed and (iii) containing such other information and provisions as may be requested by any existing or prospective lender or by any prospective purchaser. Any such Certificate may be conclusively relied upon by any prospective purchaser or encumbrancer of the Office Building Project.

(b)    At the Lessor's option, (a) the failure to deliver such Certificate within such time shall be a material default of this Lease by Lessee without any further notice to Lessee, (b) any material misstatement in the Certificate which is not corrected within two (2) days of Lessor's written request shall be a material default of this Lease by Lessee without any further notice to Lessee, and/or (c) it shall constitute a certification by Lessee that the statements which may be included in the Certificate (as same may have been so amended or supplemented) are true and correct, except as Lessor shall otherwise indicate and any prospective purchaser or encumbrancer of the Office Building Project, which may be conclusively relied upon by any prospective purchaser or encumbrancer of the Office Building Project.

(c)    Upon the signing of this Lease and within seven (7) days following written request from Lessor in the event Lessor desires to finance, refinance, or sell the Office Building Project, or any part thereof, Lessee shall furnish Lessor, or such lender or purchaser designated by Lessor, with current personal financial statements, and if applicable, corporate financial statements. Such financial statements shall be in a form reasonably required by Lessor, such lender or purchaser and shall include the past three (3) years' financial statements of Lessee, including a balance sheet, statements of profit/loss and tax returns, or any other reasonable financial information deemed necessary by Lessor, such lender or purchaser. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17.    Lessor's Liability.** The term "Lessor" as used herein shall mean only the owner or owners, at the time in question, of the fee title or a lessee's interest in a ground lease of the Office Building Project, and except as expressly provided in paragraph 15, in the event of any transfer of such title or interest, Lessor herein named (and in case of any subsequent transfers then the grantor) shall be relieved from and after the date of such transfer of all liability as respects Lessor's obligations thereafter to be performed, provided that any funds in the hands of Lessor or the then grantor at the time of such transfer, in which Lessee has an interest, shall be delivered to the grantee. The obligations contained in this Lease to be performed by Lessor shall, subject as aforesaid, be binding on Lessor's successors and assigns, only during their respective periods of ownership.

**18.    Severability.** The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

**19.    Interest on Past-due Obligations.** Except as expressly herein provided, any amount due to Lessor not paid when due shall bear interest at the maximum rate then allowable by law or judgments from the date due. Payment of such interest shall not excuse or cure any default by Lessee under this Lease; provided, however, that interest shall not be payable on late charges incurred by Lessee nor on any amounts upon which late charges are paid by Lessee.

**20.    Time of Essence.** Time is of the essence with respect to the obligations to be performed under this Lease.

**21.    Additional Rent.** All monetary obligations of Lessee to Lessor under the terms of this Lease, including but not limited to Lessee's Share of Operating Expense Increase and any other expenses payable by Lessee hereunder shall be deemed to be rent.

**22.    Incorporation of Prior Agreements; Amendments.** This Lease contains all agreements of the parties with respect to any matter mentioned herein. No prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective. This Lease may be modified in writing only, signed by the parties in interest at the time of the modification. Except as otherwise stated in this Lease, Lessee hereby acknowledges that neither the real estate broker listed in paragraph 15 hereof nor any cooperating broker on this transaction nor the Lessor or any employee or agents of any of said persons has made any oral or written warranties or representations to Lessee relative to the condition or use by Lessee of the Premises or the Office Building Project and Lessee acknowledges that Lessee assumes all responsibility regarding the Occupational Safety Health Act, the legal use and adaptability of the Premises and the compliance thereof with all applicable laws and regulations in effect during the term of this Lease.

**23.    Notices.** Any notice required or permitted to be given hereunder shall be in writing and may be given by personal delivery or by certified or registered mail, and shall be deemed sufficiently given if delivered or addressed to Lessee or to Lessor at the address noted below or adjacent to the signature of the respective parties, as the case may be. Mailed notices shall be deemed given upon actual receipt at the address required, or forty-eight hours following deposit in the mail, postage prepaid, whichever first occurs. Either party may by notice to the other specify a different address for notice purposes except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice purposes. A copy of all notices required or permitted to be given to Lessor hereunder shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate by notice to Lessee.

24.    **Waivers.** No waiver by Lessor of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Lessee of the same or any other provision. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to or approval of any subsequent act by Lessee. The acceptance of rent hereunder by Lessor shall not be a waiver of any preceding breach by Lessee of any provision hereof, other than the failure of Lessee to pay the particular rent so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

25.    **Recording.** Either Lessor or Lessee shall, upon request of the other, execute, acknowledge and deliver to the other a "short form" memorandum of this Lease for recording purposes.

26.    **Holding Over.** If Lessee, with Lessor's consent, remains in possession of the Premises or any part thereof after the expiration of the term hereof, such occupancy shall be a tenancy from month to month upon all the provisions of this Lease pertaining to the obligations of Lessee, except that the rent payable shall be two hundred percent (200%) of the rent payable immediately preceding the termination date of this Lease, and all Options, if any, granted under the terms of this Lease shall be deemed terminated and be of no further effect during said month to month tenancy.

27.    **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.    **Covenants and Conditions.** Each provision of this Lease performable by Lessee shall be deemed both a covenant and a condition.

29.    **Binding Effect; Choice of Law.** Subject to any provisions hereof restricting assignment or subletting by Lessee and subject to the provisions of paragraph 17, this Lease shall bind the parties, their personal representatives, successors and assigns. This Lease shall be governed by the laws of the State where the Office Building Project is located and any litigation concerning this Lease between the parties hereto shall be initiated in the county in which the Office Building Project is located.

30.    **Subordination.**

(a)    Without the necessity of any additional document being executed by Lessee for the purpose of effecting a subordination, this Lease and any Option granted hereunder shall be subject and subordinate at all times to the lien of any mortgage or deed of trust which may now exist or hereafter be executed affecting all or any portion of the Building and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding the foregoing, Lessor shall have the right to subordinate or cause to be subordinated any such liens to this Lease. In the event that any mortgage or deed of trust is foreclosed or a deed in lieu of foreclosure is made for any reason, Lessee shall, notwithstanding the subordination, attorn to and become the Lessee of the successor in interest to Lessor at the option of and on terms acceptable to such successor in interest. So long as Lessee is not in default under this lease, Lessee's possession of the Premises shall not be disturbed as a result of such termination, foreclosure or deed in lieu of foreclosure.

(b)    Lessee covenants and agrees to execute and deliver, upon demand by Lessor or any lienholder or successor in interest, and in the form requested thereby, any additional documents evidencing the priority or subordination of this Lease and the attornment of Lessee with respect to any lien of any such mortgage or deed or trust. Lessee hereby irrevocably appoints Lessor as attorney-in-fact of Lessee to execute, deliver and record any such documents in the name and on behalf of Lessee if Lessee fails to do so pursuant to the foregoing. In addition, at Lessor's election, Lessee's failure to execute and deliver such document(s) within seven (7) days of Lessor's written request shall be a material default of this Lease by Lessee without any further notice to Lessee.

31.    **Attorneys' Fees.**

31.1    If either party or the broker(s) named herein bring an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, trial or appeal thereon, shall be entitled to his reasonable attorneys' fees to be paid by the losing party as fixed by the court in the same or separate suit, and whether or not such action is pursued to decision or judgment. The provisions of this paragraph shall inure to the benefit of the broker named herein who seeks to enforce a right hereunder.

31.2    The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred in good faith.

31.3    Lessor shall be entitled to reasonable attorneys' fees and all other costs and expenses incurred in the preparation and service of notice of default and consultations in connection therewith, whether or not a legal transaction is subsequently commenced in connection with such default.

32.    **Lessor's Access.**

32.1    Lessor and Lessor's agents shall have the right to enter the Premises at reasonable times for the purpose of inspecting the same, performing any services required of Lessor, showing the same to prospective purchasers, lenders, or lessees, taking such safety measures, erecting such scaffolding or other necessary structures, making such alterations, repairs, improvements or additions to the Premises or to the Office Building Project as Lessor may reasonably deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. Lessor may at any time place on or about the Premises or the Building any ordinary "For Sale" signs and Lessor may at any time during the last 120 days of the term hereof place on or about the Premises any ordinary "For Lease" signs.

32.2    All activities of Lessor pursuant to this paragraph shall be without abatement of rent, nor shall Lessor have any liability to Lessee for the same.

32.3    Lessor shall have the right to retain keys to the Premises and to unlock all doors in or upon the Premises other than to files, vaults and safes, and in the case of emergency to enter the Premises by any reasonably appropriate means, and any such entry shall not be deemed a forceable or unlawful entry or defamer of the Premises or an eviction. Lessee waives any charges for damages or injuries or interference with Lessee's property or business in connection therewith.

33.    **Auctions.** Lessee shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction upon the Premises or the Common Areas without first having obtained Lessor's prior written consent. Notwithstanding anything to the contrary in this Lease, Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to grant such consent. The holding of any auction on the Premises or Common Areas in violation of this paragraph shall constitute a material default of this Lease.

34.    **Signs.** Lessee shall not place any sign upon the Premises or the Office Building Project without Lessor's prior written consent. Under no circumstances shall Lessee place a sign on any roof of the Office Building Project.

35.    **Merger.** The voluntary or other surrender of this Lease by Lessee, or a mutual cancellation thereof, or a termination by Lessor, shall not work a merger, and shall, at the option of Lessor, terminate all or any existing subtenancies or may, at the option of Lessor, operate as an assignment to Lessor of any or all of such subtenancies.

36.    **Consents.** Except for paragraphs 33 (auctions) and 34 (signs) hereof, wherever in this Lease the consent of one party is required to an act of the other party such consent shall not be unreasonably withheld or delayed.

37.    **Guarantor.** In the event that there is a guarantor of this Lease, said guarantor shall have the same obligations as Lessee under this Lease.

38.    **Quiet Possession.** Upon Lessee paying the rent for the Premises and observing and performing all of the covenants, conditions and provisions on Lessee's part to be observed and performed hereunder, Lessee shall have quiet possession of the Premises for the entire term hereof subject to all of the provisions of this Lease. The individuals executing this Lease on behalf of Lessor represent and warrant to Lessee that they are fully authorized and legally capable of executing this Lease on behalf of Lessor.

39.    **Options.**

39.1    **Definition.** As used in this paragraph the word "Option" has the following meaning: (1) the right or option to extend the term of this Lease or to renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor; (2) the option of right of first refusal to lease the Premises or the right of first offer to lease the Premises or the right of first refusal to lease other space within the Office Building Project or other property of Lessor or the right of first offer to lease other space within the Office Building Project or other property of Lessor; (3) the right or option to purchase the Premises or the Office Building Project, or the right of first refusal to purchase the Premises or the Office Building Project or the right of first offer to purchase the Premises or the Office Building Project, or the right or option to purchase other property of Lessor, or the right of first refusal to purchase other property of Lessor or the right of first offer to purchase other property of Lessor.

39.2    **Options Personal.** Each Option granted to Lessee in this Lease is personal to the original Lessee and may be exercised only by the original Lessee while occupying the Premises who does so without the intent of thereafter assigning this Lease or subletting the Premises or any portion thereof, and may not be exercised, assigned, or transferred voluntarily or involuntarily, by or to any person or entity other than original Lessee; provided, however, that an Option may be exercised by or assigned to any Lessee Affiliate as defined in paragraph 12.2 of this Lease. The Options, if any, herein

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Page 9 of 12

Initial: _____

granted to Lessee are not assignable separate and apart from this Lease, nor may any Option be separated from this Lease in any manner, either by reservation or otherwise.

39.3    **Multiple Options.**   In the event that Lessee has any multiple options to extend or renew this Lease a later option cannot be exercised unless the prior option to extend or renew this Lease has been so exercised.

39.4    **Effect of Default on Options.**

(a)    Lessee shall have no right to exercise an Option, notwithstanding any provision in the grant of Option to the contrary, (i) during the time commencing from the date Lessor gives to Lessee a notice of default pursuant to paragraph 13.1 (c) or 13.1 (d) and continuing until the noncompliance alleged in said notice of default is cured, or (ii) during the period of time commencing on the day after a monetary obligation to Lessor is due from Lessee and unpaid (without any necessity for notice thereof to Lessee) and continuing until the obligation is paid, or (iii) in the event that Lessor has given to Lessee three or more notices of default under paragraph 13.1(c), or paragraph 13.1(d), whether or not the defaults are cured, during the 12 month period of time immediately prior to the time that Lessee attempts to exercise the subject Option, (iv) if Lessee has committed any non-curable breach, including without limitation those described in paragraph 13.1(b), or is otherwise in default of any of the terms, covenants or conditions of this Lease.

(b)    The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of paragraph 39.4(a).

(c)    All rights of Lessee under the provisions of an Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and during the term of this Lease, (i) Lessee fails to pay to Lessor a monetary obligation of Lessee for a period of thirty (30) days after such obligation becomes due (without any necessity of Lessor to give notice thereof to Lessee), or (ii) Lessee fails to commence to cure a default specified in paragraph 13.1 (d) within thirty (30) days after the date that Lessor gives notice to Lessee of such default and/or Lessee fails thereafter to diligently prosecute said cure to completion, or (iii) Lessor gives to Lessee three or more notices of default under paragraph 13.1 (c), or paragraph 13.1 (d), whether or not the defaults are cured, or (iv) if Lessee has committed any non-curable breach, including without limitation those described in paragraph 13.1 (b), or is otherwise in default of any of the terms, covenants and conditions of this Lease.

**40.    Security Measures-Lessor's Reservations.**

40.1    Lessee hereby acknowledges that Lessor shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Office Building Project.   Lessee assumes all responsibility for the protection of Lessee, its agents, and invitees and the property of Lessee and of Lessee's agents and invitees from acts of third parties.   Nothing herein contained shall prevent Lessor, at Lessor's sole option, from providing security protection for the Office Building Project or any part thereof, in which event the cost thereof shall be included within the definition of Operating Expenses, as set forth in paragraph 4.2(b).

40.2    Lessor shall have the following rights:

(a)    To change the name, address or title of the Office Building Project or building in which the Premises are located upon not less than 90 days prior written notice;

(b)    To, at Lessee's expense, provide and install Building standard graphics on the door of the Premises and such portions of the Common Areas as Lessor shall reasonably deem appropriate;

(c)    To permit any lessee the exclusive right to conduct any business as long as such exclusive does not conflict with any rights expressly given herein;

(d)    To place such signs, notices or displays as Lessor reasonably deems necessary or advisable upon the roof, exterior of the buildings or the Office Building Project or on pole signs in the Common Areas;

40.3    Lessee shall not:

(a)    Use a representation (photographic or otherwise) of the Building or the Office Building Project or their name(s) in connection with Lessee's business;

(b) Suffer or permit anyone, except in emergency, to go upon the roof of the Building.

**41.    Easements.**

41.1    Lessor reserves to itself the right, from time to time, to grant such easements, rights and dedications that Lessor deems necessary or desirable, and to cause the recordation of Parcel Maps and restrictions, so long as such easements, rights, dedications, Maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee.   Lessee shall sign any of the aforementioned documents upon request of Lessor and failure to do so shall constitute a material default of this Lease by Lessee without the need for further notice to Lessee.

41.2    The obstruction of Lessee's view, air, or light by any structure erected in the vicinity of the Building, whether by Lessor or third parties, shall in no way affect this Lease or impose any liability upon Lessor.

**42.    Performance Under Protest.**   If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment. and there shall survive the right on the part of said party to institute suit for recovery of such sum.   If it shall be adjudged that there was no legal obligation on the part of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease.

**43.    Authority.**   If Lessee is a corporation, trust, or general or limited partnership, Lessee, and each individual executing this Lease on behalf of such entity represent and warrant that such individual is duly authorized to execute and deliver this Lease on behalf of said entity.   If Lessee is a corporation, trust or partnership, Lessee shall, within thirty (30) days after execution of this Lease, deliver to Lessor evidence of such authority satisfactory to Lessor.

**44.    Conflict.**   Any conflict between the printed provisions, Exhibits or Addenda of this Lease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions.

**45.    No Offer.**   Preparation of this Lease by Lessor or Lessor's agent and submission of same to Lessee shall not be deemed an offer to Lessee to lease.   This Lease shall become binding upon Lessor and Lessee only when fully executed by both parties.

**46.    Lender Modification.**   Lessee agrees to make such reasonable modifications to this Lease as may be reasonably required by an Institutional lender in connection with the obtaining of normal financing or refinancing of the Office Building Project.

**47.    Multiple Parties.**   If more than one person or entity is named as either Lessor or Lessee herein, except as otherwise expressly provided herein, the obligations of the Lessor or Lessee herein shall be the joint and several responsibility of all persons or entities named herein as such Lessor or Lessee, respectively.

**48.    Work Letter.**   This Lease is supplemented by that certain Work Letter of even date executed by Lessor and Lessee, attached hereto as Exhibit C, and incorporated herein by this reference. *SEE WORKING DRAWINGS FROM THE BORSUK COMPANY.*

**49.    Attachments.**   Attached hereto are the following documents, which shall constitute a part of this Lease:

Exhibit A - Floor Plan
Exhibit B - Rules & Regulations
Exhibit C - Work Letter
Exhibit D - Guaranty of Lease

**50.    Inducement Recapture.**   Any Agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, including the Lessor's cost of leasehold improvements for Lessee, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease.   Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee.   The acceptance by Lessor of Rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

**51.    Relocation Right.**   Lessor may, upon not less than thirty (30) days' prior written notice to Lessee, substitute for the Premises reasonably similar space elsewhere in the Building, and this Lease shall be deemed modified so as to substitute such other premises for the Premises hereby leased.   In

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Initial:

such event, this Lease shall remain in full force and effect according to its terms in all other respects, and an amendment to this Lease embodying such substitution shall be prepared by Lessor and executed and delivered by Lessor and Lessee within fifteen days following Lessee's receipt of such notice. In connection therewith, the costs of preparing such other premises for Lessee's use shall be borne by Lessor, and any of Lessee's reasonable costs of moving with respect thereto shall be paid by Lessor.

52.        **Base Rent.**  So long as Lessee is not in default of the Lease, the monthly Base Rent for months TWO (2), THIRTEEN (13), TWENTY-FIVE (25), and THIRTY-SEVEN (37) of the initial term of the Lease shall be discounted by FIFTY PERCENT (50%), for these months only.

53.        **Base Rent Increase (Paragraph 4.3).**  Paragraph 4.3 is hereby deleted and reinserted as follows: "At the time set forth in Paragraph 1.7 of the Lease, the Base Rent shall be increased by three percent (3%) per annum."

54.        **Tenant Improvements (Exhibit "C").**  Both Parties hereby agree that Lessee is currently in possession of the Premises under a separate lease agreement expiring January 31, 2016 and therefore, the following improvements to the Premises do not affect the Commencement Date of this Lease. Lessor shall refurbish the Premises where necessary (hereby called "Tenant Improvements") at a cost of up to but not to exceed $30,000.00 (hereby called "Tenant Improvement Allowance"). Said Tenant Improvement Allowance shall include the cost of architectural fees, designer fees, contractor's bid, any City of Los Angeles fees, and all necessary governmental fees required for the completion of the Tenant Improvements. Any and all costs in excess of the Tenant Improvement Allowance shall be the sole responsibility of Lessee and shall be payable to Lessor upon demand. Said Tenant Improvements must be approved and completed by Lessor and/or Lessor's agents and approved by the City of Los Angeles and all necessary governmental authorities as required, by no later than August 31, 2016. In the event the Tenant Improvements are not approved and completed by Lessor and/or Lessor's agents and approved by the City of Los Angeles and all necessary governmental authorities as required, by August 31, 2016, said Tenant Improvement Allowance shall be withdrawn and no longer available to Lessee. Furthermore, said Tenant Improvement Allowance is to be used solely for Tenant Improvements to the Premises and shall not be used to offset any rental amounts due or equipment costs.

55.        **Options (Paragraph 39).**

55.1      So long as Lessee is not in default of the Lease, Lessee shall have one option (the "Renewal Option") to extend the Term of this Lease for an additional five (5) year period (the "Option Term") on all the provisions contained in this Lease except as to Base Rent, which shall be the then current market rate for comparable medical space with similar amenities in the Building at the time of such Renewal Option; provided, however that such Base Rent shall in no event be less than the Base Rent that was in effect in the month immediately prior to the beginning of the Option Term. The Base Rent for such Renewal Option(s) shall be subject to annual adjustment pursuant to the Lease.

55.2      The Renewal Option shall be exercised by Lessee giving to Lessor written notice of Lessee's intention to renew the Lease (the "Option Notice") at least three (3) months but no more than nine (9) months prior to the beginning of the Option Term. If the Option Notice is not sent during said six (6) month period, the Renewal Option shall be null and void.

55.3      Notwithstanding anything to the contrary contained in Paragraph 39.2 ("Options Personal"), in the event of an approved assignment or transfer of Lease pursuant to Section 12 ("Assignment and Subletting"), the Renewal Option shall be exercisable by the new approved Lessee.

56.        **Death and Disability.**  Both parties hereby acknowledge that Lessee would not have leased space in the Building without both undersigned physicians leasing the Premises as Lessee, and therefore, in the event Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D. shall die or become disabled (as the term is hereinafter defined) then the estate of the deceased or disabled Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D., or Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D. themselves if no estate is created upon such disablement, shall have the right to have Lessee released from any further obligations under this Lease, but nevertheless, only upon the following terms and conditions: a) That Lessee has truly and faithfully performed all the terms, covenants and conditions of this Lease on the part of Lessee to be performed and is not in default under any of them or that Lessee or Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D.'s representative cure any defaults previously in existence; and b) That Lessee give Lessor ninety (90) days' prior written notice of Lessee's intention to terminate this Lease within ninety (90) days after such death and disability of Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D.; and c) That Lessee pay to Lessor, concurrently with the aforesaid notice, a sum equal to three (3) months' rental for consideration for the early termination which such payment shall be payment of the rent for the said ninety (90) day period; and d) That Lessee pay to Lessor an amount equal to the then unamortized cost of Tenant Improvements, Lease commissions and any concessions, if applicable; and e) That upon compliance with the above conditions, Lessor shall execute and deliver an appropriate release of liability of Lessee; and f) That time is expressly made of the essence; and g) That the term "disabled" in this Paragraph shall be deemed to mean Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D.'s total and permanent inability to carry on Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D.'s business or profession.  Such disability must be evidenced by suitable documentary support based upon generally recognized standards.

57.        **Notices (Paragraph 23).**  Notwithstanding anything to the contrary contained in Paragraph 23 of the Lease, Lessor at its option shall also send notices regarding rent to the following email address: drpraetoriushk@gmail.com and drkamiel@yahoo.com or to another email address, as specified by Lessee to Lessor.



LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

IF THIS LEASE HAS BEEN FILLED IN IT HAS BEEN PREPARED FOR SUBMISSION TO YOUR ATTORNEY FOR HIS APPROVAL. NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE REAL ESTATE BROKER OR ITS AGENTS OR EMPLOYEES AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION RELATING THERETO; THE PARTIES SHALL RELY SOLELY UPON THE ADVICE OF THEIR OWN LEGAL COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

*THIS LEASE SHALL SUPERSEDE ALL PRIOR LEASE AGREEMENTS (INCLUDING BUT NOT LIMITED TO THAT CERTAIN LEASE DATED JANUARY 4, 2007, AND THAT CERTAIN FIRST AMENDMENT TO LEASE DATED FEBRUARY 2, 2010, AND THAT CERTAIN SECOND AMENDMENT TO LEASE DATED NOVEMBER 28, 2012 BY AND BETWEEN RICHARD B. JURMAIN, M.D., AN INDIVIDUAL AND HENRY LOUIS KIRSCH, M.D. AND CULVER CITY MEDICAL TOWER, LLC, A DELAWARE LIMITED LIABILITY COMPANY DBA BROTMAN PHYSICIANS PLAZA FOR SUITE 503.*

**LESSOR**                                                      **LESSEE**

CULVER CITY MEDICAL TOWER, LLC                 HENRY LOUIS KIRSCH, M.D.,
A DELAWARE LIMITED LIABILITY COMPANY          AN INDIVIDUAL
DBA BROTMAN PHYSICIANS PLAZA

By Vendel Equities, LLC
a California limited liability company,
Its: Sole Member

By _____               By _____
   Edward C. Hudson                        Its _____
Its Manager                                Executed at _____
Executed at _____                On _____
On _____                 Address _____
Address _____                           _____

                                           MICHAEL B. KAMIEL, M.D.,
                                           AN INDIVIDUAL

                                           By _____
                                           Its _____
                                           Executed at _____
                                           On _____
                                           Address _____

**MEDICAL OFFICE LEASE**

**FLOOR PLAN**

Not to scale. For reference purposes only.



5TH FLOOR - FLOOR PLAN

1    A5.0



BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Exhibit A
Page 1 of 1

Initial:

## RULES AND REGULATIONS FOR
## MEDICAL OFFICE LEASE

Dated: JANUARY 21, 2016

By and Between: CULVER CITY MEDICAL TOWER, A DELAWARE LIMITED LIABILITY COMPANY DBA BROTMAN PHYSICIANS PLAZA & HENRY LOUIS KIRSCH, M.D., AN INDIVIDUAL AND MICHAEL B. KAMIEL, M.D., AN INDIVIDUAL

### GENERAL RULES

1.Lessee shall not suffer or permit the obstruction of any Common Areas, including driveways, walkways and stairways.

2.Lessor reserves the right to refuse access to any persons Lessor in good faith judges to be a threat to the safety, reputation, or property of the Office Building Project and its occupants.

3.Lessee shall not make or permit any noise or odors that annoy or interfere with other lessees or persons having business within the Office Building Project.

4.Lessee shall not keep animals or birds within the Office Building Project, and shall not bring bicycles, motorcycles or other vehicles into areas not designated as authorized for same.

5.Lessee shall not make, suffer or permit litter except in appropriate receptacles for that purpose.

6.Lessee shall not alter any lock or install new or additional locks or bolts.

7.Lessee shall be responsible for the inappropriate use of any toilet rooms, plumbing or other utilities.  No foreign substances of any kind are to be inserted therein.

8.Lessee shall not deface the walls, partitions or other surfaces of the Premises or Office Building Project.

9.Lessee shall not suffer or permit any thing in or around the Premises or Building that causes excessive vibration or floor loading in any part of the Office Building Project.

10.Furniture, significant freight and equipment shall be moved into or out of the building only with the Lessor's knowledge and consent, and subject to such reasonable limitations, techniques and timing, as may be designated by Lessor Lessee shall be responsible for any damage to the Office Building Project arising from any such activity.

11.Lessee shall not employ any service or contractor for services or work to be performed in the Building, except as approved by Lessor.

12.Lessor reserves the right to close and lock the Building on Saturdays, Sundays and legal holidays, and on other days between the hours of   7    P.M. and   7    A.M. of the following day.  If Lessee uses the Premises during such periods, Lessee shall be responsible for securely locking any doors it may have opened for entry.

13.Lessee shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.

14.No window coverings, shades or awnings shall be installed or used by Lessee.

15.No Lessee, employee or invites shall go upon the roof of the Building.

16.Lessee shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in areas reasonably designated by Lessor or by applicable governmental agencies as non-smoking areas.

17.Lessee shall not use any method of heating or air conditioning other than as provided by Lessor.

18.Lessee shall not install, maintain or operate any vending machines upon the Premises without Lessor's written consent.

19.The Premises shall not be used for lodging or manufacturing, cooking or food preparation.

20.Lessee shall comply with all safety, fire protection and evacuation regulations established by Lessor' or any applicable governmental agency.

21.Lessor reserves the right to waive any one of these rules or regulations, and/or as to any particular Lessee, and any such waiver shall not constitute a waiver of any other rule or regulation or any subsequent application thereof to such Lessee.

22.Lessee assumes all risks from theft or vandalism and agrees to keep its Premises locked as may be required.

23.Lessor reserves the right to make such other reasonable rules and regulations as it may from time to time deem necessary for the appropriate operation and safety of the Office Building Project and its occupants.  Lessee agrees to abide by these and such rules and regulations.

### PARKING RULES

1.Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles." Vehicles other than Permitted Size Vehicles are herein referred to as "Oversized Vehicles."

2.Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

3.Parking stickers or identification devices shall be the property of Lessor and be returned to Lessor by the holder thereof upon termination of the holder's parking privileges.  Lessee will pay such replacement charge as is reasonably established by Lessor for the loss of such devices.

4.Lessor reserves the right to refuse the sale of monthly identification devices to any person or entity that willfully refuses to comply with the applicable rules, regulations, laws and/or agreements.

5.Lessor reserves the right to relocate all or a part of parking spaces from floor to floor, within one floor, and/or to reasonably adjacent offsite location(s), and to reasonably allocate them between compact and standard size spaces, as long as the same complies with applicable laws, ordinances and regulations.

6.Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking.

7.Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle.  Lessor will not be responsible for any damage to vehicles, injury to persons or loss of property; all of which risks are assumed by the party using the parking area.

8.Validation, if established, will be permissible only by such method or methods as Lessor and/or its licensee may establish at rates generally applicable to visitor parking.

9.The maintenance, washing, waxing or cleaning of vehicles in the parking structure or Common Areas is prohibited.

10.Lessee shall be responsible for seeing that all of its employees, agents and invitees comply with the applicable parking rules, regulations, laws and agreements.

11.Lessor reserves the right to modify these rules and/or adopt such other reasonable and non-discriminatory rules and regulations as it may deem necessary for the proper operation of the parking area.

12.Such parking use as is herein provided is intended merely as a license only and no bailment is intended or shall be created hereby.

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Exhibit B
Page 1 of 1

Initial:

# WORK LETTER TO MEDICAL OFFICE LEASE

Dated: JANUARY 21, 2016

By and Between: CULVER CITY MEDICAL TOWER, A DELAWARE LIMITED LIABILITY COMPANY DBA BROTMAN PHYSICIANS PLAZA & HENRY LOUIS KIRSCH, M.D., AN INDIVIDUAL AND MICHAEL B. KAMIEL, M.D., AN INDIVIDUAL

1.   Completion of Tenant Improvements

1.1   Both Parties hereby agree that Lessee is currently in possession of the Premises under a separate lease agreement expiring January 31, 2016 and therefore, the following improvements to the Premises do not affect the Commencement Date of this Lease. Lessor shall refurbish the Premises where necessary (hereby called "Tenant Improvements") at a cost of up to but not to exceed $30,000.00 (hereby called "Tenant Improvement Allowance"). Said Tenant Improvement Allowance shall include the cost of architectural fees, designer fees, contractor's bid, any City of Los Angeles fees and all necessary governmental fees required for the completion of the Tenant Improvements. Any and all costs in excess of the Tenant Improvement Allowance shall be the sole responsibility of Lessee and shall be payable to Lessor upon demand. Said Tenant Improvements must be approved and completed by Lessor and/or Lessor's agents and approved by the City of Los Angeles and all necessary governmental authorities as required, by no later than August 31, 2016. In the event the Tenant Improvements are not approved and completed by Lessor and/or Lessor's agents and approved by the City of Los Angeles and all necessary governmental authorities as required, by August 31, 2016, said Tenant Improvement Allowance shall be withdrawn and no longer available to Lessee. Furthermore, said Tenant Improvement Allowance is to be used solely for Tenant Improvements to the Premises and shall not be used to offset any rental amounts due or equipment costs.

1.2   All Tenant Improvements shall be performed by contractors, subcontractors and engineers selected and/or approved by Lessor.

1.3   Any and all contractors, subcontractors, engineers and consultants performing Tenant Improvements to the Premises, shall coordinate its efforts with Lessor and/or Lessor's agent and The Borsuk Company.

1.4   Any and all contractors, subcontractors, engineers and consultants performing Tenant Improvements and/or any work of any kind to the Premises, shall obtain the written approval of Lessor and/or Lessor's agent prior to the commencement of any Tenant Improvements to the Premises and shall provide proof of license and applicable insurance, as may be required by Lessor.

2.   Preparation of Preliminary Space Plan

2.1   Within ten (10) business days after Lessee and Lessor execute the Lease, Lessee shall meet with Lessor and Lessor's interior architect ("The Borsuk Company") to submit Lessee's specifications and criteria for improvements (the "Criteria") to the Premises.

2.2   Within ten (10) business days of Architects receipt of Criteria, Architect shall prepare a preliminary space plan ("Preliminary Space Plan") based on the Criteria, including representative office, work station, and basic furniture layouts as well as functional requirements, partitions and door locations.

2.3   The Preliminary Space Plan shall itemize the work to be done by each party, including a cost estimate of any work required of Lessor in excess of the Tenant Improvement Allowance.

2.4   The Preliminary Space Plan shall be transmitted to Lessee and Lessor for review.

2.5   Lessee shall approve the Preliminary Space Plan and the preliminary cost estimate or specify with particularity its objection thereto within ten (10) business days following receipt thereof. Failure to so approve or disapprove within said period of time shall constitute approval thereof.

2.6   If Lessee shall reject the Preliminary Space Plan either partially or totally, and they cannot in good faith be modified within ten (10) business days after such rejection to be acceptable to Lessor and Lessee, the Lease shall terminate and neither party shall thereafter be obligated to the other party for any reason whatsoever having to do with this Lease, except that Lessee shall be refunded an amount equal to one half of any security deposit or prepaid rent.

2.7   When approved by Lessee, the Preliminary Space Plan and specifications, which shall serve as the foundation for the Tenant Improvements, shall supersede any prior agreement concerning the Tenant Improvements.

3.   Responsibility for Working Drawings

3.1   Within ten (10) business days after Lessee's and Lessor's approval of the Preliminary Space Plan, Lessee shall submit to Architect any additional Criteria necessary for preparation of working drawings (hereby called, "Working Drawings"). Architect shall prepare and submit to Lessee and Lessor the Working Drawings within ten (10) business days thereafter. The Working Drawings may include the following items to the extent deemed necessary by Lessor:

Prepared by Architect:

3.1.1   A dimensional floor plan including walls, partitions, doors, frames and hardware schedules.

3.1.2   A reflected ceiling plan, depicting the tile pattern with the lighting fixtures and diffusers, and indicating the ceiling heights, switch locations and lighting fixture schedules.

3.1.3   A floor plan, indicating the telephone, computer, data and electrical outlet locations.

3.1.4   A floor and wall finish plan and related schedule, indicating Building standard colors and materials for room finishes.

3.1.5   Prepared by Lessor's electrical and mechanical engineers:

3.1.5.1   Electrical distribution, lighting plan and specifications.

3.1.5.2   HVAC distribution plan and specifications.

3.2   Lessee and Lessor shall review and approve the Working Drawings within ten (10) business days of receipt. Failure by Lessee to approve or disapprove the Working Drawings by this date shall, at Lessor's option, be deemed to constitute Lessee's approval.

3.3   Any changes to the Working Drawings after approval shall be chargeable to Lessee as a change order.

3.4   Working Drawings shall be subject to approval of all governmental agencies, and any changes required thereby shall be subject to the approval of Lessee and Lessor.

4.   Lessor's Cost

4.1   At a cost of up to but not to exceed the Tenant Improvement Allowance, Lessor shall bear the cost of Tenant Improvements and associated costs as set forth in the Preliminary Space Plan, the Working Drawings and this Work Letter, as follows:

4.1.1   The payment of Architectural fees, including fees for working drawings, interior design drawings, structural drawings, mechanical, electrical and plumbing drawings, blueprinting fees, plan check fees and associated permitting fees and associated consulting costs, as required.

4.1.2   The direct cost of construction for labor, materials (including sales taxes thereon), overhead and profit, construction insurance premiums, bond fees and other construction related costs.

4.1.3   The cost of building permits, governmental agency inspection fees and occupancy permit fees.

4.1.4   The cost of any and all legal fees, as may be required and incurred by Lessee.

4.1.5   The payment of fees to the Interior Designer

BROTMAN PHYSICIANS PLAZA                    Exhibit C                    Initial: _____
HENRY LOUIS KIRSCH, M.D. AND                Page 1 of 3
MICHAEL B. KAMIEL, M.D.

4.1.6    Tenant Improvements as follows:

4.1.6.1    Demolition
Demolish debris, walls, lights, ceiling, HVAC ducting, plumbing and flooring per the Working Drawings.

4.1.6.2    Partitions
Frame and Drywall interior partition walls with insulation per the Working Drawings.

4.1.6.3    Wall Surfaces
Patch and skim coat all wall scars and paint walls per the design specifications and Working Drawings.

4.1.6.4    Window Treatments
Supply and install window treatments per the design specifications and Working Drawings.

4.1.6.5    Flooring
Supply and Install Vinyl Floor Covering, Carpet and Cove Base per the design specifications and Working Drawings

4.1.6.6    Doors
Supply and Install Timely frames and paint grade doors with hardware per the design specifications and Working Drawings.
Paint doors and door frames per the design specifications and Working Drawings.
Supply and Install locking door levers and keys per the design specifications and Working Drawings.
Payment of fees for initial locksmith service to said locking door levers.

4.1.6.7    Electrical and Telephone Outlets
Supply Title 24 calculations and electrical engineering plans per the Working Drawings.
Supply and install conduit for telephone outlets and data lines per the Working Drawings.
Supply and install back boxes, conduit and wires and ADA speaker strobes per the Working Drawings.

4.1.6.8    Ceiling
Supply and install 2x2 T-bar ceiling with tiles and hard deck ceiling per the Working Drawings.

4.1.6.9    Lighting
Supply and install exit lights, switches, receptacles, 18 cell lights and occupancy sensors per the Working Drawings.
Supply and install exit signs and emergency lighting per the Working Drawings.

4.1.6.10    Heating, Ventilation and Air Conditioning (HVAC)
Install flex duct from Building main HVAC supply to accommodate suite and supply and install all ducted return registers, per the Working Drawings.

4.1.6.11    Sound Proofing
Supply and install sound attenuation blankets at the demising walls per the Working Drawings.

4.1.6.12    Plumbing
Supply and install plumbing, toilets, sinks and solenoid valves per the design specifications and Working Drawings.

4.1.6.13    Work Surfaces/Cabinetry
Supply and install work surfaces, upper and base cabinets, including necessary locks and keys, and counter tops per the design specifications and Working Drawings.

4.1.6.14    LAFD Fire Life Safety
Supply and Install per the Working Drawings.

4.2    Lessee shall at its expense, pay for any and all costs not to be borne by Lessor.

4.3    Lessee shall, by its approval of the Working Drawings as set forth in Paragraphs 3.2, 3.3 and 3.4 above, give Lessor authorization to complete construction of the Tenant Improvements in accordance with the Working Drawings and shall accompany such approval with a check made payable to Lessor in the amount, if any, for which Lessee shall, in Lessor's estimation, be responsible under the foregoing provisions of this Paragraph 4. Lessor shall not be obligated to commence the Tenant Improvements until Lessor receives such approval and payment, and Lessee shall be liable to Lessor for any costs incurred by Lessor by reason of delay caused by Lessee, including, but not limited to, the costs referred to in Paragraph 6 below.

4.4    If after the completion of the Tenant Improvements, the actual total cost of work for which Lessee is responsible is less than the amount estimated by Lessee under Paragraph 4.3 above, Lessor shall refund to Lessee any unused portion of Lessee's payment to Lessor under Paragraph 4.3 above. At Lessor's option, such refund may be made directly by check or by a credit against Base Rent next falling due under the Lease.

4.5    If after the completion of the Tenant Improvements, the actual total cost of work for which Lessor shall bear the cost, pursuant to this Paragraph 4, is a lesser amount than the Tenant Improvement Allowance as provided for in Paragraph 52 of the Lease and Paragraph 1.1 of this Work Letter, Lessee shall, in no event, receive such lesser amount.

5.    Construction

5.1    Following Lessor's receipt of Lessee's authorization and check as provided in Paragraph 4.3 above, Lessor shall commence and proceed with the construction of the Tenant Improvements, subject to delays beyond the reasonable control of Lessor or its contractor or subcontractors, in accordance with the approved Preliminary Space Plan, Working Drawings and this Work Letter, and all applicable rules, regulations, laws, or ordinances. All work shall be performed by contractors and subcontractors selected and/or approved by Lessor and said contractors and subcontractors shall provide proof of license and applicable insurance, as may be required by Lessor.

5.2    Lessor shall obtain a building permit to construct the Tenant Improvements as soon as possible.

5.3    Lessor shall complete the construction of the Tenant Improvements as soon as reasonably possible after the obtaining of necessary building permits.

6.    Changes, Additions, or Alterations; Acceptance

6.1    If Lessee shall request any change, addition or alteration in approved Working Drawings, Lessor shall promptly give Lessee a written change estimate of the maximum cost of engineering and design services to prepare Working Drawings in accordance with such request and the time delay expected because of such request. If Lessee approves such change estimate in writing, Lessor shall have Working Drawings prepared and Lessee shall promptly reimburse Lessor for the cost thereof. Promptly upon the completion of such Working Drawings, Lessor shall notify Lessee in writing of the cost (or credit, if any) which shall be charged to or credited to Lessee by reason of such change, addition or alteration. Lessee shall, within three (3) business days thereafter, notify Lessor in writing whether it desires to proceed with such change, addition or alteration and shall accompany such notice with a check made payable to Lessor in the amount of any additional costs thereof. In the absence of such written authorization and payment, Lessor shall not be obligated to continue construction of the Tenant Improvements and Lessee shall be chargeable with any delay caused by Lessee's request for such change, addition or alteration.

6.2    After construction of the Tenant Improvements has commenced, Lessor shall have no obligation to make any change or modification to the approved Working Drawings if such change or modification shall have a material impact on the structural, mechanical or electrical systems of the Office Building Project.

6.3    Lessee delay referred to in Paragraph 3.2.2 of the Lease, which shall in no event affect the Taking of Possession of Premises as defined in Paragraph 3.2.1 of the Lease and Paragraph 9 of this Work Letter and Acceptance of Premises as defined in Paragraph 10 of this Work Letter, shall include, without limitation, the following:

6.3.1    Lessee's failure to approve or disapprove any plan and specifications or the Working Drawings within any time periods required herein;

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Exhibit C
Page 2 of 3

Initial:

6.3.2   Lessee's failure to deposit any amounts required by Paragraph 4.3 above within the time period required herein;

6.3.3   Lessee's failure to observe or perform any of its other obligations hereunder; or

6.3.4   Any changes, additions or alterations in the approved Working Drawings which were requested by Lessee.

Lessee shall be responsible for, and shall pay for, any and all costs and expenses incurred by Lessor in connection with any delay in the commencement or completion of the Tenant Improvements and any increase in costs caused by any of the foregoing.

6.4   If Lessor shall be delayed at any time in the progress of the construction of the Tenant Improvements or any portion thereof by extra work, changes in construction ordered by Lessee, or by strikes, lockouts, fire, delay in transportation, unavoidable casualties, rain or weather conditions, governmental procedures or delay, or by any other cause beyond Lessor's control, then the Commencement Date established in Paragraph 1.5 of the Lease shall be extended by the period of such delay.

7.   <u>Substantial Completion of Tenant Improvements</u>

7.1   The term "Substantial Completion", as used in this Work Letter, is hereby defined to mean the date the building department of the municipality having jurisdiction of the Premises shall have made a final inspection of the Tenant Improvements to the Premises, or a portion thereof, and authorized a final release of restrictions on the use of public utilities in connection therewith and the same are in a broom-clean condition.

7.2   Lessor shall use its best efforts to achieve Substantial Completion of the Tenant Improvements on or before the Commencement Date set forth in Paragraph 1.5 of the Basic Lease Provisions or within three hundred sixty (360) days after Lessor obtains the building permit from the applicable building department and all necessary governmental authorities as required, whichever is later.

7.3   In the event that the Tenant Improvements or any portion thereof have not reached Substantial Completion by the Commencement Date, this Lease shall not be invalid, but rather Lessor shall complete the same as soon thereafter as is possible and Lessor shall not be liable to Lessee for damages in any respect whatsoever.

8.   <u>Term</u>

Upon Substantial Completion of the Tenant Improvements as defined in Paragraph 7, above, Lessor and Lessee shall execute an amendment to the Lease setting forth the date of Tender of Possession as defined in Paragraph 3.2.1 of the Lease or of actual taking of possession, whichever first occurs, as the Commencement Date of this Lease.

9.   <u>Taking of Possession of Premises</u>

Lessor shall notify Lessee of the estimated Completion Date at least ten (10) days before said date. Lessee shall thereafter have the right to enter the Premises, or a portion thereof, to commence construction of any work to be done by Lessee and to equip and fixturize the Premises, as long as such entry does not interfere with Lessor's work. Lessee shall take possession of the Premises, or a portion thereof, upon the tender thereof as provided in Paragraph 3.2.1 of the Lease to which this Work Letter is attached. Any entry by Lessee of the Premises under this paragraph shall be with all of the terms and provisions of the Lease to which this Work Letter is attached.

10.   <u>Acceptance of Premises</u>

Upon the Substantial Completion of the Tenant Improvements, Lessor may submit to Lessee an agreement (the "Substantial Completion Acknowledgment") by which Lessor and Lessee shall acknowledge and agree that the Tenant Improvements are substantially complete and within ten (10) days following Tender of Possession as set forth in Paragraph 3.2.1 of the lease to which this Work Letter is attached, shall specify the remaining items ("Punch-list Items") to be done, completed or repaired by Lessor that were not done or completed pursuant to the approved Working Drawings, Changes, Additions, or Alterations. Lessee agrees not to unreasonably withhold its execution of such Substantial Completion Acknowledgment and to cooperate with Lessor in Lessor's performance, completion or correction of Punch-list Items. Upon Lessor's performance, completion or correction of Punch-List Items, the Tenant Improvements shall be deemed fully complete. Lessee shall execute such additional documentation evidencing full completion of the Tenant Improvements as Lessor may reasonably require. Any remaining items, as specified by Lessee, to be done, completed or repaired that were not originally part of the approved Working Drawings, Changes, Additions, or Alterations, shall not cause any delay whatsoever in Lessee's execution of the Substantial Completion Agreement and any such additional documentation evidencing full completion of the Tenant Improvements as Lessor may reasonably require. Lessee shall be deemed to have accepted the premises and approved construction if Lessee does not deliver such a list to Lessor within said number of days.

11.   <u>Work Done by Lessee</u>

11.1   Any work done by Lessee shall be done only with Lessor's prior written consent and in conformity with a valid building permit and all applicable rules, regulations, laws and ordinances, and be done in a good and workmanlike manner with good and sufficient materials. All work shall be done only by contractors approved by Lessor, it being understood that all HVAC, plumbing, mechanical, electrical wiring and ceiling work are to be done only by contractors designated by Lessor.

11.2   In accordance with the terms and conditions of the Lease and this Work Letter, attached hereto as part of the Lease, the following items, which shall in no event affect the Tender of Possession of Premises as defined in Paragraph 3.2.2 of the Lease and Paragraph 9 of this Work Letter and Acceptance of Premises as defined in Paragraph 10 of this Work Letter, shall be deemed as Work Done by Lessee and shall be the sole responsibility of Lessee, and shall not be deemed Tenant Improvements:

11.2.1   Supply and Install Built-In Furniture to the Premises.

11.2.2   Supply and Install Interior Art Work/Art Work for the Premises.

11.2.3   Supply and Install Refrigerator(s) to the Premises.

11.2.4   Supply and Install All Computers and Computer Systems, Phone Systems, Information Systems, Software for the Premises and Payment of All Associated Service Installation and Repair and Maintenance costs.

11.2.5   Supply and Install Exam Room Tables to the Premises.

11.2.6   Supply and Install any Mobile Medical Equipment to the Premises.

11.2.7   Supply Clinical Instruments for the Premises.

11.2.8   Supply Pharmaceuticals, Soft Goods, and Durable Medical Goods/Equipments for the Premises.

11.2.9   Supply and Install Fire Extinguishers to the Premises and Obtain Certification as required.

12.   <u>Data Processing</u>

All data processing and other special electrical equipment shall be installed only under the observation of Lessor's electrical contractor.

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Exhibit C
Page 3 of 3

Initial:

## GUARANTY OF LEASE

WHEREAS, BROTMAN CULVER CITY MEDICAL TOWER, A DELAWARE LIMITED LIABILITY COMPANY DBA BROMAN PHYSICIANS PLAZA, hereinafter "Lessor" HENRY LOUIS KIRSCH, M.D., AN INDIVIDUAL AND MICHAEL B. KAMIEL, M.D., AN INDIVIDUAL, hereinafter "Lessee", are about to execute a document entitled "Lease" dated JANUARY 21, 2016 concerning the Premises commonly known as Suite 503 located at 9808 Venice Boulevard, Los Angeles, California, wherein Lessor will lease the Premises to Lessee, and

WHEREAS, Henry Louis Kirsch, M.D., an individual and Michael B. Kamiel, M.D., an individual, hereinafter Guarantors have a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantors did not execute and deliver to Lessor this Guaranty of Lease.

NOW THEREFORE, in consideration of the execution of the forgoing Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantors hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed that the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a course of conduct, and said Lease may be assigned by Lessor or any assignee of Lessor without consent or notice to Guarantors and that this Guaranty shall guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantors, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantors following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantors hereunder following any breach or default by Lessee without first proceeding against Lessee and without previous notice to or demand upon either Lessee or Guarantors.

Guarantors hereby waive (a) notice of acceptance of this Guaranty. (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantors or any other person or entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantors, (g) any right of subrogation.

Guarantors do hereby subrogate all existing or future indebtedness of Lessee to Guarantors to the obligations owed to Lessor under the Lease and this Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided shall be deemed to also require the Guarantors hereunder to do and provide the same.

The term Lessor refers to and means the Lessor named in the Lease and also Lessor's successors and assigns. So long as Lessor's interest in the Lease, the leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantors of the Lessor's interest shall affect the continuing obligation of Guarantors under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term Lessee refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

In the event any action be brought by said Lessor against Guarantors hereunder to enforce the obligation of Guarantors hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee which shall be fixed by the court.

"GUARANTORS"

By: _Henry L. Kirsch MD_

Henry Louis Kirsch, M.D.

Date: _1/22/2016_

By: _Michael B. Kamiel_

Michael B. Kamiel, M.D.

Date: _1/22/16_

# EXHIBIT 2

100638585

## THREE-DAY NOTICE TO COMPLY WITH LEASE AND PAY RENT AND CHARGES OR QUIT

TO:     _Michael B. Kamiel, MD
Address:  9808 Venice Blvd., Suite 503, Los Angeles, CA 90232

AND TO ALL TENANTS IN POSSESSION.

NOTICE IS HEREBY GIVEN that under the terms of the Lease under which you took possession of the premises located at 9808 Venice Blvd., Ste.503,Los Angeles, CA 90232, there is now due, owing and unpaid rent and other charges for the premises in the total amount of $28,098.79 as follows:

| Description | Amount |
|---|---|
| October 2021 Rent & November 2021 Rent | $9912.79 |
| Bounced Check #9774 | $2016.00 |
| Bounced Check #9775 | $2016.00 |
| Bounced Check #9512 | $2016.00 |
| Bounced Check #9513 | $2016.00 |
| December 2021 Rent | $4559.00 |
| January 2022 Rent | $5563.00 |

Within THREE (3) days after service of this notice, you are required to pay the above specified rent and other charges in full or deliver up occupancy and possession of the premises referenced above to the Lessor. Your Lessor hereby elects to declare a forfeiture of the Lease in the event you fail to pay the rent and other charges as set forth above.

If you fail to pay the rent and other charges as specified above, or deliver up occupancy and possession of the premises within THREE (3) days, legal proceedings may be commenced to recover possession of the premises, declare the Lease forfeited and recover damages, costs and other relief.  This notice supersedes all prior notices to pay or quit relating to the above-mentioned premises. The rent specified above claimed by Lessor is a reasonable estimate pursuant to California Code of Civil Procedure §1161.1(a).

Lessor's Acceptance of any partial rent will not constitute a waiver of any of Lessor's rights, including any right the Lessor may have to recover possession of the property except that you will be given credit for the amount paid against the total amount owing.

Your payment should be made payable to Culver City Medical Tower, LLC and payment shall be delivered to: 11645 Wilshire Boulevard, Suite 901, Los Angeles, California 90025 no later than January 24, 2022 before 5:00 pm. Tel. # 818-882-5700

DATED:   January 19, 2022                              Brotman Physicians Plaza
                                                        LESSOR
                                                        BY: _Adrianne Robledo_
                                                        Adrianne Robledo, Accounting Department

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                PROOF OF SERVICE
I, _Adrianne Robledo_ declare as follows;
I served the above Notice as follows: METHOD OF SERVICE: (check one)

1.  ____✓____ By handing a copy to person or party served or handing a copy with an adult at the premises described in the above mentioned address
    NAME OF PERSON THAT RECEIVED NOTICE: Rep- Front Office
    DATE OF DELIVERY: 1-19-22

2.  ____✓____ By mailing a copy to the person or party served, addressed to said person or party at the same premises described in the above mentioned notice by regular mail and certified mail; MAILING DATE: 1-19-22 .

3.  _____ By posting a copy on the door at the premises described in the above mentioned notice after finding no adult available at the premises to receive the notice POSTING DATE _____ .

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration is executed on
1-19-22 at Los Angeles, California.                     By: _Adrianne Robledo_

# EXHIBIT 3

100638585

Assigned for all purposes to: Santa Monica Courthouse, Judicial Officer: Craig Karlan

Electronically FILED by Superior Court of California, County of Los Angeles on 02/10/2022 04:12 PM Sherri R. Carter, Executive Officer/Clerk of Court, by V. Yonker,Deputy Clerk

**UD-100**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER: |
| NAME: Lane Nussbaum, SBN 264200 | |
| FIRM NAME: Nussbaum APC | |
| STREET ADDRESS: 27489 Agoura Rd. Ste. 102 | |
| CITY: Agoura Hills CA 91301   STATE:   ZIP CODE: | |
| TELEPHONE NO.: 818-660-1919   FAX NO.: 818-864-3241 | |
| EMAIL ADDRESS: info@nussbaumapc.com | |
| ATTORNEY FOR (name): Culver City Medical Tower, LLC | |

**FOR COURT USE ONLY**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles
STREET ADDRESS: 1725 Main St.
MAILING ADDRESS: 1725 Main St.
CITY AND ZIP CODE: Santa Monica 90401
BRANCH NAME: Santa Monica Courthouse

PLAINTIFF: Culver City Medical Tower, LLC

DEFENDANT: Michael B. Kamiel, M.D.

[✓] DOES 1 TO    10

| | | |
|---|---|---|
| **COMPLAINT—UNLAWFUL DETAINER*** | | CASE NUMBER: |
| [✓] COMPLAINT   [ ] AMENDED COMPLAINT   (Amendment Number): | | 22SMCV00211 |

**Jurisdiction** *(check all that apply):*

[ ] **ACTION IS A LIMITED CIVIL CASE**
Amount demanded   [ ] does not exceed $10,000.
　　　　　　　　　　[ ] exceeds $10,000 but does not exceed $25,000.
[✓] **ACTION IS AN UNLIMITED CIVIL CASE** (amount demanded exceeds $25,000)
[ ] **ACTION IS RECLASSIFIED** by this amended complaint or cross-complaint *(check all that apply):*
　　[ ] from unlawful detainer to general unlimited civil (possession not in issue).   [ ] from limited to unlimited.
　　[ ] from unlawful detainer to general limited civil (possession not in issue).   [ ] from unlimited to limited.

1. *PLAINTIFF (name each):*
   Culver City Medical Tower, LLC

   *alleges causes of action against DEFENDANT (name each):*

   Michael B. Kamiel, M.D.

2. a.   Plaintiff is  (1) [ ] an individual over the age of 18 years.  (4) [ ] a partnership.
   　　　　　　　　(2) [ ] a public agency.　　　　　　　　　(5) [ ] a corporation.
   　　　　　　　　(3) [✓] other *(specify):* limited liability company
   b. [ ] Plaintiff has complied with the fictitious business name laws and is doing business under the fictitious name of *(specify):*

3. a.   *The venue is the court named above because defendant named above is in possession of the premises located at (street address, apt. no., city, zip code, and county):*
   9808 Venice Blvd., Suite 503, Los Angeles, CA 90232, County of Los Angeles

   b.   The premises in 3a are *(check one)*
   　　(1) [✓] within the city limits of *(name of city):* Los Angeles
   　　(2) [ ] within the unincorporated area of *(name of county):*

   c.   The premises in 3a were constructed in *(approximate year):*

4. Plaintiff's interest in the premises is [ ] as owner [✓] other *(specify):* Landlord

5. The true names and capacities of defendants sued as Does are unknown to plaintiff.

*****NOTE:** Do not use this form for evictions after sale (Code Civ. Proc., § 1161a).

**Page 1 of 4**

| | | |
|---|---|---|
| Form Approved for Optional Use | **COMPLAINT—UNLAWFUL DETAINER** | Civil Code, § 1940 et seq.; |
| Judicial Council of California | | Code of Civil Procedure, §§ 425.12, 1166 |
| UD–100 [Rev. September 1, 2020] | | *www.courts.ca.gov* |

100612828

**UD-100**

| | |
|---|---|
| PLAINTIFF: Culver City Medical Tower, LLC | CASE NUMBER: |
| DEFENDANT: Michael B. Kamiel, M.D., et al. | |

6.  a.  On or about *(date):* 2020-12-05
    *defendant (name each):*
    Michael B. Kamiel, M.D.

    (1)  agreed to rent the premises as a ☐ month-to-month tenancy  ☑ other tenancy *(specify):* Fixed term expiring 01/31/2026
    (2)  agreed to pay rent of  $ 12,457.85   payable  ☑ monthly  ☐ other *(specify frequency):*
    (3)  agreed to pay rent on the  ☑ first of the month  ☐ other day *(specify):*

    b.  This  ☑ written  ☐ oral   agreement was made with
    (1)  ☐ plaintiff.  (3)  ☐ plaintiff's predecessor in interest.
    (2)  ☑ plaintiff's agent.  (4)  ☐ Other *(specify):*

    c.  ☑ The defendants not named in item 6a are
    (1)  ☐ subtenants.
    (2)  ☐ assignees.
    (3)  ☑ Other *(specify):*  Unknown occupants

    d.  ☐ The agreement was later changed as follows *(specify):*

    e.  ☑ A copy of the written agreement, including any addenda or attachments that form the basis of this complaint, is attached
    and labeled Exhibit 1. *(Required for residential property, unless item 6f is checked. See Code Civ. Proc., § 1166.)*

    f.  ☐ *(For residential property)* A copy of the written agreement is **not** attached because *(specify reason):*
    (1)  ☐ *the written agreement is not in the possession of the landlord or the landlord's employees or agents.*
    (2)  ☐ *this action is solely for nonpayment of rent (Code Civ. Proc., § 1161(2)).*

7.  The tenancy described in 6 *(complete (a) or (b))*
    a.  ☑ is **not** subject to the Tenant Protection Act of 2019 (Civil Code, § 1946.2). The specific subpart supporting why tenancy
    is exempt is *(specify):*  The property is not residential tenant-occupied property
    b.  ☐ is subject to the Tenant Protection Act of 2019.

8.  *(Complete only if item 7b is checked. Check all applicable boxes.)*
    a.  ☐ The tenancy was terminated for at-fault just cause (Civil Code, § 1946.2(b)(1)).
    b.  ☐ The tenancy was terminated for no-fault just cause (Civil Code, § 1946.2(b)(2)) and the plaintiff *(check one)*
    (1)  ☐ waived the payment of rent for the final month of the tenancy, before the rent came due, under
    section 1946.2(d)(2), in the amount of  $ _____.
    (2)  ☐ provided a direct payment of one month's rent under section 1946.2(d)(3), equaling  $
    to *(name each defendant and amount given to each):*

    c.  ☐ Because defendant failed to vacate, plaintiff is seeking to recover the total amount in 8b as damages in this action.

9.  a.  ☑ Defendant *(name each):*
    Michael B. Kamiel, M.D.

    was served the following notice on the same date and in the same manner:

    (1)  ☑ Notice to pay rent or quit          (5)  ☐ Notice to perform covenants or quit
    (2)  ☐ 30-day notice to quit                    *(not applicable if item 7b checked)*
    (3)  ☐ 60-day notice to quit              (6)  ☐ Notice to quit under Civil Code, § 1946.2(c)
    (4)  ☐ 3-day notice to quit                    Prior required notice to perform covenants served *(date):*
                                             (7)  ☐ Other *(specify):*

100612828

**UD-100**

| | |
|---|---|
| PLAINTIFF: Culver City Medical Tower, LLC | CASE NUMBER: |
| DEFENDANT: Michael B. Kamiel, M.D., et al. | |

9.  b.  (1)  On *(date):* January 24, 2022        the period stated in the notice checked in 9a expired at the end of the day.

(2)  Defendants failed to comply with the requirements of the notice by that date.

c.  All facts stated in the notice are true.

d.  ☑  The notice included an election of forfeiture.

e.  ☑  A copy of the notice is attached and labeled Exhibit 2. *(Required for residential property. See Code Civ. Proc., § 1166. When Civil Code, § 1946.2(c), applies and two notices are required, provide copies of both.)*

f.  ☐  One or more defendants were served (1) with the prior required notice under Civil Code, § 1946.2(c), (2) with a different notice, (3) on a different date, or (4) in a different manner, as stated in Attachment 10c. *(Check item 10c and attach a statement providing the information required by items 9a–e and 10 for each defendant and notice.)*

10.  a.  ☑  The notice in item 9a was served on the defendant named in item 9a as follows:

(1)  ☐  By personally handing a copy to defendant on *(date):*

(2)  ☑  By leaving a copy with *(name or description):*

a person of suitable age and discretion, on *(date):*   January 19, 2022        at defendant's

☐ residence    ☑ business    AND mailing a copy to defendant at defendant's place of residence

on *(date):* January 19, 2022  because defendant cannot be found at defendant's residence or usual place of business.

(3)  ☐  By posting a copy on the premises on *(date):*

☐  AND mailing a copy to defendant at the premises

on *(date):*

(a)  ☐  because defendant's residence and usual place of business cannot be ascertained OR

(b)  ☐  because no person of suitable age or discretion can be found there.

(4)  ☐  *(Not for 3-day notice; see Civil Code, § 1946, before using)* By sending a copy by certified or registered mail addressed to defendant on *(date):*

(5)  ☐  *(Not for residential tenancies; see Civil Code, § 1953, before using)* In the manner specified in a written commercial lease between the parties

b.  ☐  *(Name):*

was served on behalf of all defendants who signed a joint written rental agreement.

c.  ☐  *A copy of the prior Notice is attached as Exhibit 4. Proof of Service of the prior Notice is attached as Exhibit 5*

d.  ☑  *Proof of service of the notice in item 9a is attached and labeled Exhibit 3.*

11.  ☐  *Plaintiff demands possession from each defendant because of expiration of a fixed-term lease.*

12.  ☑  *At the time the 3-day notice to pay rent or quit was served, the amount of **rent due** was*  $ 28,098.79

13.  ☑  *The fair rental value of the premises is*  $  415.26        *per day.*

14.  ☐  *Defendant's continued possession is malicious, and plaintiff is entitled to statutory damages under Code of Civil Procedure section 1174(b). (State specific facts supporting a claim up to $600 in Attachment 14.)*

15.  ☑  *A written agreement between the parties provides for attorney fees.*

16.  ☐  *Defendant's tenancy is subject to local rent control or eviction control ordinance of:*

Plaintiff has met all applicable requirements of the ordinances.

17.  ☐  *Other allegations are stated in Attachment 17.*

18.  Plaintiff accepts the jurisdictional limit, if any, of the court.

100612828

| PLAINTIFF: Culver City Medical Tower, LLC | CASE NUMBER: |
| DEFENDANT: Michael B. Kamiel, M.D., et al. | |

19. **PLAINTIFF REQUESTS**

a. possession of the premises.

b. costs incurred in this proceeding:

c. ☑ past-due rent of $ 28,098.79

d. ☑ reasonable attorney fees.

e. ☑ forfeiture of the agreement.

f. ☐ damages in the amount of waived rent or relocation assistance as stated in item 8: $

g. ☑ damages at the rate stated in item 13 from

*date:* February 01, 2022

for each day that defendants remain in possession through entry of judgment.

h. ☐ statutory damages up to $600 for the conduct alleged in item 14.

i. ☐ other *(specify):*

20. ☐ Number of pages attached *(specify):*

## UNLAWFUL DETAINER ASSISTANT  (Bus. & Prof. Code, §§ 6400–6415)

21. ☐ *(Complete in all cases.)* An unlawful detainer assistant ☑ did **not** ☐ did for compensation give advice or assistance with this form. (*If declarant has received any help or advice for pay from an unlawful detainer assistant, complete a–f.*)

a. Assistant's name:

b. Street address, city, and zip code:

c. Telephone no.:

d. County of registration:

e. Registration no.:

f. Expires on *(date):*

Date: February 7, 2022

Lane Nussbaum

———————————————
(TYPE OR PRINT NAME)

▶

———————————————
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

## SEE ATTACHED VERIFICATION

100612828

DocuSign Envelope ID: F44A2C3D-4629-4061-AE0D-107223A93194

## **VERIFICATION**

I, Edward Gordon Hudson, declare:

I am a member of the Plaintiff.  I have read the foregoing Complaint as well as the Plaintiff's

Mandatory Cover Sheet and Supplemental Allegations--Unlawful Detainer, and know the

contents thereof.  I am the most knowledgeable person regarding the facts therein, and am

therefore authorized to make this verification on its behalf. The matters stated within it are

true of my own knowledge and belief, except as to those matters which are stated to be on

information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury, according to the laws of the State of California, that the

foregoing is true and correct.  Executed on February 7, 2022 in Los Angeles, California

*Edward Hudson*

Edward Gordon Hudson

1

VERIFICATION

100612835

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>EXHIBIT 1</u>**

100612829

> *This First Amendment to Lease is non-binding unless signed by both Lessor and Lessee and further,*
> *unless signed by Lessee and delivered to Lessor by Friday, January 15, 2021 at 5:00 pm,*
> *the terms and conditions offered herein shall be withdrawn and become null and void.*

### FIRST AMENDMENT TO LEASE

This First Amendment to Lease (this "Amendment") dated as of December 5, 2020 is entered into by and between Culver City Medical Tower, LLC, a Delaware limited liability company doing business as Brotman Physicians Plaza ("Lessor") and Henry Louis Kirsch, M.D., an individual and Michael B. Kamiel, M.D., an individual ("Lessee"), with reference to the following:

A.  Lessor and Lessee have entered into that certain Lease dated January 21, 2016 (the "Lease"), with reference to **Suite 503** (the "Premises") of the building located at 9808 Venice Boulevard, Los Angeles, California (the "Building").

B.  <u>Effective November 1, 2020</u> (the "Effective Date"), the parties hereto desire to modify the Lease in the respects hereinafter set forth.  This Amendment shall supplement and amend the Lease and the provisions set forth below shall supersede any inconsistent provisions set forth in the Lease.  All other terms and conditions of the Lease shall be in full force and effect.  Except as may be otherwise specifically provided below, any terms used below which are defined in the Lease shall have their respective meanings set forth in the Lease.  This Amendment shall become binding upon Lessor and Lessee only if fully executed by both parties.

NOW, THEREAFTER, in consideration of the foregoing, the parties hereto agree as follows:

1.  **Lessee (Section 1.1).** Commencing February 1, 2021, Lessee shall be Michael B. Kamiel, M.D., an individual. Henry Louis Kirsch, M.D., an individual shall be released of all obligations under the Lease.

2.  **Lease Term (Paragraph 1.5).** The Term of the Lease shall expire on January 31, 2026.

3.  **Base Rent (Paragraph 1.6).** Commencing February 1, 2021, the Base Rent shall be $12,095.00 per month, plus all applicable rent increases.

4.  **Base Rent (Paragraph 1.6).** Provided Lessee is not in default of the Lease, the monthly Base Rent for February and August 2021, February and August 2022, February and August 2023, February and August 2024, and February and August 2025 shall be discounted by fifty percent (50%) for these months only.

5.  **Base Year (Paragraph 4.2b).** Commencing January 1, 2021, the Base Year shall be 2021.

6.  **Guaranty of Lease.** Concurrently with the execution of this First Amendment to Lease, Michael B. Kamiel, M.D. shall execute a replacement Guaranty of Lease, attached hereto as Exhibit "A" and made part of this Amendment. Effective as of February 1, 2021, Henry Louis Kirsch, M.D. shall be released of all obligations as Guarantor.

7.  **Lessee's Obligation (Section 7.2).**

    7.1.  **Lessee's Medical Equipment.** Notwithstanding anything to the contrary contained in this Section 7 of the Lease, all of Lessee's medical equipment, including but not limited to any, surgical equipment, gas and/or water lines, compressor systems, dental chairs, battery back-up systems, and/or any other medical equipment exclusive to Lessee shall be the sole responsibility of Lessee. Any costs of repair, maintenance, and/or replacement of said medical equipment shall be exclusively borne by Lessee. Lessee must maintain said equipment in good working order with periodic inspection of equipment to verify equipment is functioning appropriately and free from leaks.

    7.2.  **Plumbing.** Plumbing fixtures in the Premises for the sole use of Lessee, including but not limited to toilets, sinks, and floor drains, (hereby called "Plumbing Fixtures") shall be used only for purposes for which constructed, and any damage resulting to any Plumbing Fixtures from misuse by Lessee shall be paid by Lessee and Lessor shall not in any case be responsible therefore. Any and all costs in connection with the repairs, maintenance, and/or replacement of said Plumbing Fixtures, beyond normal wear and tear, will be Lessee's sole responsibility. Lessee shall cause to be performed periodic inspection of plumbing connections by certified plumber within the Premises to ensure that all Plumbing Fixtures are in good working order. Plumbing Fixtures Lessee must observe strict care and caution that all water faucets and water apparatus (including water shut-off valves) are shut off before Lessee or its employees leave the Premises.

    7.3.  **Independent/Supplement HVAC Systems.** In the event there is an independent/supplemental HVAC system installed in the Premises for the exclusive use of Lessee, or should an independent/supplemental be HVAC installed any time during the Term of the Lease, any and all costs associated with the maintenance, repairs, and/or replacement of the independent/supplemental HVAC system shall be borne by Lessee. Lessor shall retain a maintenance and service contract with Lessor's approved HVAC vendor

at Lessee's sole expense (the "Maintenance Contract") for the independent/supplemental HVAC system and bill Lessee accordingly. Additionally, in consideration of the excess utility usage, Lessee shall pay to Lessor as additional rent on the 1st of each month, an amount Lessor deems reason for the cost of said excess utility usage.

8. **Notices (Paragraph 23).** Notwithstanding anything to the contrary contained in Paragraph 23 of the Lease, Lessor at its option shall also send notices regarding rent to the following email address: _____ or to another email address, as specified by Lessee to Lessor.

9. **ACH/Direct Deposit Transactions (Paragraph 4.1).** Lessee shall pay Base Rent directly to Lessor electronically via either Automated Clearing House (ACH) payment or via Lessee initiated direct deposit payment into a bank account specified by Lessor, as may be updated from time to time. Lessee may make arrangements with Lessor to pay Base Rent through other agreed upon methods.

No further text on this page.



Page 2 of 4
of the First Amendment to Lease by and between
Culver City Medical Tower, LLC and Michael B. Kamiel, M.D.
Dated December 5, 2020

WITNESS WHEREOF, the parties have hereunder set their hands and seals this _____ day of _____, 20__.

**"LESSOR"**

Culver City Medical Tower, LLC,
a Delaware limited liability company

By: <u>Vendel Equities, LLC</u>
    <u>a California limited liability company</u>
Its: <u>Sole Member</u>

By: _____
    Edward G. Hudson
Its: <u>Manager</u>

Executed at: _____

On: _____

Address: _____
         _____

**"LESSEE"**

Michael B. Kamiel, M.D., an individual

By: _____
    Michael B. Kamiel, M.D.

Its: _____

Executed on: _____

*Acknowledged and Accepted by:*
Henry Louis Kirsch, M.D., an individual

By: _____
    Henry Louis Kirsch, M.D.
Its: _____

Executed on: Dec 17, 2020

First Amendment to Lease
GUARANTY OF LEASE

WHEREAS, Culver City Medical Tower, LLC a Delaware limited liability company, DBA Brotman Physicians Plaza, hereinafter Lessor, and Michael B. Kamiel, M.D., an individual, hereinafter Lessee, are about to execute a document entitled First Amendment to Lease dated December 5 2020 concerning the Premises commonly known as Suite 503 located at 11645 Wilshire Boulevard, Los Angeles, California, wherein Lessor has leased the Premises to Lessee, and

WHEREAS, Michael B. Kamiel, M.D., hereinafter Guarantor has a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantor did not execute and deliver to Lessor this Guaranty of Lease.

NOW THEREFORE, in consideration of the execution of the forgoing Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantor hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed that the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a course of conduct, and said Lease may be assigned by Lessor or any assignee of Lessor without consent or notice to Guarantor and that this Guaranty shall guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantor, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantor following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantor hereunder following any breach or default by Lessee without first proceeding against Lessee and without previous notice to or demand upon either Lessee or Guarantor.

Guarantor hereby waives (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantor or any other person or entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantor, (g) any right of subrogation.

Guarantor does hereby subrogate all existing or future indebtedness of Lessee to Guarantor to the obligations owed to Lessor under the Lease and this Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided shall be deemed to also require the Guarantor hereunder to do and provide the same.

The term Lessor refers to and means the Lessor named in the Lease and also Lessor's successors and assigns. So long as Lessor's interest in the Lease, the leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantor of the Lessor's interest shall affect the continuing obligation of Guarantor under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term Lessee refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

In the event any action be brought by said Lessor against Guarantor hereunder to enforce the obligation of Guarantor hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee which shall be fixed by the court.

"GUARANTOR"
Michael B. Kamiel, M.D.

By: _____
Michael B. Kamiel, M.D.

Date: _____

Page 4 of 4
of the First Amendment to Lease by and between
Culver City Medical Tower, LLC and Michael B. Kamiel, M.D.
Dated December 5, 2020

*The terms offered herein shall expire if a Lease is not executed by Lessee and delivered to Lessor by Friday, January 29, 2016*

# MEDICAL OFFICE LEASE

1.    **Basic Lease Provisions** ("Basic Lease Provisions")

1.1    **Parties:**  This Lease, dated, for reference purposes only, JANUARY 21, 2016, is made by and between CULVER CITY MEDICAL TOWER, LLC A DELAWARE LIMITED LIABILITY COMPANY, DBA BROTMAN PHYSICIANS PLAZA (herein called "Lessor") and HENRY LOUIS KIRSCH, M.D., AN INDIVIDUAL AND MICHAEL B. KAMIEL, M.D., AN INDIVIDUAL (herein called "Lessee").

1.2    **Premises:**  Suite Number 503, consisting of approximately not less than 2,419 rentable square feet, more or less, as defined in Paragraph 2 and as shown on Exhibit "A" hereto (the "Premises").

1.3    **Building:**  Commonly described as being located at 9808 VENICE BOULEVARD, in the City of LOS ANGELES, County of LOS ANGELES, State of CALIFORNIA, as defined in Section 2.

1.4    **Use:**  MEDICAL OFFICE, subject to Paragraph 6.

1.5    **Term:**  FIVE years commencing FEBRUARY 1, 2016 ("Commencement Date") and ending JANUARY 31, 2021 as defined in Paragraph 3.

1.6    **Base Rent:** $9,202.95 per month, payable on the FIRST day of each month, commencing FEBRUARY 1, 2016 per Paragraph 4.1.

1.7    **Base Rent Increase:** On EACH ANNUAL ANNIVERSARY OF THE COMMENCEMENT DATE OF THIS LEASE the monthly Base Rent payable under Paragraph 1.6 above shall be adjusted as provided in Paragraph 4.3 below.

1.8    **Rent Paid Upon Execution:** $9,202.95 for the first month's Base Rent.

1.9    **Security Deposit:** $0.00 due upon Lease execution.

1.10    **Lessee's Share of Operating Expense Increase:** 4.9% as defined in Paragraph 4.2.

2.    **Premises, Parking and Common Areas.**

2.1    **Premises.**

2.1.1    The Premises are a portion of a building, herein sometimes referred to as the "Building" identified in paragraph 1.3 of the Basic Lease Provisions.  "Building" shall include adjacent parking structures used in connection therewith.  The Premises, the Building, the Common Areas, the land upon which the same are located, along with all other buildings and improvements thereon or thereunder, are herein collectively referred to as the "Office Building Project."  Lessor hereby leases to Lessee and Lessee leases from Lessor for the term, at the rental, and upon all of the conditions set forth herein, the real property referred to in the Basic Lease Provisions, paragraph 1.2, as the "Premises," including rights to the Common Areas as hereinafter specified.

2.1.2    Lessor's architect or space planner shall determine and certify in writing to Lessor the actual rentable area of the Premises and the Building, respectively, in accordance with then current Standard Methods of Measuring Floor Area in Office Buildings, as promulgated by the Building Owners and Management Association (BOMA) and the Base Rent, Lessee's Share of Operating Expense Increase, Vehicle Parking or any other provision of the Lease based on the size of the Premises shall be adjusted accordingly.

2.2    **Vehicle Parking.**  So long as Lessee is not in default, and subject to the rules and regulations attached hereto, and as established by Lessor from time to time, Lessee shall be entitled to rent and use FIVE (5) parking spaces in the Office Building Project at the monthly rate applicable from time to time for monthly parking as set by Lessor and/or its licensee.

2.2.1    If Lessee commits, permits or allows any of the prohibited activities described in the Lease or the rules then in effect, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.2.2    The monthly parking rate per parking space will be MARKET RATE per month at the commencement of the term of this Lease, and is subject to change upon five (5) days prior written notice to Lessee.  Monthly parking fees shall be payable one month in advance prior to the first day of each calendar month.

2.3    **Common Areas-Definition.**  The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Office Building Project that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and of other lessees of the Office Building Project and their respective employees, suppliers, shippers, customers and invitees, including but not limited to common entrances, lobbies, corridors, stairways and stairwells, public restrooms, elevators, escalators, parking areas to the extent not otherwise prohibited by this Lease, loading and unloading areas, trash areas, roadways, sidewalks, walkways, parkways, ramps, driveways, landscaped areas and decorative walls.

2.4    **Common Areas-Rules and Regulations.**  Lessee agrees to abide by and conform to the rules and regulations attached hereto as Exhibit B with respect to the Office Building Project and Common Areas, and to cause its employees, suppliers, shippers, customers, and invitees to so abide and conform.  Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to modify, amend and enforce said rules and regulations.  Lessor shall not be responsible to Lessee for the non-compliance with said rules and regulations by other lessees, their agents, employees and invitees of the Office Building Project,

2.5    **Common Areas-Changes.**  Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)    To make changes to the Building interior and exterior and Common Areas, including, without limitation, changes in the location, size, shape, number, and appearance thereof, including but not limited to the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, decorative walls, landscaped areas and walkways; provided, however, Lessor shall at all times provide the parking facilities required by applicable law;

(b) To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)    To designate other land and improvements outside the boundaries of the Office Building Project to be a part of the Common Areas, provided that such other land and improvements have a reasonable and functional relationship to the Office Building Project;

(d)    To add additional buildings and improvements to the Common Areas;

(e)    To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Office Building Project, or any portion thereof;

(f)    To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Office Building Project as Lessor may, in the exercise of sound business judgment deem to be appropriate.

3.    **Term.**

3.1    **Term.**  The term and Commencement Date of this Lease shall be as specified in paragraph 1.5 of the Basic Lease Provisions.

3.2    **Delay in possession.**  Notwithstanding said Commencement Date, if for any reason Lessor cannot deliver possession of the Premises to Lessee on said date and subject to paragraph 3.2.2, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or the obligations of Lessee hereunder or extend the term hereof; but, in such case, Lessee shall not be obligated to pay rent or perform any other obligation of Lessee under the terms of this Lease, except as may be otherwise provided in this Lease, until possession of the Premises is tendered to Lessee, as hereinafter defined; provided, however, that if Lessor shall not have delivered possession of the Premises within sixty (60) days following said Commencement Date, as the same may be extended under the terms of a Work Letter executed by Lessor and Lessee, Lessee may, at Lessee's option, by notice in writing to Lessor within ten (10) days thereafter, cancel this Lease, in which event the parties shall be discharged from all obligations hereunder;

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Page 1 of 12

Initial:

provided, however, that, as to Lessee's obligations, Lessee first reimburses Lessor for all costs incurred for Non-Standard Improvements and, as to Lessor's obligations, Lessor shall return any money previously deposited by Lessee (less any offsets due Lessor for Non-Standard Improvements); and provided further, that if such written notice by Lessee is not received by Lessor within said ten (10) day period, Lessee's right to cancel this Lease hereunder shall terminate and be of no further force or effect.

        3.2.1    **Possession Tendered-Defined.**  Possession of the Premises shall be deemed tendered to Lessee ("Tender of Possession") when (1) the improvements to be provided by Lessor under this Lease are substantially completed, (2) the Building utilities are ready for use in the Premises, (3) Lessee has reasonable access to the Premises, and (4) ten (10) days shall have expired following advance written notice to Lessee of the occurrence of the matters described in (1), (2) and (3), above in this Paragraph 3.2.1.

        3.2.2    **Delays Caused by Lessee.**  There shall be no abatement of rent for any delay caused by Lessee.  If there is any delay caused by the acts or omissions of Lessee, Lessee's agents, employees or contractors, and that delay in the aggregate exceeds fifteen (15) days, Lessee's right to terminate the Lease, if any, under Paragraph 3.2, or otherwise, is terminated and waived and of no force or effect and Lessee waives any and all claims against Lessor in connection with any delay caused by Lessee.

    3.3    **Early Possession.**  If Lessee occupies the Premises prior to said Commencement Date, such occupancy shall be subject to all provisions of this Lease, such occupancy shall not change the termination date, and Lessee shall pay rent for such occupancy.

    3.4    **Uncertain Commencement.**  In the event commencement of the Lease term is defined as the completion of the improvements, Lessee and Lessor shall execute an amendment to this Lease establishing the date of Tender of Possession (as defined in paragraph 3.2.1) or the actual taking of possession by Lessee, whichever first occurs, as the Commencement Date.

    **3.5**    **Reversion.**  Lessee acknowledges that the Premises and Project are subject to  a Declaration of Covenants, Conditions and Restrictions (the "CC&R's), a copy of which has been provided to Lessee by Lessor, in favor of  Brotman Medical Center, Inc., a California Corporation (the "Declarant") with regard to the Premises and the Office Building Project. Lessee agrees that it will not do anything which will constitute a violation of the CC&Rs.

**4.**    **Rent.**

    4.1    **Base Rent.**  Subject to adjustment as hereinafter provided in Paragraph 4.3, and except as may be otherwise expressly provided in this Lease, Lessee shall pay to Lessor the Base Rent for the Premises set forth in paragraph 1.6 of the Basic Lease Provisions, without offset or deduction. Lessee shall pay Lessor upon execution hereof the advance Base Rent described in paragraph 1.8 of the Basic Lease Provisions.  Rent for any period during the term hereof which is for less than one month shall be prorated based upon the actual number of days of the calendar month involved.  Rent shall be payable in lawful money of the United States to Lessor at the address stated herein or to such other persons or at such other places as Lessor may designate in writing.

    4.2    **Operating Expense Increase.**  Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share, as hereinafter defined, of the amount by which all Operating Expenses, as hereinafter defined, for each Comparison Year exceeds the amount of all Operating Expenses for the Base Year such excess being hereinafter referred to as the "Operating Expense Increase,"  in accordance with the following provisions:

        (a)    "Lessee's Share" is defined, for purposes of this Lease, as the percentage set forth in paragraph 1.10 of the Basic Lease Provisions, which percentage has been determined by dividing the approximate square footage of the Premises by the total approximate square footage of the rentable space contained in the Office Building Project.  It is understood and agreed that the square footage figures set forth in the Basic Lease Provisions are approximations, which Lessor and Lessee agree are reasonable and shall not be subject to revision except in connection with an actual change in the size of the Premises or a change in the space available for lease in the Office Building Project.

        (b)    "Base Year" is defined as the calendar year in which the Lease term commences.

        (c)    "Comparison Year" is defined as each calendar year during the term of this Lease subsequent to the Base Year.  Lessee's Share of the Operating Expense Increase for the last Comparison Year of the Lease Term shall be prorated according to that portion of such Comparison Year as to which Lessee is responsible for a share of such increase.

        (d)    "Operating Expenses" is defined, for purposes of this Lease, to include all costs, if any, incurred by Lessor in the exercise of its reasonable discretion, for:

            (i)    The operation, repair, maintenance, and replacement, in neat, clean, sale, good order and condition, of the Office Building Project, including but not limited to, the following:

                (aa)    The Common Areas, including their surfaces, coverings, decorative items, carpets, drapes and window coverings, and including parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, stairways, parkways, driveways, landscaped areas, striping, bumpers, irrigation systems, Common Area lighting facilities, building exteriors and roofs, fences and gates;

                (bb)    All heating, air conditioning, plumbing, electrical systems, life safety equipment, telecommunication and other equipment used in common by, or for the benefit of, lessees or occupants of the Office Building Project, including elevators and escalators, tenant directories, fire detection systems including sprinkler system maintenance and repair.

            (ii)    Trash disposal, janitorial and security services;

            (iii)    Any other service to be provided by Lessor that is elsewhere in this Lease stated to be an "Operating Expense";

            (iv)    The cost of the premiums for the liability and property insurance policies to be maintained by Lessor under Paragraph 8 hereof;

            (v)    The amount of the real property taxes to be paid by Lessor under paragraph 10.1 hereof;

            (vi)    The cost of water, sewer, gas, electricity, and other publicly mandated services to the Office Building Project;

            (vii)    Labor, salaries and applicable fringe benefits and costs, materials, supplies and tools, used in maintaining and/or cleaning the Office Building Project and accounting and a management fee attributable to the operation of the Office Building Project;

            (viii)    Replacing and/or adding improvements mandated by any governmental agency and any repairs or removals necessitated thereby amortized over its useful life according to Federal income tax regulations or guidelines for depreciation thereof (including interest on the unamortized balance as is then reasonable in the judgment of Lessor's accountants);

            (ix)    Replacements of equipment or improvements that have a useful life for depreciation purposes according to Federal income tax guidelines of five (5) years or less, as amortized over such life.

        (e)    Operating Expenses shall not include the costs of replacements of equipment or improvements that have a useful life for Federal income tax purposes in excess of five (5) years unless it is of the type described in paragraph 4.2(d)(viii), in which case their cost shall be included as above provided.

        (f)    Operating Expenses shall not include any expenses paid by any lessee directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or by insurance proceeds.

        (g)    Lessee's Share of Operating Expense Increase shall be payable by Lessee within ten (10) days after a reasonably detailed statement of actual expenses is presented to Lessee by Lessor.  At Lessor's option, however, an amount may be estimated by Lessor from time to time in advance of Lessee's Share of the Operating Expense Increase for any Comparison Year, and the same shall be payable monthly or quarterly, as Lessor shall designate, during each Comparison Year of the Lease term, on the same day as the Base Rent is due hereunder.  In the event that Lessee pays Lessor's estimate of Lessee's Share of Operating Expense Increase as aforesaid, Lessor shall deliver to Lessee within ninety (90) days after the expiration of each Comparison Year a reasonably detailed statement showing Lessee's Share of the actual Operating Expense Increase incurred during such year.  If Lessee's payments under this paragraph 4.2(g) during said Comparison Year exceed Lessee's Share as indicated on said statement, Lessee shall be entitled to credit the amount of such overpayment against Lessee's Share of Operating Expense Increase next falling due.  If Lessee's payments under this paragraph during said Comparison Year were less than Lessee's Share as indicated on said statement, Lessee shall pay to Lessor the amount of the deficiency within ten (10) days after delivery by Lessor to Lessee of said statement.  Lessor and Lessee shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last Comparison Year for which Lessee is responsible as to Operating Expense Increases, notwithstanding that the Lease term may have terminated before the end of such Comparison Year.

    4.3    **Base Rent Increase.**

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND              Page 2 of 12
MICHAEL B. KAMIEL, M.D.

Initials

4.3.1    At the times set forth in Paragraph I.7 of the Basic Lease Provisions, the monthly Base Rent payable under Paragraph 4.1 of this Lease shall be adjusted by the increase, if any, in the Consumer Price Index of the Bureau of Labor Statistics of the Department of Labor for All Urban Consumers, (1982-84=100), "All items" for the city nearest the location of the Building, herein referred to as "C.P.I." since the date of this Lease.

4.3.2    The monthly Base Rent payable pursuant to Paragraph 4.3.1 shall be calculated as follows: the Base Rent payable for the first month of the term of this Lease, as set forth in paragraph 4.1 of this Lease, shall be multiplied by a fraction the numerator of which shall be the C.P.I. of the calendar month during which the adjustment is to take effect, and the denominator of which shall be the C.P.I. for the calendar month in which the original Lease term commences. The sum so calculated shall constitute the new monthly Base Rent hereunder, but, in no event, shall such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the date for the rent adjustment.

4.3.3    In the event the compilation and/or publication of the C.P.I. shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the Index most nearly the same as the C.P.I. shall be used to make such calculations. In the event that Lessor and Lessee cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in the County in which the Premises are located, in accordance with the then rules of said association and the decision of the arbitrators shall be binding upon the parties, notwithstanding one party failing to appear after due notice of the proceeding. The cost of said Arbitrators shall be paid equally by Lessor and Lessee.

4.3.4    Lessee shall continue to pay the Base Rent at the rate previously in effect until the increase, if any is determined. Within five (5) days following the date on which the increase is determined, Lessee shall make such payment to Lessor as will bring the increased rental current, commencing with the effective date of such increase through the date of any rental installments then due. Thereafter the rental shall be paid at the increased rate.

4.3.5    At such time as the amount of any change in rental required by this Lease is known or determined, Lessor and Lessee shall execute an amendment to this Lease setting forth such change.

**5.    Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the security deposit set forth in paragraph I.9 of the Basic Lease Provisions as security for Lessee's faithful performance of Lessee's obligations hereunder. If Lessee fails to pay rent or other charges due hereunder, or otherwise defaults with respect to any provision of this Lease, Lessor may use, apply or retain all or any portion of said deposit for the payment of any rent or other charge in default for the payment of any other sum to which Lessor may become obligated by reason of Lessee's default, or to compensate Lessor for any loss or damage which Lessor may suffer thereby. If Lessor so uses or applies all or any portion of said deposit, Lessee shall within ten (10) days after written demand therefor deposit cash with Lessor in an amount sufficient to restore said deposit to the full amount then required of Lessee. If the monthly Base Rent shall, from time to time, increase during the term of this Lease, Lessee shall, at the time of such increase, deposit with Lessor additional money as a security deposit so that the total amount of the security deposit held by Lessor shall at all times bear the same proportion to the then current Base Rent as the initial security deposit bears to the initial Base Rent set forth in paragraph I.6 of the Basic Lease Provisions. Lessor shall not be required to keep said security deposit separate from its general accounts. If Lessee performs all of Lessee's obligations hereunder, said deposit, or so much thereof as has not heretofore been applied by Lessor, shall be returned, without payment of interest or other increment for its use, to Lessee (or, at Lessor's option, to the last assignee, if any, of Lessee's interest hereunder) at the expiration of the term hereof, and after Lessee has vacated the Premises. No trust relationship is created herein between Lessor and Lessee with respect to said Security Deposit.

**6.    Use.**

6.1    **Primary Uses.** For so long as an acute care hospital (the "Hospital") is operated on the real property adjacent to the Office Building Project described in Exhibit "2" of the CC&R's ("Hospital Land"): Lessee shall use the Premises solely for purposes permitted under the CC&Rs without the consent of Declarant and which   are not prohibited under the Use Restrictions (as defined in below) As used herein, the term "Use Restrictions" shall refer collectively to the restrictions on the use of the Premises set forth in Paragraph 1.4 of the Basic Lease Provisions, the CC&Rs and to the use restrictions as defined in paragraph 6.2 below. All subleases, and any assignments of this Lease or any subleases hereunder, shall contain provisions requiring compliance with the Use Restrictions.

6.2    **Use Restrictions.** Subject to the provisions of the CC&R's Lessee agrees that, for so long as there is an acute care hospital operating on the Hospital Land, the following existing and projected services shall, as free-standing services, be reserved exclusively to the Hospital and excluded as permissible uses within the Office Building Project, unless the Declarant, consents to such use as provided herein: (i) ambulatory or out-patient surgery center (including endoscopy); (ii) radiological services, including radiation and nuclear medicinal therapy, computerized tomography, ultrasound and nuclear diagnostic imaging, mammography, PET Scanner, CT and MRI (collectively, "Imaging Services"); (iii) cardiac catheterization laboratory; (iv) physical therapy; (v) occupational and respiratory therapy; (vi) drug and alcohol abuse and addiction clinic; (vii) emergency care center; (viii) cardiac rehabilitation center; (ix) pulmonary function testing center; (x) speech therapy center; (xi) wound care center; (xii) infusion center; (xiii) outpatient rehabilitation center; (xiv) urgent care center; (xv) psychiatric urgent care center; (xvi) outpatient psychiatric programs that are not normally provided by individual psychiatrists in their individual offices as a customary part of their practice; (xvii) adult daycare center; (xviii) Alzheimer's center; (xix) arthritis treatment center; (xx) independent alternative medicine center; (xxi) sleep center; and (xxii) laboratories other than laboratories that are "drawing stations".

6.3    **Release of Prohibitions.** Notwithstanding the provisions of paragraphs 6.1 and 6.2 above, the Use Restrictions shall not be construed to prohibit Lessee (or sublessees and/or proper occupants) of the Premises from performing laboratory, diagnostic or treatment services of a type listed in 6.2 of the Lease, provided such services are provided by Lessee (or sublessees and/or proper occupants) to perform on its private patients within its offices in the ordinary course of treatment within its practice and further provided that such services are actually performed by Lessee (or sublessees and/or proper occupants) or its employees or affiliated companies (and not other occupants or contractors) within its offices for its private patients.

6.4    **Termination of CC&Rs.** In the event that the CC&Rs are terminated for any reason, the restrictions contained therein will continue to apply under this Lease, unless Lessor, in its sole discretion, waives them.

6.5    **Hazardous Materials.** As used herein, "Hazardous Materials" shall mean any material, substance or waste that is or has the characteristic of being hazardous, toxic, ignitable, reactive or corrosive, including, without limitation, petroleum, PCBs, asbestos, materials known to cause cancer or reproductive problems and those materials, substances and/or wastes, including infectious waste, medical waste, and potentially infectious biomedical waste, which are or later become regulated by any governmental authority or agency of the United States, the State, the County, the City or any other local governmental authority or agency, including without limitation, substances defined as "hazardous substances," "hazardous materials," "toxic substances" or "hazardous wastes" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §1801, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §6901, et seq.; and all corresponding and related statutes, ordinances and regulations of the State, County, City or other local governmental authority or agency, including without limitation, any such statutes, ordinances or regulations addressing underground storage tanks; and any other material or substance which by regulation or ordinance now existing or hereinafter enacted (collectively, "Hazardous Materials Laws"). Lessee hereby agrees that Lessee and Lessee's officers, directors, employees, representatives, agents, contractors, subcontractors, successors, assigns, lessees, sublessees, concessionaires, invitees and any other tenants or occupants of the Premises (for purpose of this Section 6.5, singularly a "Lessee Representative" and collectively "Lessee Representatives") shall not use, generate, manufacture, refine, produce, process, store, handle or dispose of, on, under or about the Premises or the Office Building Project, or transport to or from the Premises or the Office Building Project for the purpose of using, generating, manufacturing, refining, producing, processing, storing, handling, disposing of or transporting on, under or about the Premises or the Office Building Project, any Hazardous Materials, except in compliance with all applicable Hazardous Materials Laws. Lessee shall, at its own expense, procure, maintain in effect and comply with all conditions of any and all permits, licenses and other governmental and regulatory approvals required for the storage or use by Lessee or any Lessee Representative of Hazardous Materials on the Premises or in the Building, including without limitation, the discharge of materials or wastes into or through any sanitary sewer serving the Premises or the Office Building Project. It shall be the sole responsibility of Lessee to have any Hazardous Materials removed from the Premises and the Office Building Project via a licensed bio-hazardous waste removal service. All subleases of space within the Premises will contain use restrictions and limitations conforming to the terms of this Section 6.5, in form reasonably satisfactory to Lessor and Master Lessor.

6.6    **Compliance with Law.**

(a)    Lessor warrants to Lessee that the Premises, in the state existing on the Commencement Date, but without regard to alterations or improvements made by Lessee or the use for which Lessee will occupy the Premises, does not violate any covenants or restrictions of record, or any applicable building code, regulation or ordinance in effect on such Lease term Commencement Date. In the event it is determined that this warranty has been violated, then it shall be the obligation of the Lessor, after written notice from Lessee, to promptly, at Lessor's sole cost and expense, rectify any such violation.

(b)    Except as provided in paragraph 6.6 (a) Lessee shall, at Lessee's expense, promptly comply with all applicable statutes, ordinances, rules, regulations, orders, covenants and restrictions of record, and requirements of any fire insurance underwriters or rating bureaus, now in effect or which may hereafter come into effect, whether or not they reflect a change in policy from that now existing, during the term or any part of the term hereof, relating in any manner to the Premises and the occupation and use by Lessee of the Premises. Lessee shall conduct its business in a lawful manner and shall not use or permit the use of the Premises or the Common Areas in any manner that will tend to create waste or a nuisance or shall tend to disturb other occupants of the Office Building Project.

6.7    **Condition of Premises.**

(a)    Lessor shall deliver the Premises to Lessee in clean condition on the Lease Commencement Date (unless Lessee is already in possession) and Lessor warrants to Lessee that the plumbing, lighting, air conditioning, and heating system in the Premises shall be in good operating

**BROTMAN PHYSICIANS PLAZA**
**HENRY LOUIS KIRSCH, M.D. AND**
**MICHAEL B. KAMIEL, M.D.**                              Page 3 of 12                                        Initial: _____

condition. In the event that it is determined that this warranty has been violated, then it shall be the obligation of Lessor, after receipt of written notice from Lessee setting forth with specificity the nature of the violation, to promptly, at Lessor's sole cost, rectify such violation.

(b)    Except as otherwise provided in this Lease, Lessee hereby accepts the Premises and the Office Building Project in their condition existing as of the Lease Commencement Date or on the date that Lessee takes possession of the Premises, whichever is earlier, subject to all applicable zoning, municipal, county and state laws, ordinances and regulations governing and regulating the use of the Premises, and any easements, covenants or restrictions of record, and accepts this Lease subject thereto and to all matters disclosed thereby and by any exhibits attached hereto. Lessee acknowledges that it has satisfied itself by its own independent investigation that the Premises are suitable for its intended use, and that neither Lessor nor Lessor's agent or agents has made any representation or warranty as to the present or future suitability of the Premises, Common Areas, or Office Building Project for the conduct of Lessee's business.

## 7.    Maintenance, Repairs, Alterations and Common Area Services.

7.1    **Lessor's Obligations.** Lessor shall keep the Office Building Project, including the Premises, interior and exterior walls, roof, and common areas, and the equipment whether used exclusively for the Premises or in common with other premises, in good condition and repair; provided, however, Lessor shall not be obligated to paint, repair or replace wall coverings, or to repair or replace any improvements that are not ordinarily a part of the Building or are above then Building standards. Except as provided in paragraph 9.5, there shall be no abatement of rent or liability of Lessee on account of any injury or interference with Lessee's business with respect to any improvements, alterations or repairs made by Lessor to the Office Building Project or any part thereof. Lessee expressly waives the benefits of any statute now or hereafter in effect which would otherwise afford Lessee the right to make repairs at Lessor's expense or to terminate this Lease because of Lessor's failure to keep the Premises in good order, condition and repair.

7.2    **Lessee's Obligations.**

(a)    Notwithstanding Lessor's obligation to keep the Premises in good condition and repair, Lessee shall be responsible for payment of the cost thereof to Lessor as additional rent for that portion of the cost of any maintenance and repair of the Premises, or any equipment (wherever located) that serves only Lessee or the Premises, to the extent such cost is attributable to causes beyond normal wear and tear. Lessee shall be responsible for the cost of painting, repairing or replacing wall coverings, and to repair or replace any Premises improvements that are not ordinarily a part of the Building or that are above then Building standards. Lessor may, at its option, upon reasonable notice, elect to have Lessee perform any particular such maintenance or repairs the cost of which is otherwise Lessee's responsibility hereunder.

(b)    On the last day of the term hereof, or on any sooner termination, Lessee shall surrender the Premises to Lessor in the same condition as received, ordinary wear and tear excepted, clean and free of debris. Any damage or deterioration of the Premises shall not be deemed ordinary wear and tear if the same could have been prevented by good maintenance practices by Lessee. Lessee shall repair any damage to the Premises occasioned by the installation or removal of Lessee's trade fixtures, alterations, furnishings and equipment. Except as otherwise stated in this Lease, Lessee shall leave the air lines, power panels, electrical distribution systems, lighting fixtures, air conditioning, window coverings, wall coverings, carpets, wall paneling, ceilings and plumbing on the Premises and in good operating condition.

7.3    **Alterations and Additions.**

(a)    Lessee shall not, without Lessor's prior written consent make any alterations, improvements, additions, Utility Installations or repairs in, on or about the Premises, or the Office Building Project. As used in this paragraph 7.3 the term "Utility Installation" shall mean carpeting, window and wall coverings, power panels, electrical distribution systems, lighting fixtures, air conditioning, plumbing, and telephone and telecommunication wiring and equipment. At the expiration of the term, Lessor may require the removal of any or all of said alterations, improvements, additions or Utility Installations, and the restoration of the Premises and the Office Building Project to their prior condition, at Lessee's expense. Should Lessor permit Lessee to make its own alterations, improvements, additions or Utility Installations, Lessee shall use only such contractor as has been expressly approved by Lessor, and Lessor may require Lessee to provide Lessor, at Lessee's sole cost and expense, a lien and completion bond in an amount equal to one and one-half times the estimated cost of such improvements, to insure Lessor against any liability for mechanic's and materialmen's liens and to insure completion of the work. Should Lessee make any alterations, improvements, additions of Utility Installations without the prior approval of Lessor, or use a contractor not expressly approved by Lessor, Lessor may, at any time during the term of this Lease, require that Lessee remove any part or all of the same.

(b)    Any alterations, improvements, additions or Utility Installations in or about the Premises or the Office Building Project that Lessee shall desire to make shall be presented to Lessor in written form, with proposed detailed plans. If Lessor shall give its consent to Lessee's making such alteration, improvement, addition or Utility Installation, the consent shall be deemed conditioned upon Lessee acquiring a permit to do so from the applicable governmental agencies, furnishing a copy thereof to Lessor prior to the commencement of the work, and compliance by Lessee with all conditions of said permit in a prompt and expeditious manner.

(c)    Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use in the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises, the Building or the Office Building Project, or any interest therein.

(d)    Lessee shall give Lessor not less than ten (10) days' notice prior to the commencement of any work in the Premises by Lessee, and Lessor shall have the right to post notices of non -responsibility in or on the Premises or the Building as provided by law. If Lessee shall, in good faith, contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend itself and Lessor against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof against the Lessor or the Premises, the Building or the Office Building Project, upon the condition that if Lessor shall require, Lessee shall furnish to Lessor a surety bond satisfactory to Lessor in an amount equal to such contested lien claim or demand indemnifying Lessor against liability for the same and holding the Premises, the Building and the Office Building Project free from the effect of such lien or claim. In addition, Lessor may require Lessee to pay Lessor's reasonable attorneys' fees and costs in participating in such action if Lessor shall decide it is to Lessor's best interest so to do.

(e)    All alterations, improvements, additions and Utility Installations (whether or not such Utility Installations constitute trade fixtures of Lessee), which may be made to the Premises by Lessee, including but not limited to, floor coverings, paneling, doors, drapes, built-ins, moldings, sound attenuation, and lighting and telephone or communication systems, conduit, wiring and outlets, shall be made and done in a good and workmanlike manner and of good and sufficient quality and materials and shall be the property of Lessor and remain upon and be surrendered with the Premises at the expiration of the Lease term, unless Lessor requires their removal pursuant to paragraph 7.3(a). Provided Lessee is not in default, notwithstanding the provisions of this paragraph 7.3(e), Lessee's personal property and equipment, other than that which is affixed to the Premises so that it cannot be removed without material damage to the Premises or the Building, and other than Utility Installations, shall remain the property of Lessee and may be removed by Lessee subject to the provisions of paragraph 7.2.

(f)    Lessee shall provide Lessor with as-built plans and specifications for any alterations, improvements, additions or Utility Installations.

7.4    **Utility Additions.** Lessor reserves the right to install new or additional utility facilities throughout the Office Building Project for the benefit of Lessor or Lessee, or any other lessee of the Office Building Project, including, but not by way of limitation, such utilities as plumbing, electrical systems, communication systems, and fire protection and detection systems, so long as such installations do not unreasonably interfere with Lessee's use of the Premises.

## 8.    Insurance; Indemnity.

8.1    **Liability Insurance-Lessee.** Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease a policy of Comprehensive General Liability insurance utilizing an Insurance Services Office standard form with Broad Form General Liability Endorsement (GL0404), or equivalent, in an amount of not less than $1,000,000 per occurrence of bodily injury and property damage combined or in a greater amount as reasonably determined by Lessor and shall insure Lessee with Lessor as an additional insured against liability arising out of the use, occupancy or maintenance of the Premises. Compliance with the above requirement shall not, however, limit the liability of Lessee hereunder.

8.2    **Liability Insurance-Lessor.** Lessor shall obtain and keep in force during the term of this Lease a policy of Combined Single Limit Bodily Injury and Broad Form Property Damage Insurance, plus coverage against such other risks Lessor deems advisable from time to time, insuring Lessor, but not Lessee, against liability arising out of the ownership, use, occupancy or maintenance of the Office Building Project in an amount not less than $5,000,000.00 per occurrence.

8.3    **Property Insurance-Lessee.** Lessee shall, at Lessee's expense, obtain and keep in force during the term of this Lease for the benefit of Lessee, replacement cost fire and extended coverage insurance, with vandalism and malicious mischief, sprinkler leakage and earthquake sprinkler leakage endorsements, in an amount sufficient to cover not less than 100% of the full replacement cost, as the same may exist from time to time, of all of Lessee's personal property, fixtures, equipment and tenant improvements.

8.4    **Property Insurance-Lessor.** Lessor shall obtain and keep in force during the term of this Lease a policy or policies of insurance loss or damage to the Office Building Project improvements, but not Lessee's personal property, fixtures, equipment or tenant improvements, in the amount of the full replacement cost thereof, as the same may exist from time to time, utilizing Insurance Services Office standard form, or equivalent, providing protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, plate glass, and such other perils as Lessor deems advisable or may be required by a lender having a lien on the Office Building Project. In addition, Lessor shall obtain and keep in force, during the term of this Lease, a policy of rental value insurance covering a period of one year, with loss payable to Lessor, which insurance shall also cover

Page 4 of 12

Initial

all Operating Expenses for said period.  Lessee will not be named in any such policies carried by Lessor and shall have no right to any proceeds therefrom.  The policies required by these paragraphs 8.2 and 8.4 shall contain such deductibles as Lessor or the aforesaid lender may determine.  In the event that the Premises shall suffer an insured loss as defined in paragraph 9.1(f) hereof, the deductible amounts under the applicable insurance policies shall be deemed an Operating Expense.  Lessee shall not do, or permit to be done anything which shall invalidate the insurance policies carried by Lessor.  Lessee shall pay the entirety of any increase in the property insurance premium for the Office Building Project over what it was immediately prior to the commencement of the term of this Lease if the increase is specified by Lessor's insurance carrier as being caused by the nature of Lessee's occupancy or any act or omission of Lessee.

8.5     **Insurance Policies.** Lessee shall deliver to Lessor copies of liability insurance policies required under paragraph 8.1 or certificates evidencing the existence and amounts of such insurance within seven (7) days after the Commencement Date of this Lease.  No such policy shall be cancelable or subject to reduction of coverage or other modification except after thirty (30) days prior written notice to Lessor.  Lessee shall, at least thirty (30) days prior to the expiration of such policies, furnish Lessor with renewals thereof.

8.6     **Waiver of Subrogation.** Lessee and Lessor each hereby release and relieve the other and waive their entire right of recovery against the other, for direct or consequential loss or damage arising out of or incident to the perils covered by property insurance carried by such party, whether due to the negligence of Lessor or Lessee or their agents, employees, contractors and/or invitees.  If necessary all property insurance policies required under this Lease shall be endorsed to so provide.

8.7     **Indemnity.** Lessee shall indemnify and hold harmless Lessor and its agents, Lessor's master or ground lessors partners and lenders, from and against any and all claims for damage to the person or property of anyone or any entity arising from Lessee's use of the Office Building Project, or from the conduct of Lessee's business or from any activity, work or things done, permitted or suffered by Lessee in or about the Premises or elsewhere and shall further indemnify and hold harmless Lessor from and against any and all claims, costs and expenses arising from any breach or default in the performance of any obligation on Lessee's part to be performed under the terms of this Lease, or arising from any act or omission of Lessee, or any of Lessee's agents, contractors, employees, or invitees, and from and against all costs, attorney's fees, expenses and liabilities incurred by Lessor as the result of any such use, conduct, activity, work, things done, permitted or suffered, breach, default or negligence, and in dealing reasonably therewith, including but not limited to the defense or pursuit of any claim or any action or proceeding involved therein; and in case any action or proceeding be brought against Lessor by reason of any such matter, Lessee upon notice from Lessor shall defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense.  Lessor need not have first paid any such claim in order to be so indemnified.  Lessee, as a material part of the consideration to Lessor, hereby assumes all risk of damage to property of Lessee or injury to persons, in, upon or about the Office Building Project arising from any cause and Lessee hereby waives all claims in respect thereof against Lessor.

8.8     **Exemption of Lessor from Liability.** Lessee hereby agrees that Lessor shall not be liable for injury to Lessee's business or any loss of income therefrom or for loss of or damage to the goods, wares, merchandise or other property of Lessee, Lessee's employees, invitees, customers, or any other person in or about the Premises or the Office Building Project, nor shall Lessor be liable for injury to the person of Lessee, Lessee's employees, agents or contractors, whether such damage or injury is caused by or results from theft, fire, steam, electricity, gas, water or rain, or from the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures, or from any other cause, whether said damage or injury results from conditions arising upon the Premises or upon other portions of the Office Building Project, or from other sources or places, or from new construction or the repair, alteration or improvement of any part of the Office Building Project, or of the equipment, fixtures or appurtenances applicable thereto, and regardless of whether the cause of such damage or injury or the means of repairing the same is inaccessible, Lessor shall not be liable for any damages arising from any act or neglect of any other lessee, occupant or user of the Office Building Project, nor from the failure of Lessor to enforce the provisions of any other lease of the Office Building Project.

8.9     **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified in this Paragraph 8 are adequate to cover Lessee's property or obligations under this Lease.

9.     **Damage or Destruction.**

9.1     **Definitions.**

(a)     "Premises Damage" shall mean if the Premises are damaged or destroyed to any extent.

(b)     "Premises Building Partial Damage" shall mean if the Building of which the Premises are a part is damaged or destroyed to the extent that the cost to repair is less than fifty percent (50%) of the then Replacement Cost of the building.

(c)     "Premises Building Total Destruction" shall mean if the Building of which the Premises are a part is damaged or destroyed to the extent that the cost to repair is fifty percent (50%) or more of the then Replacement Cost of the Building.

(d)     "Office Building Project Buildings" shall mean all of the buildings on the Office Building Project site.

(e)     "Office Building Project Buildings Total Destruction" shall mean if the Office Building Project Buildings are damaged or destroyed to the extent that the cost of repair is fifty percent (50%) or more of the then Replacement Cost of the Office Building Project Buildings.

(f)     "Insured Loss" shall mean damage or destruction which was caused by an event required to be covered by the insurance described in paragraph 8.  The fact that an Insured Loss has a deductible amount shall not make the loss an uninsured loss.

(g)     "Replacement Cost" shall mean the amount of money necessary to be spent in order to repair or rebuild the damaged area to the condition that existed immediately prior to the damage occurring, excluding all improvements made by lessees, other than those installed by Lessor at Lessee's expense.

9.2     **Premises Damage: Premises Building Partial Damage.**

(a)     Insured Loss: Subject to the provisions of Paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage which is an Insured Loss and which falls into the classification of either Premises Damage or Premises Building Partial Damage, then Lessor shall, as soon as reasonably possible and to the extent the required materials and labor are readily available through usual commercial channels, at Lessor's expense, repair such damage (but not Lessee's fixtures, equipment or tenant improvements originally paid for by Lessee) to its condition existing at the time of the damage, and this Lease shall continue in full force and effect.

(b)     Uninsured Loss: Subject to the provisions of paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage which is not an Insured Loss and which falls within the classification of Premises Damage or Premises Building Partial Damage, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), which damage prevents Lessee from making any substantial use of the Premises, Lessor may at Lessor's option either (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) give written notice to Lessee within thirty (30) days after the date of the occurrence of such damage of Lessor's intention to cancel and terminate this Lease as of the date of the occurrence of such damage, in which event this Lease shall terminate as of the date of the occurrence of such damage.

9.3     **Premises Building Total Destruction; Office Building Project Total Destruction.** Subject to the provisions of paragraphs 9.4 and 9.5, if at any time during the term of this Lease there is damage, whether or not it is an Insured Loss, which falls into the classifications of either (i) Premises Building Total Destruction, or (ii) Office Building Project Total Destruction, then Lessor may at Lessor's option either (i) repair such damage or destruction as soon as reasonably possible at Lessor's expense (to the extent the required materials are readily available through usual commercial channels) to its condition existing at the time of the damage, but not Lessee's fixtures, equipment or tenant improvements, and this Lease shall continue in full force and effect, or (II) give written notice to Lessee within thirty (30) days after the date of occurrence of such damage of Lessor's intention to cancel and terminate this Lease, in which case this Lease shall terminate as of the date of the occurrence of such damage.

9.4     **Damage Near End of Term.**

(a)     Subject to Paragraph 9.4(b), if at any time during the last twelve (12) months of the term of this Lease there is substantial damage to the Premises, Lessor may at Lessor's option cancel and terminate this Lease as of the date of occurrence of such damage by giving written notice to Lessee of Lessor's election to do so within 30 days after the date of occurrence of such damage.

(b)     Notwithstanding paragraph 9.4(a), in the event that Lessee has an option to extend or renew this Lease, and the time within which said option may be exercised has not yet expired, Lessee shall exercise such option, if it is to be exercised at all, no later than twenty (20) days after the occurrence of an Insured Loss falling within the classification of Premises Damage during the last twelve (12) months of the term of this Lease.  If Lessee duly exercises such option during said twenty (20) day period, Lessor shall, at Lessor's expense, repair such damage, but not Lessee's fixtures, equipment or tenant improvements, as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option during said twenty (20) day period, then Lessor may at Lessor's option terminate and cancel this Lease as of the expiration of said twenty (20) day period by giving written notice to Lessee of Lessor's election to do so within ten (10) days after the expiration of said twenty (20) day period, notwithstanding any term or provision in the grant of option to the contrary.

9.5     **Abatement of Rent; Lessee's Remedies.**

(a)    In the event Lessor repairs or restores the Building or Premises pursuant to the provisions of this Paragraph 9, and any part of the Premises are not usable (including loss of use due to loss of access or essential services), the rent payable hereunder (including Lessee's Share of Operating Expense Increase) for the period during which such damage, repair or restoration continues shall be abated, provided (1) the damage was not the result of the negligence of Lessee, and (2) such abatement shall only be to the extent the operation and profitability of Lessee's business as operated from the Premises is adversely affected. Except for said abatement of rent, if any, Lessee shall have no claim against Lessor for any damage suffered by reason of any such damage, destruction, repair or restoration.

(b)    If Lessor shall be obligated to repair or restore the Premises or the Building under the provisions of this Paragraph 9 and shall not commence such repair or restoration within ninety (90) days after such occurrence, or if Lessor shall not complete the restoration and repair within six (6) Months after such occurrence, Lessee may at Lessee's option cancel and terminate this Lease by giving Lessor written notice of Lessee's election to do so at any time prior to the commencement or completion, respectively, of such repair or restoration. In such event this Lease shall terminate as of the date of such notice.

(c)    Lessee agrees to cooperate with Lessor in connection with any such restoration and repair, including but not limited to the approval and/or execution of plans and specifications required.

9.6    **Termination-Advance Payments.** Upon termination of this Lease pursuant to this paragraph 9, an equitable adjustment shall be made concerning advance rent and any advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's security deposit as has not theretofore been applied by Lessor.

9.7    **Waiver.** Lessor and Lessee waive the provisions of any statute which relate to termination of leases when leased property is destroyed and agree that such event shall be governed by the terms of this Lease.

10.    **Real Property Taxes.**

10.1    **Payment of Taxes.** Lessor shall pay the real property tax, as defined in paragraph 10.3, applicable to the Office Building Project subject to reimbursement by Lessee of Lessee's Share of such taxes in accordance with the provisions of paragraph 4.2, except as otherwise provided in paragraph 10.2.

10.2    **Additional Improvements.** Lessee shall not be responsible for paying any increase in real property tax specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Office Building Project by other lessees or by Lessor for the exclusive enjoyment of any other lessee. Lessee shall, however, pay to Lessor at the time that Operating Expenses are payable under paragraph 4.2(c) the entirety of any increase in real property tax if assessed solely by reason of additional improvements placed upon the Premises by Lessee or at Lessee's request.

10.3    **Definition of "Real Property Tax."** As used herein, the term "real property tax" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, and any license fee, commercial rental tax, improvement bond or bonds, levy or tax (other than inheritance, personal income or estate taxes) imposed on the Office Building Project or any portion thereof by any authority having the direct or indirect power to tax, including any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Lessor in the Office Building Project or in any portion thereof, as against Lessor's right to rent or other income therefrom, and as against Lessor's business of leasing the Office Building Project. The term "real property tax" shall also include any tax, fee, levy, assessment or charge (i) in substitution of, partially or totally, any tax, fee, levy, assessment or charge hereinabove included within the definition of "real property tax," or (ii) the nature of which was hereinbefore included within the definition of "real property tax," or (iii) which is imposed for a service or right not charged prior to June 1, 1978, or, if previously charged, has been increased since June 1, 1978, or (iv) which is imposed as a result of a change in ownership, as defined by applicable local statutes for property tax purposes, of the Office Building Project or which is added to a tax or charge hereinbefore included within the definition of real property tax by reason of such change of ownership, or (v) which is imposed by reason of this transaction, any modifications or changes hereto, or any transfers hereof.

10.4    **Joint Assessment.** If the improvements or property, the taxes for which are to be paid separately by Lessee under paragraph 10.2 or 10.5 are not separately assessed, Lessee's portion of that tax shall be equitably determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information (which may include the cost of construction) as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5    **Personal Property Taxes.**

(a)    Lessee shall pay prior to delinquency all taxes assessed against and levied upon trade fixtures, furnishings, equipment and all other personal property of Lessee contained in the Premises or elsewhere.

(b)    If any of Lessee's said personal property shall be assessed with Lessor's real property, Lessee shall pay to Lessor the taxes attributable to Lessee within ten (10) days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.    **Services and Utilities.**

11.1    **Services and Utilities Provided by Lessor.** Lessor shall provide heating, ventilation, air conditioning, and janitorial services during the times and in the manner that such services are customarily furnished in comparable medical office buildings in the immediate market area, reasonable amounts of electricity for normal lighting and office machines, water for reasonable and normal drinking and lavatory use, and replacement light bulbs and/or fluorescent tubes and ballasts for standard overhead fixtures.

11.2    **Services Exclusive to Lessee.** Lessee shall pay for all water, gas, heating, ventilation, air conditioning, light, power, telephone, janitorial services and other utilities and services specially or exclusively supplied and/or metered exclusively to the Premises or to Lessee, together with any taxes thereon. If any such services and utilities are not separately metered to the Premises, Lessee shall pay at Lessor's option, either Lessee's Share or a reasonable proportion to be determined by Lessor of all charges jointly metered with and/or provided to other premises in the Building.

11.3    **Hours of Service.** Said services and utilities shall be provided during generally accepted business days and hours or such other days or hours as may hereafter be set forth. Utilities and services required at other times shall be subject to advance request and reimbursement by Lessee to Lessor of the cost thereof.

11.4    **Excess Usage by Lessee.** Lessee shall not make connection to the utilities except by or through existing outlets and shall not install or use machinery or equipment in or about the Premises that uses excess water, lighting or power, or suffer or permit any act that causes extra burden upon the utilities or services, including but not limited to security services, over standard office usage for the Office Building Project. Lessor shall require Lessee to reimburse Lessor for any excess expenses or costs that may arise out of a breach of this subparagraph by Lessee. Lessor may, in its sole discretion, install at Lessee's expense supplemental equipment and/or separate metering applicable to Lessee's excess usage or loading.

11.5    **Interruptions.** There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.    **Assignment and Subletting.**

12.1    **Lessor's Consent Required.** Lessee shall not voluntarily or by operation of law assign, transfer, mortgage, sublet, or otherwise transfer or encumber all or any part of Lessee's interest in the Lease or in the Premises, without Lessor's prior written consent, which Lessor shall not unreasonably withhold. Lessor shall respond to Lessee's request for consent hereunder in a timely manner and any attempted assignment, transfer, mortgage, encumbrance or subletting without such consent shall be void, and shall constitute a material default and breach of this Lease without the need for notice to Lessee under paragraph 13.1. "Transfer" within the meaning of this paragraph 12 shall include the transfer or transfers aggregating: (a) if Lessee is a corporation, more than twenty-five percent (25%) of the voting stock of such corporation, or (b) if Lessee is a partnership, more than twenty-five percent (25%) of the profit and loss participation in such partnership.

12.2    **Lessee Affiliate.** Notwithstanding the provisions of paragraph 12.1 hereof, Lessee may assign or sublet the Premises, or any portion thereof, without Lessor's consent, to any corporation which controls, is controlled by or is under common control with Lessee, or to any corporation resulting from the merger or consolidation with Lessee, or to any person or entity which acquires all the assets of Lessee as a going concern of the business that is being conducted on the Premises, all of which are referred to as "Lessee Affiliate"; provided that before such assignment shall be effective, (a) said assignee shall assume, in full, the obligations of Lessee under this Lease and (b) Lessor shall be given written notice of such assignment and assumption. Any such assignment shall not, in any way, affect or limit the liability of Lessee under the terms of this Lease even if after such assignment or subletting the terms of this Lease are materially changed or altered without the consent of Lessee, the consent of whom shall not be necessary.

12.3    **Terms and Conditions Applicable to Assignment and Subletting.**

(a)    Regardless of Lessor's consent, no assignment or subletting shall release Lessee of Lessee's obligations hereunder or alter the primary liability of Lessee to pay the rent and other sums due Lessor hereunder including Lessee's Share of Operating Expense Increase, and to perform all other obligations to be performed by Lessee hereunder.

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Page 6 of 12

Initial

(b)    Lessor may accept rent from any person other than Lessee pending approval or disapproval of such assignment.

(c)    Neither a delay in the approval or disapproval of such assignment or subletting, nor the acceptance of rent, shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for the breach of any of the terms or conditions of this paragraph 12 or this Lease.

(d)    If Lessee's obligations under this Lease have been guaranteed by third parties, then an assignment or sublease, and Lessor's consent thereto, shall not be effective unless said guarantors give their written consent to such sublease and the terms thereof.

(e)    The consent by Lessor to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting by Lessee or to any subsequent or successive assignment or subletting by the sublessee. However, Lessor may consent to subsequent sublettings and assignments of the sublease or any amendments or modifications thereto without notifying Lessee or anyone else liable on the Lease or sublease and without obtaining their consent and such action shall not relieve such persons from liability under this Lease or said sublease; however, such persons shall not be responsible to the extent any such amendment or modification enlarges or increases the obligations of the Lessee or sublessee under this Lease or such sublease.

(f)    In the event of any default under this Lease, Lessor may proceed directly against Lessee, any guarantors or any one else responsible for the performance of this Lease, including the sublessee, without first exhausting Lessor's remedies against any other person or entity responsible thereto to Lessor, or any security held by Lessor or Lessee.

(g)    Lessor's written consent to any assignment or subletting of the Premises by Lessee shall not constitute an acknowledgement that no default then exists under this Lease of the obligations to be performed by Lessee nor shall such consent be deemed a waiver of any then existing default, except as may be otherwise stated by Lessor at the time.

(h)    The discovery of the fact that any financial statement relied upon by Lessor in giving its consent to an assignment or subletting was materially false shall, at Lessor's election, render Lessor's said consent null and void.

12.4    **Additional Terms and Conditions Applicable to Subletting.**  Regardless of Lessor's consent, the following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)    Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all rentals and income arising from any sublease heretofore or hereafter made by Lessee, and Lessor may collect such rent and income and apply same toward Lessee's obligations under this Lease; provided, however, that until a default shall occur in the performance of Lessee's obligations under this Lease, Lessee may receive, collect and enjoy the rents accruing under such sublease. Lessee shall not, by reason of this or any other assignment of such sublease to Lessor nor by reason of the collection of the rents from a sublessee, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee under such sublease. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a default exists in the performance of Lessee's obligations under this Lease, to pay to Lessor the rents due and to become due under the sublease Lessee agrees that such sublessee shall have the right to rely upon any such statement and request from Lessor, and that such sublessee shall pay such rents to Lessor without any obligation or right to inquire as to whether such default exists and notwithstanding, any notice from or claim from Lessee to the contrary. Lessee shall have no right or claim against said sublessee or Lessor for any such rents so paid by said sublessee to Lessor.

(b)    No sublease entered into by Lessee shall be effective unless and until it has been approved in writing by Lessor. In entering into any sublease, Lessee shall use only such form of sublessee as is satisfactory to Lessor, and once approved by Lessor, such sublease shall not be changed or modified without Lessor's prior written consent. Any sublease shall, by reason of entering into a sublease under this Lease, be deemed, for the benefit of Lessor, to have assumed and agreed to conform and comply with each and every obligation herein to be performed by Lessee other than such obligations as are contrary to or inconsistent with provisions contained in a sublease to which Lessor has expressly consented in writing.

(c)    In the event Lessee shall default in the performance of its obligations under this Lease, Lessor at its option and without any obligation to do so, may require any sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of Lessee under such sublease from the time of the exercise of said option to the termination of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to Lessee or for any other prior defaults of Lessee under such sublease.

(d)    No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)    With respect to any subletting to which Lessor has consented, Lessor agrees to deliver a copy of any notice of default by Lessee to the sublessee. Such sublessee shall have the right to cure a default of Lessee within three (3) days after service of said notice of default upon such sublessee, and the sublessee shall have a right of reimbursement and offset from and against Lessor for any such defaults cured by the sublessee.

12.5    **Lessor's Expenses.**  In the event Lessee shall assign or sublet the Premises or request the consent of Lessor to any assignment or subletting or if Lessee shall request the consent of Lessor for any act Lessee proposes to do then Lessee shall pay Lessor's reasonable costs and expenses incurred in connection therewith, including attorneys', architects', engineers', or other consultants' fees.

12.6    **Conditions to Consent.**  Lessor reserves the right to condition any approval to assign or sublet upon Lessor's determination that (a) the proposed assignee or sublessee shall conduct a business on the Premises of a quality substantially equal to that of Lessee and consistent with the general character of the other occupants of the Office Building Project and not in violation of any exclusives or rights then held by other tenants, and (b) the proposed assignee or sublessee be at least as financially responsible as Lessee was expected to be at the time of the execution of this Lease or of such assignment or sublease, whichever is greater.

**13.    Default; Remedies.**

13.1    **Default.**  The occurrence of any one or more of the following events shall constitute a material default of this Lease by Lessee:

(a)    The vacation or abandonment of the Premises by Lessee. Vacation of the Premises shall include the failure to occupy the Premises for a continuous period of sixty (60) days or more, whether or not the rent is paid.

(b)    The breach by Lessee of any of the covenants, conditions or provisions of paragraphs 7.3(a), (b) or (d) (alterations), 12.1 (assignment or subletting). 13.1(a) (vacation or abandonment), 13.1(e) (insolvency), 13.1(f) (false statement), 16(a) (estoppel certificate), 30(b) (subordination), 33 (auctions), or 41.1 (easements), all of which are hereby deemed to be material, non-curable defaults without the necessity of any notice by Lessor to Lessee thereof.

(c)    The failure by Lessee to make any payment of rent or any other payment required to be made by Lessee hereunder, as and when due, where such failure shall continue for a period of three (3) days after written notice thereof from Lessor to Lessee. In the event that Lessor serves Lessee with a Notice to Pay Rent or Quit pursuant to applicable Unlawful Detainer statutes such Notice to Pay Rent or Quit shall also constitute the notice required by this subparagraph.

(d)    The failure by Lessee to observe or perform any of the covenants, conditions or provisions of this Lease to be observed or performed by Lessee other than those referenced in subparagraphs (b) and (c), above, where such failure shall continue for a period of thirty (30) days after written notice thereof from Lessor to Lessee; provided, however, that if the nature of Lessee's noncompliance is such that more than thirty (30) days are reasonably required to cure it, then Lessee shall not be deemed to be in default if Lessee commenced such cure within said thirty (30) day period and thereafter diligently pursues such cure to completion. To the extent permitted by law, such thirty (30) day notice shall constitute the sole and exclusive notice required to be given to Lessee under applicable Unlawful Detainer statutes.

(e)    (i) The making by Lessee of any general arrangement or general assignment for the benefit of creditors; (ii) Lessee becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within sixty (60) days (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within thirty (30) days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within thirty (30) days. In the event that any provision of this paragraph 13.1(e) is contrary to any applicable law, such provision shall be of no force or effect.

(f)    The discovery by Lessor that any financial statement given to Lessor by Lessee, or its successor in interest or by any guarantor of Lessee's obligation hereunder, was materially false.

13.2    **Remedies.**  In the event of any material default or breach of this Lease by Lessee, Lessor may at any time thereafter, with or without notice or demand and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such default:

(a)    Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease and the term hereof shall terminate and Lessee shall immediately surrender possession of the Premises to Lessor. In such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including, but not limited to, the cost of recovering possession of the Premises; expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and any real estate commission actually paid; the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent for the balance of the term after the time of such award

exceeds the amount of such rental loss for the same period that Lessee proves could be reasonably avoided; that portion of the leasing commission paid by Lessor pursuant to paragraph 15 applicable to the unexpired term of this Lease.

(b)    Maintain Lessee's right to possession in which case this Lease shall continue in effect whether or not Lessee shall have vacated or abandoned the Premises.  In such event Lessor shall be entitled to enforce all of Lessor's rights and remedies under this Lease, including the right to recover the rent as it becomes due hereunder.

(c)    Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the state wherein the Premises are located.  Unpaid installments of rent and other unpaid monetary obligations of Lessee under the terms of this Lease shall bear interest from the date due at the maximum rate then allowable by law.

13.3    **Default by Lessor.**  Lessor shall not be in default unless Lessor fails to perform obligations required of Lessor within a reasonable time, but in no event later than thirty (30) days after written notice by Lessee sent simultaneously to Lessor, to Master Lessor and to the holder of any first mortgage or deed of trust covering the Premises whose name and address shall have theretofore been furnished to Lessee in writing, specifying wherein Lessor has failed to perform such obligation(s); provided, however, that if the nature of Lessor's obligation(s) is such that more than thirty (30) days are required for performance, then Lessor shall not be in default if Lessor commences performance within such 30-day period and thereafter diligently pursues the same to completion.

13.4    **Late Charges.**  Lessee hereby acknowledges that late payment by Lessee to Lessor of Base Rent, Lessee's Share of Operating Expense Increase or other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed on Lessor by the terms of any mortgage or trust deed covering the Office Building Project.  Accordingly, if any installment of Base Rent, Operating Expense Increase, or any other sum due from Lessee shall not be received by Lessor or Lessor's designee within *five (5) days* after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall pay to Lessor a late charge equal to twelve percent *(12%)* of such overdue amount.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of late payment by Lessee.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's default with respect to such overdue amount, nor prevent Lessor from exercising any of the other rights and remedies granted hereunder.

**14.    Condemnation.**  If the Premises or any portion thereof or the Office Building Project are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs; provided that if so much of the Premises or the Office Building Project are taken by such condemnation as would substantially and adversely affect the operation and profitability of Lessee's business conducted from the Premises, Lessee shall have the option, to be exercised only in writing within thirty (30) days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession), to terminate this Lease as of the date the condemning authority takes such possession.  If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the rent and Lessee's Share of Operating Expense Increase shall be reduced in the proportion that the floor area of the Premises taken bears to the total floor area of the Premises.  Common Areas taken shall be excluded from the Common Areas usable by Lessee and no reduction of rent shall occur with respect thereto or by reason thereof.  Lessor shall have the option in its sole discretion to terminate this Lease as of the taking of possession by the condemning authority, by giving written notice to Lessee of such election within thirty (30) days after receipt of notice of a taking by condemnation of any part of the Premises or the Office Building Project.  Any award for the taking of all or any part of the Premises or the Office Building Project under the power of eminent domain or any temporary taking under threat of the exercise of such power shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided, however that Lessee shall be entitled to any separate award for loss of or damage to Lessee's trade fixtures, removable personal property and unamortized tenant improvements that have been paid for by Lessee.  For that purpose the cost of such improvements shall be amortized over the original term of this Lease excluding any options.  In the event that this Lease is not terminated by reason of such condemnation, Lessor shall to the extent of severance damages received by Lessor in connection with such condemnation, repair any damage to the Premises caused by such condemnation except to the extent that Lessee has been reimbursed therefor by the condemning authority.  Lessee shall pay any amount in excess of such severance damages required to complete such repair.

**15.    Broker's Fee.**  Intentionally omitted.

**16.    Tenant Estoppel Certificate/Financial Statements.**

(a)    Lessee shall at any time upon not less than seven (7) days' prior written notice from Lessor execute, acknowledge and deliver to the requesting party a statement in writing in  (the "Certificate") (i) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the rent and other charges are paid in advance, if any, and (ii) acknowledging that there are not, to the responding party's knowledge any uncured defaults on the part of the requesting party, or specifying such defaults if any are claimed and (iii) containing such other information and provisions as may be requested by any existing or prospective lender or by any prospective purchaser.  Any such Certificate may be conclusively relied upon by any prospective purchaser or encumbrancer of the Office Building Project.

(b)    At the Lessor's option, (a) the failure to deliver such Certificate within such time shall be a material default of this Lease by Lessee without any further notice to Lessee, (b) any material misstatement in the Certificate which is not corrected within two (2) days of Lessor's written request shall be a material default of this Lease by Lessee without any further notice to Lessee, and/or (c) it shall constitute a certification by Lessee that the statements which may be included in the Certificate (as same may have been so amended or supplemented) are true and correct, except as Lessor shall otherwise indicate and any prospective purchaser or encumbrancer of the Office Building Project, which may be conclusively relied upon by any prospective purchaser or encumbrancer of the Office Building Project.

(c)    Upon the signing of this Lease and within seven (7) days following written request from Lessor in the event Lessor desires to finance, refinance, or sell the Office Building Project, or any part thereof, Lessee shall furnish Lessor, or such lender or purchaser designated by Lessor, with current personal financial statements, and if applicable, corporate financial statements.  Such financial statements shall be in a form reasonably required by Lessor, such lender or purchaser and shall include the past three (3) years' financial statements of Lessee, including a balance sheet, statements of profit/loss and tax returns, or any other reasonable financial information deemed necessary by Lessor, such lender or purchaser.  All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17.    Lessor's Liability.**  The term "Lessor" as used herein shall mean only the owner or owners, at the time in question, of the fee title or a lessee's interest in a ground lease of the Office Building Project, and except as expressly provided in paragraph 15, in the event of any transfer of such title or interest, Lessor herein named (and in case of any subsequent transfers then the grantor) shall be relieved from and after the date of such transfer of all liability as respects Lessor's obligations thereafter to be performed, provided that any funds in the hands of Lessor or the then grantor at the time of such transfer, in which Lessee has an interest, shall be delivered to the grantee.  The obligations contained in this Lease to be performed by Lessor shall, subject as aforesaid, be binding on Lessor's successors and assigns, only during their respective periods of ownership.

**18.    Severability.**  The invalidity of any provision of this Lease as determined by a court of competent jurisdiction shall in no way affect the validity of any other provision hereof.

**19.    Interest on Past-due Obligations.**  Except as expressly herein provided, any amount due to Lessor not paid when due shall bear interest at the maximum rate then allowable by law or judgments from the date due.  Payment of such interest shall not excuse or cure any default by Lessor under this Lease; provided, however, that interest shall not be payable on late charges incurred by Lessee nor on any amounts upon which late charges are paid by Lessee.

**20.    Time of Essence.**  Time is of the essence with respect to the obligations to be performed under this Lease.

**21.    Additional Rent.**  All monetary obligations of Lessee to Lessor under the terms of this Lease, including but not limited to Lessee's Share of Operating Expense Increase and any other expenses payable by Lessee hereunder shall be deemed to be rent.

**22.    Incorporation of Prior Agreements; Amendments.**  This Lease contains all agreements of the parties with respect to any matter mentioned herein.  No prior or contemporaneous agreement or understanding pertaining to any such matter shall be effective.  This Lease may be modified in writing only, signed by the parties in interest at the time of the modification.  Except as otherwise stated in this Lease, Lessee hereby acknowledges that neither the real estate broker listed in paragraph 15 hereof nor any cooperating broker on this transaction nor the Lessor or any employee or agents of any of said persons has made any oral or written warranties or representations to Lessee relative to the condition or use by Lessee of the Premises or the Office Building Project and Lessee acknowledges that Lessee assumes all responsibility regarding the Occupational Safety Health Act, the legal use and adaptability of the Premises and the compliance thereof with all applicable laws and regulations in effect during the term of this Lease.

**23.    Notices.**  Any notice required or permitted to be given hereunder shall be in writing and may be given by personal delivery or by certified or registered mail, and shall be deemed sufficiently given if delivered or addressed to Lessee or to Lessor at the address noted below or adjacent to the signature of the respective parties, as the case may be.  Mailed notices shall be deemed given upon actual receipt at the address required, or forty-eight hours following deposit in the mail, postage prepaid, whichever first occurs.  Either party may by notice to the other specify a different address for notice purposes except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice purposes.  A copy of all notices required or permitted to be given to Lessor hereunder shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate by notice to Lessee.

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Page 8 of 12

Initial:

24.    **Waivers.** No waiver by Lessor of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Lessee of the same or any other provision. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to or approval of any subsequent act by Lessee. The acceptance of rent hereunder by Lessor shall not be a waiver of any preceding breach by Lessee of any provision hereof, other than the failure of Lessee to pay the particular rent so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

25.    **Recording.** Either Lessor or Lessee shall, upon request of the other, execute, acknowledge and deliver to the other a "short form" memorandum of this Lease for recording purposes.

26.    **Holding Over.** If Lessee, with Lessor's consent, remains in possession of the Premises or any part thereof after the expiration of the term hereof, such occupancy shall be a tenancy from month to month upon all the provisions of this Lease pertaining to the obligations of Lessee, except that the rent payable shall be two hundred percent (200%) of the rent payable immediately preceding the termination date of this Lease, and all Options, if any, granted under the terms of this Lease shall be deemed terminated and be of no further effect during said month to month tenancy.

27.    **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.    **Covenants and Conditions.** Each provision of this Lease performable by Lessee shall be deemed both a covenant and a condition.

29.    **Binding Effect; Choice of Law.** Subject to any provisions hereof restricting assignment or subletting by Lessee and subject to the provisions of paragraph 17, this Lease shall bind the parties, their personal representatives, successors and assigns. This Lease shall be governed by the laws of the State where the Office Building Project is located and any litigation concerning this Lease between the parties hereto shall be initiated in the county in which the Office Building Project is located.

30.    **Subordination.**

(a)    Without the necessity of any additional document being executed by Lessee for the purpose of effecting a subordination, this Lease and any Option granted hereunder shall be subject and subordinate at all times to the lien of any mortgage or deed of trust which may now exist or hereafter be executed affecting all or any portion of the Building and all advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding the foregoing, Lessor shall have the right to subordinate or cause to be subordinated any such liens to this Lease. In the event that any mortgage or deed of trust is foreclosed or a deed in lieu of foreclosure is made for any reason, Lessee shall, notwithstanding the subordination, attorn to and become the Lessee of the successor in interest to Lessor at the option of and on terms acceptable to such successor in interest. So long as Lessee is not in default under this lease, Lessee's possession of the Premises shall not be disturbed as a result of such termination, foreclosure or deed in lieu of foreclosure.

(b)    Lessee covenants and agrees to execute and deliver, upon demand by Lessor or any lienholder or successor in interest, and in the form requested thereby, any additional documents evidencing the priority or subordination of this Lease and the attornment of Lessee with respect to any lien of any such mortgage or deed or trust. Lessee hereby irrevocably appoints Lessor as attorney-in-fact of Lessee to execute, deliver and record any such documents in the name and on behalf of Lessee if Lessee fails to do same pursuant to the foregoing. In addition, at Lessor's election, Lessee's failure to execute and deliver such document(s) within seven (7) days of Lessor's written request shall be a material default of this Lease by Lessee without any further notice to Lessee.

31.    **Attorneys' Fees.**

31.1    If either party or the broker(s) named herein bring an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, trial or appeal thereon, shall be entitled to his reasonable attorneys' fees to be paid by the losing party as fixed by the court in the same are separate suit, and whether or not such action is pursued to decision or judgment. The provisions of this paragraph shall inure to the benefit of the broker named herein who seeks to enforce a right hereunder.

31.2    The attorneys' fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred in good faith.

31.3    Lessor shall be entitled to reasonable attorneys' fees and all other costs and expenses incurred in the preparation and service of notice of default and consultations in connection therewith, whether or not a legal transaction is subsequently commenced in connection with such default.

32.    **Lessor's Access.**

32.1    Lessor and Lessor's agents shall have the right to enter the Premises at reasonable times for the purpose of inspecting the same, performing any services required of Lessor, showing the same to prospective purchasers, lenders, or lessees, taking such safety measures, erecting such scaffolding or other necessary structures, making such alterations, repairs, improvements or additions to the Premises or to the Office Building Project as Lessor may reasonably deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. Lessor may at any time place on or about the Premises or the Building any ordinary "For Sale" signs and Lessor may at any time during the last 120 days of the term hereof place on or about the Premises any ordinary "For Lease" signs.

32.2    All activities of Lessor pursuant to this paragraph shall be without abatement of rent, nor shall Lessor have any liability to Lessee for the same.

32.3    Lessor shall have the right to retain keys to the Premises and to unlock all doors in or upon the Premises other than to files, vaults and safes, and in the case of emergency to enter the Premises by any reasonably appropriate means, and any such entry shall not be deemed a forceable or unlawful entry or defamer of the Premises or an eviction. Lessee waives any charges for damages or injuries or interference with Lessee's property or business in connection therewith.

33.    **Auctions.** Lessee shall not conduct, nor permit to be conducted, either voluntarily or involuntarily, any auction upon the Premises or the Common Areas without first having obtained Lessor's prior written consent. Notwithstanding anything to the contrary in this Lease, Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to grant such consent. The holding of any auction on the Premises or Common Areas in violation of this paragraph shall constitute a material default of this Lease.

34.    **Signs.** Lessee shall not place any sign upon the Premises or the Office Building Project without Lessor's prior written consent. Under no circumstances shall Lessee place a sign on any roof of the Office Building Project.

35.    **Merger.** The voluntary or other surrender of this Lease by Lessee, or a mutual cancellation thereof, or a termination by Lessor, shall not work a merger, and shall, at the option of Lessor, terminate all or any existing subtenancies or may, at the option of Lessor, operate as an assignment to Lessor of any or all of such subtenancies.

36.    **Consents.** Except for paragraphs 33 (auctions) and 34 (signs) hereof, wherever in this Lease the consent of one party is required to an act of the other party such consent shall not be unreasonably withheld or delayed.

37.    **Guarantor.** In the event that there is a guarantor of this Lease, said guarantor shall have the same obligations as Lessee under this Lease.

38.    **Quiet Possession.** Upon Lessee paying the rent for the Premises and observing and performing all of the covenants, conditions and provisions on Lessee's part to be observed and performed hereunder, Lessee shall have quiet possession of the Premises for the entire term hereof subject to all of the provisions of this Lease. The individuals executing this Lease on behalf of Lessor represent and warrant to Lessee that they are fully authorized and legally capable of executing this Lease on behalf of Lessor.

39.    **Options.**

39.1    **Definition.** As used in this paragraph the word "Option" has the following meaning: (1) the right or option to extend the term of this Lease or to renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor; (2) the option of right of first refusal to lease the Premises or the right of first offer to lease the Premises or the right of first refusal to lease other space within the Office Building Project or other property of Lessor or the right of first offer to lease other space within the Office Building Project or other property of Lessor; (3) the right or option to purchase the Premises or the Office Building Project, or the right of first refusal to purchase the Premises or the Office Building Project or the right of first offer to purchase the Premises or the Office Building Project, or the right or option to purchase other property of Lessor, or the right of first refusal to purchase other property of Lessor or the right of first offer to purchase other property of Lessor.

39.2    **Options Personal.** Each Option granted to Lessee in this Lease is personal to the original Lessee and may be exercised only by the original Lessee while occupying the Premises who does so without the intent of thereafter assigning this Lease or subletting the Premises or any portion thereof, and may not be exercised, assigned, or transferred voluntarily or involuntarily, by or to any person or entity other than original Lessee; provided, however, that an Option may be exercised by or assigned to any Lessee Affiliate as defined in paragraph 12.2 of this Lease. The Options, if any, herein

**BROTMAN PHYSICIANS PLAZA**
**HENRY LOUIS KIRSCH, M.D. AND**          Page 9 of 12          Initial: ___
**MICHAEL B. KAMIEL, M.D.**

granted to Lessee are not assignable separate and apart from this Lease, nor may any Option be separated from this Lease in any manner, either by reservation or otherwise.

39.3    **Multiple Options.**  In the event that Lessee has any multiple options to extend or renew this Lease a later option cannot be exercised unless the prior option to extend or renew this Lease has been so exercised.

39.4    **Effect of Default on Options.**

(a)    Lessee shall have no right to exercise an Option, notwithstanding any provision in the grant of Option to the contrary, (i) during the time commencing from the date Lessor gives to Lessee a notice of default pursuant to paragraph 13.1 (c) or 13.1 (d) and continuing until the noncompliance alleged in said notice of default is cured, or (ii) during the period of time commencing on the day after a monetary obligation to Lessor is due from Lessee and unpaid (without any necessity for notice thereof to Lessee) and continuing until the obligation is paid, or (iii) in the event that Lessor has given to Lessee three or more notices of default under paragraph 13.1(c), or paragraph 13.1(d), whether or not the defaults are cured, during the 12 month period of time immediately prior to the time that Lessee attempts to exercise the subject Option, (iv) if Lessee has committed any non-curable breach, including without limitation those described in paragraph 13.1(b), or is otherwise in default of any of the terms, covenants or conditions of this Lease.

(b)    The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of paragraph 39.4(a).

(c)    All rights of Lessee under the provisions of an Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and during the term of this Lease, (i) Lessee fails to pay to Lessor a monetary obligation of Lessor for a period of thirty (30) days after such obligation becomes due (without any necessity of Lessor to give notice thereof to Lessee), or (ii) Lessee fails to commence to cure a default specified in paragraph 13.1 (d) within thirty (30) days after the date that Lessor gives notice to Lessee of such default and/or Lessee fails thereafter to diligently prosecute said cure to completion, or (iii) Lessor gives to Lessee three or more notices of default under paragraph 13.1 (c), or paragraph 13.1 (d), whether or not the defaults are cured, or (iv) if Lessee has committed any non-curable breach, including without limitation those described in paragraph 13.1 (b), or is otherwise in default of any of the terms, covenants and conditions of this Lease.

**40.    Security Measures-Lessor's Reservations.**

40.1    Lessee hereby acknowledges that Lessor shall have no obligation whatsoever to provide guard service or other security measures for the benefit of the Premises or the Office Building Project.  Lessee assumes all responsibility for the protection of Lessee, its agents, and invitees and the property of Lessee and of Lessee's agents and invitees from acts of third parties.  Nothing herein contained shall prevent Lessor, at Lessor's sole option, from providing security protection for the Office Building Project or any part thereof, in which event the cost thereof shall be included within the definition of Operating Expenses, as set forth in paragraph 4.2(b).

40.2    Lessor shall have the following rights:

(a)    To change the name, address or title of the Office Building Project or building in which the Premises are located upon not less than 90 days prior written notice;

(b)    To, at Lessee's expense, provide and install Building standard graphics on the door of the Premises and such portions of the Common Areas as Lessor shall reasonably deem appropriate;

(c)    To permit any lessee the exclusive right to conduct any business as long as such exclusive does not conflict with any rights expressly given herein;

(d)    To place such signs, notices or displays as Lessor reasonably deems necessary or advisable upon the roof, exterior of the buildings or the Office Building Project or on pole signs in the Common Areas;

40.3    Lessee shall not:

(a)    Use a representation (photographic or otherwise) of the Building or the Office Building Project or their name(s) in connection with Lessee's business;

(b) Suffer or permit anyone, except in emergency, to go upon the roof of the Building.

**41.    Easements.**

41.1    Lessor reserves to itself the right, from time to time, to grant such easements, rights and dedications that Lessor deems necessary or desirable, and to cause the recordation of Parcel Maps and restrictions, so long as such easements, rights, dedications, Maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee.  Lessee shall sign any of the aforementioned documents upon request of Lessor and failure to do so shall constitute a material default of this Lease by Lessee without the need for further notice to Lessee.

41.2    The obstruction of Lessee's view, air, or light by any structure erected in the vicinity of the Building, whether by Lessor or third parties, shall in no way affect this Lease or impose any liability upon Lessor.

**42.    Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other under the provisions hereof, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment, and there shall survive the right on the part of said party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease.

**43.    Authority.**  If Lessee is a corporation, trust, or general or limited partnership, Lessee, and each individual executing this Lease on behalf of such entity represent and warrant that such individual is duly authorized to execute and deliver this Lease on behalf of said entity.  If Lessee is a corporation, trust or partnership, Lessee shall, within thirty (30) days after execution of this Lease, deliver to Lessor evidence of such authority satisfactory to Lessor.

**44.    Conflict.**  Any conflict between the printed provisions, Exhibits or Addenda of this Lease and the typewritten or handwritten provisions, if any, shall be controlled by the typewritten or handwritten provisions.

**45.    No Offer.**  Preparation of this Lease by Lessor or Lessor's agent and submission of same to Lessee shall not be deemed an offer to Lessee to lease.  This Lease shall become binding upon Lessor and Lessee only when fully executed by both parties.

**46.    Lender Modification.**  Lessee agrees to make such reasonable modifications to this Lease as may be reasonably required by an Institutional lender in connection with the obtaining of normal financing or refinancing of the Office Building Project.

**47.    Multiple Parties.**  If more than one person or entity is named as either Lessor or Lessee herein, the obligations of the Lessor or Lessee herein shall be the joint and several responsibility of all persons or entities named herein as such Lessor or Lessee, respectively.

**48.    Work Letter.**  This Lease is supplemented by that certain Work Letter of even date executed by Lessor and Lessee, attached hereto as Exhibit C, and incorporated herein by this reference. ***SEE WORKING DRAWINGS FROM THE BORSUK COMPANY.***

**49.    Attachments.**  Attached hereto are the following documents, which shall constitute a part of this Lease:

Exhibit A - Floor Plan
Exhibit B - Rules & Regulations
Exhibit C - Work Letter
Exhibit D - Guaranty of Lease

**50.    Inducement Recapture.**  Any Agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, including the Lessor's cost of leasehold improvements for Lessee, all of which concessions are hereinafter referred to as "Inducement Provisions," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease.  Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee.  The acceptance by Lessor of Rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

**51.    Relocation Right.**  Lessor may, upon not less than thirty (30) days' prior written notice to Lessee, substitute for the Premises reasonably similar space elsewhere in the Building, and this Lease shall be deemed modified so as to substitute such other premises for the Premises hereby leased.  In

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Page 10 of 12

Initial: _____

such event, this Lease shall remain in full force and effect according to its terms in all other respects, and an amendment to this Lease embodying such substitution shall be prepared by Lessor and executed and delivered by Lessor and Lessee within fifteen days following Lessee's receipt of such notice. In connection therewith, the costs of preparing such other premises for Lessee's use shall be borne by Lessor, and any of Lessee's reasonable costs of moving with respect thereto shall be paid by Lessor.

52.     **Base Rent.**  So long as Lessee is not in default of the Lease, the monthly Base Rent for months TWO (2), THIRTEEN (13), TWENTY-FIVE (25), and THIRTY-SEVEN (37) of the initial term of the Lease shall be discounted by FIFTY PERCENT (50%), for these months only.

53.     **Base Rent Increase (Paragraph 4.3).**  Paragraph 4.3 is hereby deleted and reinserted as follows: "At the time set forth in Paragraph 1.7 of the Lease, the Base Rent shall be increased by three percent (3%) per annum."

54.     **Tenant Improvements (Exhibit "C").**  Both Parties hereby agree that Lessee is currently in possession of the Premises under a separate lease agreement expiring January 31, 2016 and therefore, the following improvements to the Premises do not affect the Commencement Date of this Lease. Lessor shall refurbish the Premises where necessary (hereby called "Tenant Improvements") at a cost of up to but not to exceed $30,000.00 (hereby called "Tenant Improvement Allowance"). Said Tenant Improvement Allowance shall include the cost of architectural fees, designer fees, contractor's bid, any City of Los Angeles fees, and all necessary governmental fees required for the completion of the Tenant Improvements. Any and all costs in excess of the Tenant Improvement Allowance shall be the sole responsibility of Lessee and shall be payable to Lessor upon demand. Said Tenant Improvements must be approved and completed by Lessor and/or Lessor's agents and approved by the City of Los Angeles and all necessary governmental authorities as required, by no later than August 31, 2016. In the event the Tenant Improvements are not completed and completed by Lessor and/or Lessor's agents and approved by the City of Los Angeles and all necessary governmental authorities as required, by August 31, 2016, said Tenant Improvement Allowance shall be withdrawn and no longer available to Lessee. Furthermore, said Tenant Improvement Allowance is to be used solely for Tenant Improvements to the Premises and shall not be used to offset any rental amounts due or equipment costs.

55.     **Options (Paragraph 39).**

55.1     So long as Lessee is not in default of the Lease, Lessee shall have one option (the "Renewal Option") to extend the Term of this Lease for an additional five (5) year period (the "Option Term") on all the provisions contained in this Lease except as to Base Rent, which shall be the then current market rate for comparable medical space with similar amenities in the Building at the time of such Renewal Option; provided, however that such Base Rent shall in no event be less than the Base Rent that was in effect in the month immediately prior to the beginning of the Option Term. The Base Rent for such Renewal Option(s) shall be subject to annual adjustment pursuant to the Lease.

55.2     The Renewal Option shall be exercised by Lessee giving to Lessor written notice of Lessee's intention to renew the Lease (the "Option Notice") at least three (3) months but no more than nine (9) months prior to the beginning of the Option Term. If the Option Notice is not sent during said six (6) month period, the Renewal Option shall be null and void.

55.3     Notwithstanding anything to the contrary contained in Paragraph 39.2 ("Options Personal"), in the event of an approved assignment or transfer of Lease pursuant to Section 12 ("Assignment and Subletting"), the Renewal Option shall be exercisable by the new approved Lessee.

56.     **Death and Disability.**  Both parties hereby acknowledge that Lessee would not have leased space in the Building without both undersigned physicians leasing the Premises as Lessee, and therefore, in the event Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D. shall die or become disabled (as the term is hereinafter defined) then the estate of the deceased or disabled Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D., or Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D. themselves if no estate is created upon such disablement, shall have the right to have Lessee released from any further obligations under this Lease, but nevertheless, only upon the following terms and conditions: a) That Lessee has truly and faithfully performed all the terms, covenants and conditions of this Lease on the part of Lessee to be performed and is not in default under any of them or that Lessee or Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D.'s representative may give Lessor any defaults previously in existence; and b) That Lessee give Lessor ninety (90) days' prior written notice of Lessee's intention to terminate this Lease within ninety (90) days after such death and disability of Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D.; and c) That Lessee pay to Lessor, concurrently with the aforesaid notice, a sum equal to three (3) months' rental for consideration for the early termination which such payment shall be payment of the rent for the said ninety (90) day period; and d) That Lessee pay to Lessor an amount equal to the then unamortized cost of Tenant Improvements, Lease commissions and any concessions, if applicable; and e) That upon compliance with the above conditions, Lessor shall execute and deliver an appropriate release of liability of Lessee; and f) That time is expressly made of the essence; and g) That the term "disabled" in this Paragraph shall be deemed to mean Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D.'s total and permanent inability to carry on Michael B. Kamiel, M.D. or Henry Louis Kirsch, M.D.'s business or profession.  Such disability must be evidenced by suitable documentary support based upon generally recognized standards.

57.     **Notices (Paragraph 23).**  Notwithstanding anything to the contrary contained in Paragraph 23 of the Lease, Lessor at its option shall also send notices regarding rent to the following email address: drpraetoriushk@gmail.com and drkamiel@yahoo.com or to another email address, as specified by Lessee to Lessor.



LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN AND, BY EXECUTION OF THIS LEASE, SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

IF THIS LEASE HAS BEEN FILLED IN IT HAS BEEN PREPARED FOR SUBMISSION TO YOUR ATTORNEY FOR HIS APPROVAL.  NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE REAL ESTATE BROKER OR ITS AGENTS OR EMPLOYEES AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION RELATING THERETO; THE PARTIES SHALL RELY SOLELY UPON THE ADVICE OF THEIR OWN LEGAL COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.

*THIS LEASE SHALL SUPERSEDE ALL PRIOR LEASE AGREEMENTS (INCLUDING BUT NOT LIMITED TO THAT CERTAIN LEASE DATED JANUARY 4, 2007, AND THAT CERTAIN FIRST AMENDMENT TO LEASE DATED FEBRUARY 2, 2010, AND THAT CERTAIN SECOND AMENDMENT TO LEASE DATED NOVEMBER 28, 2012 BY AND BETWEEN RICHARD B. JURMAIN, M.D., AN INDIVIDUAL AND HENRY LOUIS KIRSCH, M.D. AND CULVER CITY MEDICAL TOWER, LLC, A DELAWARE LIABILITY COMPANY DBA BROTMAN PHYSICIANS PLAZA FOR SUITE 503.*

**LESSOR**                                                      **LESSEE**

CULVER CITY MEDICAL TOWER, LLC            HENRY LOUIS KIRSCH, M.D.,
A DELAWARE LIMITED LIABILITY COMPANY      AN INDIVIDUAL
DBA BROTMAN PHYSICIANS PLAZA

By Vendel Equities, LLC
a California limited liability company,
Its: Sole Member

By _____            By _____ Henry L Kirsch _____
   Edward G. Hudson                      Its _____ Physician _____
Its: Manager                            Executed at __ Culver City, CA __
Executed at _____             On ___ 1/22/2016 _____
On _____             Address __ 9808 Venice Blvd #503
Address _____                      Culver City, CA 90232

                                        MICHAEL B. KAMIEL, M.D.,
                                        AN INDIVIDUAL

                                        By _____ Michael B Kamiel _____
                                        Its _____ Physician _____
                                        Executed at __ Culver City CA __
                                        On ___ 1/22/16 _____
                                        Address __ 9808 Venice Blvd #503

                                                 Culver City CA 90232

# MEDICAL OFFICE LEASE

## FLOOR PLAN

Not to scale. For reference purposes only.



5TH FLOOR - FLOOR PLAN                                    1   A5.0



BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Exhibit A
Page 1 of 1

Initial: _____

## RULES AND REGULATIONS FOR
## MEDICAL OFFICE LEASE

Dated: JANUARY 21, 2016

By and Between: CULVER CITY MEDICAL TOWER, A DELAWARE LIMITED LIABILITY COMPANY DBA BROTMAN PHYSICIANS PLAZA & HENRY LOUIS KIRSCH, M.D., AN INDIVIDUAL AND MICHAEL B. KAMIEL, M.D., AN INDIVIDUAL

### GENERAL RULES

1. Lessee shall not suffer or permit the obstruction of any Common Areas, including driveways, walkways and stairways.

2. Lessor reserves the right to refuse access to any persons Lessor in good faith judges to be a threat to the safety, reputation, or property of the Office Building Project and its occupants.

3. Lessee shall not make or permit any noise or odors that annoy or interfere with other lessees or persons having business within the Office Building Project.

4. Lessee shall not keep animals or birds within the Office Building Project, and shall not bring bicycles, motorcycles or other vehicles into areas not designated as authorized for same.

5. Lessee shall not make, suffer or permit litter except in appropriate receptacles for that purpose.

6. Lessee shall not alter any lock or install new or additional locks or bolts.

7. Lessee shall be responsible for the inappropriate use of any toilet rooms, plumbing or other utilities.  No foreign substances of any kind are to be inserted therein.

8. Lessee shall not deface the walls, partitions or other surfaces of the Premises or Office Building Project.

9. Lessee shall not suffer or permit any thing in or around the Premises or Building that causes excessive vibration or floor loading in any part of the Office Building Project.

10. Furniture, significant freight and equipment shall be moved into or out of the building only with the Lessor's knowledge and consent, and subject to such reasonable limitations, techniques and timing, as may be designated by Lessor Lessee shall be responsible for any damage to the Office Building Project arising from any such activity.

11. Lessee shall not employ any service or contractor for services or work to be performed in the Building, except as approved by Lessor.

12. Lessor reserves the right to close and lock the Building on Saturdays, Sundays and legal holidays, and on other days between the hours of ___7___ P.M. and ___7___ A.M. of the following day.  If Lessee uses the Premises during such periods, Lessee shall be responsible for securely locking any doors it may have opened for entry.

13. Lessee shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.

14. No window coverings, shades or awnings shall be installed or used by Lessee.

15. No Lessee, employee or invites shall go upon the roof of the Building.

16. Lessee shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in areas reasonably designated by Lessor or by applicable governmental agencies as non-smoking areas.

17. Lessee shall not use any method of heating or air conditioning other than as provided by Lessor.

18. Lessee shall not install, maintain or operate any vending machines upon the Premises without Lessor's written consent.

19. The Premises shall not be used for lodging or manufacturing, cooking or food preparation.

20. Lessee shall comply with all safety, fire protection and evacuation regulations established by Lessor' or any applicable governmental agency.

21. Lessor reserves the right to waive any one of these rules or regulations, and/or as to any particular Lessee, and any such waiver shall not constitute a waiver of any other rule or regulation or any subsequent application thereof to such Lessee.

22. Lessee assumes all risks from theft or vandalism and agrees to keep its Premises locked as may be required.

23. Lessor reserves the right to make such other reasonable rules and regulations as it may from time to time deem necessary for the appropriate operation and safety of the Office Building Project and its occupants.  Lessee agrees to abide by these and such rules and regulations.

### PARKING RULES

1. Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles." Vehicles other than Permitted Size Vehicles are herein referred to as "Oversized Vehicles."

2. Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

3. Parking stickers or identification devices shall be the property of Lessor and be returned to Lessor by the holder thereof upon termination of the holder's parking privileges.  Lessee will pay such replacement charge as is reasonably established by Lessor for the loss of such devices.

4. Lessor reserves the right to refuse the sale of monthly identification devices to any person or entity that willfully refuses to comply with the applicable rules, regulations, laws and/or agreements.

5. Lessor reserves the right to relocate all or a part of parking spaces from floor to floor, within one floor, and/or to reasonably adjacent offsite location(s), and to reasonably allocate them between compact and standard size spaces, as long as the same complies with applicable laws, ordinances and regulations.

6. Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking.

7. Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle.  Lessor will not be responsible for any damage to vehicles, injury to persons or loss of property; all of which risks are assumed by the party using the parking area.

8. Validation, if established, will be permissible only by such method or methods as Lessor and/or its licensee may establish at rates generally applicable to visitor parking.

9. The maintenance, washing, waxing or cleaning of vehicles in the parking structure or Common Areas is prohibited.

10. Lessee shall be responsible for seeing that all of its employees, agents and invitees comply with the applicable parking rules, regulations, laws and agreements.

11. Lessor reserves the right to modify these rules and/or adopt such other reasonable and non-discriminatory rules and regulations as it may deem necessary for the proper operation of the parking area.

12. Such parking use as is herein provided is intended merely as a license only and no bailment is intended or shall be created hereby.

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Exhibit B
Page 1 of 1

Initial: _____

# WORK LETTER TO MEDICAL OFFICE LEASE

Dated: JANUARY 21, 2016

By and Between: CULVER CITY MEDICAL TOWER, A DELAWARE LIMITED LIABILITY COMPANY DBA BROTMAN PHYSICIANS PLAZA & HENRY LOUIS KIRSCH, M.D., AN INDIVIDUAL AND MICHAEL B. KAMIEL, M.D., AN INDIVIDUAL

1.  **Completion of Tenant Improvements**

    1.1   Both Parties hereby agree that Lessee is currently in possession of the Premises under a separate lease agreement expiring January 31, 2016 and therefore, the following improvements to the Premises do not affect the Commencement Date of this Lease. Lessor shall refurbish the Premises where necessary (hereby called "Tenant Improvements") at a cost of up to but not to exceed $30,000.00 (hereby called "Tenant Improvement Allowance"). Said Tenant Improvement Allowance shall include the cost of architectural fees, designer fees, contractor's bid, any City of Los Angeles fees, and all necessary governmental fees required for the completion of the Tenant Improvements. Any and all costs in excess of the Tenant Improvement Allowance shall be the sole responsibility of Lessee and shall be payable to Lessor upon demand. Said Tenant Improvements must be approved and completed by Lessor and/or Lessor's agents and approved by the City of Los Angeles and all necessary governmental authorities as required, by no later than August 31, 2016. In the event the Tenant Improvements are not approved and completed by Lessor and/or Lessor's agents and approved by the City of Los Angeles and all necessary governmental authorities as required, by August 31, 2016, said Tenant Improvement Allowance shall be withdrawn and no longer available to Lessee. Furthermore, said Tenant Improvement Allowance is to be used solely for Tenant Improvements to the Premises and shall not be used to offset any rental amounts due or equipment costs.

    1.2   All Tenant Improvements shall be performed by contractors, subcontractors and engineers selected and/or approved by Lessor.

    1.3   Any and all contractors, subcontractors, engineers and consultants performing Tenant Improvements to the Premises, shall coordinate its efforts with Lessor and/or Lessor's agent and The Borsuk Company.

    1.4   Any and all contractors, subcontractors, engineers and consultants performing Tenant Improvements and/or any work of any kind to the Premises, shall obtain the written approval of Lessor and/or Lessor's agent prior to the commencement of any Tenant Improvements to the Premises and shall provide proof of license and applicable insurance, as may be required by Lessor.

2.  **Preparation of Preliminary Space Plan**

    2.1   Within ten (10) business days after Lessee and Lessor execute the Lease, Lessee shall meet with Lessor and Lessor's interior architect ("The Borsuk Company") to submit Lessee's specifications and criteria for improvements (the "Criteria") to the Premises.

    2.2   Within ten (10) business days of Architects receipt of Criteria, Architect shall prepare a preliminary space plan ("Preliminary Space Plan") based on the Criteria, including representative office, work station, and basic furniture layouts as well as functional requirements, partitions and door locations.

    2.3   The Preliminary Space Plan shall itemize the work to be done by each party, including a cost estimate of any work required of Lessor in excess of the Tenant Improvement Allowance.

    2.4   The Preliminary Space Plan shall be transmitted to Lessee and Lessor for review.

    2.5   Lessee shall approve the Preliminary Space Plan and the preliminary cost estimate or specify with particularity its objection thereto within ten (10) business days following receipt thereof. Failure to so approve or disapprove within said period of time shall constitute approval thereof.

    2.6   If Lessee shall reject the Preliminary Space Plan either partially or totally, and they cannot in good faith be modified within ten (10) business days after such rejection to be acceptable to Lessor and Lessee, the Lease shall terminate and neither party shall thereafter be obligated to the other party for any reason whatsoever having to do with this Lease, except that Lessee shall be refunded an amount equal to one half of any security deposit or prepaid rent.

    2.7   When approved by Lessee, the Preliminary Space Plan and specifications, which shall serve as the foundation for the Tenant Improvements, shall supersede any prior agreement concerning the Tenant Improvements.

3.  **Responsibility for Working Drawings**

    3.1   Within ten (10) business days after Lessee's and Lessor's approval of the Preliminary Space Plan, Lessee shall submit to Architect any additional Criteria necessary for preparation of working drawings (hereby called, "Working Drawings"). Architect shall prepare and submit to Lessee and Lessor the Working Drawings within ten (10) business days thereafter. The Working Drawings may include the following items to the extent deemed necessary by Lessor:

    Prepared by Architect:

    3.1.1   A dimensional floor plan including walls, partitions, doors, frames and hardware schedules.

    3.1.2   A reflected ceiling plan, depicting the tile pattern with the lighting fixtures and diffusers, and indicating the ceiling heights, switch locations and lighting fixture schedules.

    3.1.3   A floor plan, indicating the telephone, computer, data and electrical outlet locations.

    3.1.4   A floor and wall finish plan and related schedule, indicating Building standard colors and materials for room finishes.

    3.1.5   Prepared by Lessor's electrical and mechanical engineers:

    　　3.1.5.1   Electrical distribution, lighting plan and specifications.

    　　3.1.5.2   HVAC distribution plan and specifications.

    3.2   Lessee and Lessor shall review and approve the Working Drawings within ten (10) business days of receipt. Failure by Lessee to approve or disapprove the Working Drawings by this date shall, at Lessor's option, be deemed to constitute Lessee's approval.

    3.3   Any changes to the Working Drawings after approval shall be chargeable to Lessee as a change order.

    3.4   Working Drawings shall be subject to approval of all governmental agencies, and any changes required thereby shall be subject to the approval of Lessee and Lessor.

4.  **Lessor's Cost**

    4.1   At a cost of up to but not to exceed the Tenant Improvement Allowance, Lessor shall bear the cost of Tenant Improvements and associated costs as set forth in the Preliminary Space Plan, the Working Drawings and this Work Letter, as follows:

    4.1.1   The payment of Architectural fees, including fees for working drawings, interior design drawings, structural drawings, mechanical, electrical and plumbing drawings, blueprinting fees, plan check fees and associated permitting fees and associated consulting costs, as required.

    4.1.2   The direct cost of construction for labor, materials (including sales taxes thereon), overhead and profit, construction insurance premiums, bond fees and other construction related costs.

    4.1.3   The cost of building permits, governmental agency inspection fees and occupancy permit fees.

    4.1.4   The cost of any and all legal fees, as may be required and incurred by Lessee.

    4.1.5   The payment of fees to the Interior Designer

BROTMAN PHYSICIANS PLAZA　　　　　　　Exhibit C　　　　　　　　Initial: _____
HENRY LOUIS KIRSCH, M.D. AND　　　　　Page 1 of 3
MICHAEL B. KAMIEL, M.D.

4.1.6    Tenant Improvements as follows:

4.1.6.1  Demolition
Demolish debris, walls, lights, ceiling, HVAC ducting, plumbing and flooring per the Working Drawings.

4.1.6.2  Partitions
Frame and Drywall interior partition walls with insulation per the Working Drawings.

4.1.6.3  Wall Surfaces
Patch and skim coat all wall scars and paint walls per the design specifications and Working Drawings.

4.1.6.4  Window Treatments
Supply and install window treatments per the design specifications and Working Drawings.

4.1.6.5  Flooring
Supply and Install Vinyl Floor Covering, Carpet and Cove Base per the design specifications and Working Drawings

4.1.6.6  Doors
Supply and Install Timely frames and paint grade doors with hardware per the design specifications and Working Drawings.
Paint doors and door frames per the design specifications and Working Drawings.
Supply and Install locking door levers and keys per the design specifications and Working Drawings.
Payment of fees for initial locksmith service to said locking door levers.

4.1.6.7  Electrical and Telephone Outlets
Supply Title 24 calculations and electrical engineering plans per the Working Drawings.
Supply and install conduit for telephone outlets and data lines per the Working Drawings.
Supply and install back boxes, conduit and wires and ADA speaker strobes per the Working Drawings.

4.1.6.8  Ceiling
Supply and install 2x2 T-bar ceiling with tiles and hard deck ceiling per the Working Drawings.

4.1.6.9  Lighting
Supply and install exit lights, switches, receptacles, 18 cell lights and occupancy sensors per the Working Drawings.
Supply and install exit signs and emergency lighting per the Working Drawings.

4.1.6.10  Heating, Ventilation and Air Conditioning (HVAC)
Install flex duct from Building main HVAC supply to accommodate suite and supply and install all ducted return registers, per the Working Drawings.

4.1.6.11  Sound Proofing
Supply and install sound attenuation blankets at the demising walls per the Working Drawings.

4.1.6.12  Plumbing
Supply and install plumbing, toilets, sinks and solenoid valves per the design specifications and Working Drawings.

4.1.6.13  Work Surfaces/Cabinetry
Supply and install work surfaces, upper and base cabinets, including necessary locks and keys, and counter tops per the design specifications and Working Drawings.

4.1.6.14  LAFD Fire Life Safety
Supply and Install per the Working Drawings.

4.2    Lessee shall at its expense, pay for any and all costs not to be borne by Lessor.

4.3    Lessee shall, by its approval of the Working Drawings as set forth in Paragraphs 3.2, 3.3 and 3.4 above, give Lessor authorization to complete construction of the Tenant Improvements in accordance with the Working Drawings and shall accompany such approval with a check made payable to Lessor in the amount, if any, for which Lessee shall, in Lessor's estimation, be responsible under the foregoing provisions of this Paragraph 4. Lessor shall not be obligated to commence the Tenant Improvements until Lessor receives such approval and payment, and Lessee shall be liable to Lessor for any costs incurred by Lessor by reason of delay caused by Lessee, including, but not limited to, the costs referred to in Paragraph 6 below.

4.4    If after the completion of the Tenant Improvements, the actual total cost of work for which Lessee is responsible is less than the amount estimated by Lessee under Paragraph 4.3 above, Lessor shall refund to Lessee any unused portion of Lessee's payment to Lessor under Paragraph 4.3 above.  At Lessor's option, such refund may be made directly by check or by a credit against Base Rent next falling due under the Lease.

4.5    If after the completion of the Tenant Improvements, the actual total cost of work for which Lessor shall bear the cost, pursuant to this Paragraph 4, is a lesser amount than the Tenant Improvement Allowance as provided for in Paragraph 52 of the Lease and Paragraph 1.1 of this Work Letter, Lessee shall, in no event, receive such lesser amount.

5.    <u>Construction</u>

5.1    Following Lessor's receipt of Lessee's authorization and check as provided in Paragraph 4.3 above, Lessor shall commence and proceed with the construction of the Tenant Improvements, subject to delays beyond the reasonable control of Lessor or its contractor or subcontractors, in accordance with the approved Preliminary Space Plan, Working Drawings and this Work Letter, and all applicable rules, regulations, laws, or ordinances. All work shall be performed by contractors and subcontractors selected and/or approved by Lessor and said contractors and subcontractors shall provide proof of license and applicable insurance, as may be required by Lessor.

5.2    Lessor shall obtain a building permit to construct the Tenant Improvements as soon as possible.

5.3    Lessor shall complete the construction of the Tenant Improvements as soon as reasonably possible after the obtaining of necessary building permits.

6.    <u>Changes, Additions, or Alterations; Acceptance</u>

6.1    If Lessee shall request any change, addition or alteration in approved Working Drawings, Lessor shall promptly give Lessee a written change estimate of the maximum cost of engineering and design services to prepare Working Drawings in accordance with such request and the time delay expected because of such request. If Lessee approves such change estimate in writing, Lessor shall have Working Drawings prepared and Lessee shall promptly reimburse Lessor for the cost thereof. Promptly upon the completion of such Working Drawings, Lessor shall notify Lessee in writing of the cost (or credit, if any) which shall be charged to or credited to Lessee by reason of such change, addition or alteration. Lessee shall, within three (3) business days thereafter, notify Lessor in writing whether it desires to proceed with such change, addition or alteration and shall accompany such notice with a check made payable to Lessor in the amount of any additional costs thereof. In the absence of such written authorization and payment, Lessor shall not be obligated to continue construction of the Tenant Improvements and Lessee shall be chargeable with any delay caused by Lessee's request for such change, addition or alteration.

6.2    After construction of the Tenant Improvements has commenced, Lessor shall have no obligation to make any change or modification to the approved Working Drawings if such change or modification shall have a material impact on the structural, mechanical or electrical systems of the Office Building Project.

6.3    Lessee delay referred to in Paragraph 3.2.2 of the Lease, which shall in no event affect the Taking of Possession of Premises as defined in Paragraph 3.2.1 of the Lease and Paragraph 9 of this Work Letter, and Acceptance of Premises as defined in Paragraph 10 of this Work Letter, shall include, without limitation, the following:

6.3.1  Lessee's failure to approve or disapprove any plan and specifications or the Working Drawings within any time periods required herein;

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Exhibit C
Page 2 of 3

Initial

6.3.2    Lessee's failure to deposit any amounts required by Paragraph 4.3 above within the time period required herein;

6.3.3    Lessee's failure to observe or perform any of its other obligations hereunder; or

6.3.4    Any changes, additions or alterations in the approved Working Drawings which were requested by Lessee.

Lessee shall be responsible for, and shall pay for, any and all costs and expenses incurred by Lessor in connection with any delay in the commencement or completion of the Tenant Improvements and any increase in costs caused by any of the foregoing.

6.4    If Lessor shall be delayed at any time in the progress of the construction of the Tenant Improvements or any portion thereof by extra work, changes in construction ordered by Lessee, or by strikes, lockouts, fire, delay in transportation, unavoidable casualties, rain or weather conditions, governmental procedures or delay, or by any other cause beyond Lessor's control, then the Commencement Date established in Paragraph 1.5 of the Lease shall be extended by the period of such delay.

7.    <u>Substantial Completion of Tenant Improvements</u>

7.1    The term "Substantial Completion", as used in this Work Letter, is hereby defined to mean the date the building department of the municipality having jurisdiction of the Premises shall have made a final inspection of the Tenant Improvements to the Premises, or a portion thereof, and authorized a final release of restrictions on the use of public utilities in connection therewith and the same are in a broom-clean condition.

7.2    Lessor shall use its best efforts to achieve Substantial Completion of the Tenant Improvements on or before the Commencement Date set forth in Paragraph 1.5 of the Basic Lease Provisions or within three hundred sixty (360) days after Lessor obtains the building permit from the applicable building department and all necessary governmental authorities as required, whichever is later.

7.3    In the event that the Tenant Improvements or any portion thereof have not reached Substantial Completion by the Commencement Date, this Lease shall not be invalid, but rather Lessor shall complete the same as soon thereafter as is possible and Lessor shall not be liable to Lessee for damages in any respect whatsoever.

8.    <u>Term</u>

Upon Substantial Completion of the Tenant Improvements as defined in Paragraph 7, above, Lessor and Lessee shall execute an amendment to the Lease setting forth the date of Tender of Possession as defined in Paragraph 3.2.1 of the Lease or of actual taking of possession, whichever first occurs, as the Commencement Date of this Lease.

9.    <u>Taking of Possession of Premises</u>

Lessor shall notify Lessee of the estimated Completion Date at least ten (10) days before said date. Lessee shall thereafter have the right to enter the Premises, or a portion thereof, to commence construction of any work to be done by Lessee and to equip and fixturize the Premises, as long as such entry does not interfere with Lessor's work. Lessee shall take possession of the Premises, or a portion thereof, upon the tender thereof as provided in Paragraph 3.2.1 of the Lease to which this Work Letter is attached. Any entry by Lessee of the Premises under this paragraph shall be under all of the terms and provisions of the Lease to which this Work Letter is attached.

10.    <u>Acceptance of Premises</u>

Upon the Substantial Completion of the Tenant Improvements, Lessor may submit to Lessee an agreement (the "Substantial Completion Acknowledgment") by which Lessor and Lessee shall acknowledge and agree that the Tenant Improvements are substantially complete and within ten (10) days following Tender of Possession as set forth in Paragraph 3.2.1 of the lease to which this Work Letter is attached, shall specify the remaining items ("Punch-list Items") to be done, completed or repaired by Lessor that were not done or completed pursuant to the approved Working Drawings, Changes, Additions, or Alterations. Lessee agrees not to unreasonably withhold its execution of such Substantial Completion Acknowledgment and to cooperate with Lessor in Lessor's performance, completion or correction of Punch-list Items. Upon Lessor's performance, completion or correction of Punch-List Items, the Tenant Improvements shall be deemed fully complete. Lessee shall execute such additional documentation evidencing full completion of the Tenant Improvements as Lessor may reasonably require. Any remaining items, as specified by Lessee, to be done, completed or repaired that were not originally part of the approved Working Drawings, Changes, Additions, or Alterations, shall not cause any delay whatsoever in Lessee's execution of the Substantial Completion Agreement and any such additional documentation evidencing full completion of the Tenant Improvements as Lessor may reasonably require. Lessee shall be deemed to have accepted the premises and approved construction if Lessee does not deliver such a list to Lessor within said number of days.

11.    <u>Work Done by Lessee</u>

11.1    Any work done by Lessee shall be done only with Lessor's prior written consent and in conformity with a valid building permit and all applicable rules, regulations, laws and ordinances, and be done in a good and workmanlike manner with good and sufficient materials. All work shall be done only by contractors approved by Lessor, it being understood that all HVAC, plumbing, mechanical, electrical wiring and ceiling work are to be done only by contractors designated by Lessor.

11.2    In accordance with the terms and conditions of the Lease and this Work Letter, attached hereto as part of the Lease, the following items, which shall in no event affect the Tender of Possession or Premises as defined in Paragraph 3.2.2 of the Lease and Paragraph 9 of this Work Letter and Acceptance of Premises as defined in Paragraph 10 of this Work Letter, shall be deemed as Work Done by Lessee and shall be the sole responsibility of Lessee, and shall not be deemed Tenant Improvements:

11.2.1    Supply and Install Built-In Furniture to the Premises.

11.2.2    Supply and Install Interior Art Work/Art Work for the Premises.

11.2.3    Supply and Install Refrigerator(s) to the Premises.

11.2.4    Supply and Install All Computers and Computer Systems, Phone Systems, Information Systems, Software for the Premises and Payment of All Associated Service Installation and Repair and Maintenance costs.

11.2.5    Supply and Install Exam Room Tables to the Premises.

11.2.6    Supply and Install any Mobile Medical Equipment to the Premises.

11.2.7    Supply Clinical Instruments for the Premises.

11.2.8    Supply Pharmaceuticals, Soft Goods, and Durable Medical Goods/Equipments for the Premises.

11.2.9    Supply and Install Fire Extinguishers to the Premises and Obtain Certification as required.

12.    <u>Data Processing</u>

All data processing and other special electrical equipment shall be installed only under the observation of Lessor's electrical contractor.

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Exhibit C
Page 3 of 3

Initial:

## GUARANTY OF LEASE

WHEREAS, BROTMAN CULVER CITY MEDICAL TOWER, A DELAWARE LIMITED LIABILITY COMPANY DBA BROMAN PHYSICIANS PLAZA, hereinafter "Lessor" HENRY LOUIS KIRSCH, M.D., AN INDIVIDUAL AND MICHAEL B. KAMIEL, M.D., AN INDIVIDUAL, hereinafter "Lessee", are about to execute a document entitled "Lease" dated JANUARY 21, 2016 concerning the Premises commonly known as Suite 503 located at 9808 Venice Boulevard, Los Angeles, California, wherein Lessor will lease the Premises to Lessee, and

WHEREAS, Henry Louis Kirsch, M.D., an individual and Michael B. Kamiel, M.D., an individual, hereinafter Guarantors have a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantors did not execute and deliver to Lessor this Guaranty of Lease.

NOW THEREFORE, in consideration of the execution of the forgoing Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantors hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed that the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a course of conduct, and said Lease may be assigned by Lessor or any assignee of Lessor without consent or notice to Guarantors and that this Guaranty shall guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantors, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantors following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantors hereunder following any breach or default by Lessee without first proceeding against Lessee and without previous notice to or demand upon either Lessee or Guarantors.

Guarantors hereby waive (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantors or any other person or entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantors, (g) any right of subrogation.

Guarantors do hereby subrogate all existing or future indebtedness of Lessee to Guarantors to the obligations owed to Lessor under the Lease and this Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided shall be deemed to also require the Guarantors hereunder to do and provide the same.

The term Lessor refers to and means the Lessor named in the Lease and also Lessor's successors and assigns.  So long as Lessor's interest in the Lease, the leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantors of the Lessor's interest shall affect the continuing obligation of Guarantors under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term Lessee refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

In the event any action be brought by said Lessor against Guarantors hereunder to enforce the obligation of Guarantors hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee which shall be fixed by the court.

**"GUARANTORS"**

By: _Henry L Kirsch mo_
      Henry Louis Kirsch, M.D.

Date: _1/22/2016_

By: _Michael D Kamiel_
      Michael B. Kamiel, M.D.

Date: _1/22/16_

BROTMAN PHYSICIANS PLAZA
HENRY LOUIS KIRSCH, M.D. AND
MICHAEL B. KAMIEL, M.D.

Exhibit D
Page 1 of 1

Initial: _HK_
_MK_

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT 2</u>**

100612830

## THREE-DAY NOTICE TO COMPLY WITH LEASE AND PAY RENT AND CHARGES OR QUIT

TO:    _Michael B. Kamiel, MD
Address:  9808 Venice Blvd., Suite 503, Los Angeles, CA 90232

AND TO ALL TENANTS IN POSSESSION.

NOTICE IS HEREBY GIVEN that under the terms of the Lease under which you took possession of the premises located at 9808 Venice Blvd., Ste.503,Los Angeles, CA 90232, there is now due, owing and unpaid rent and other charges for the premises in the total amount of $28,098.79 as follows:

| Description | Amount |
|---|---|
| October 2021 Rent & November 2021 Rent | $9912.79 |
| Bounced Check #9774 | $2016.00 |
| Bounced Check #9775 | $2016.00 |
| Bounced Check #9512 | $2016.00 |
| Bounced Check #9513 | $2016.00 |
| December 2021 Rent | $4559.00 |
| January 2022 Rent | $5563.00 |

Within THREE (3) days after service of this notice, you are required to pay the above specified rent and other charges in full or deliver up occupancy and possession of the premises referenced above to the Lessor. Your Lessor hereby elects to declare a forfeiture of the Lease in the event you fail to pay the rent and other charges as set forth above.

If you fail to pay the rent and other charges as specified above, or deliver up occupancy and possession of the premises within THREE (3) days, legal proceedings may be commenced to recover possession of the premises, declare the Lease forfeited and recover damages, costs and other relief.  This notice supersedes all prior notices to pay or quit relating to the above-mentioned premises. The rent specified above claimed by Lessor is a reasonable estimate pursuant to California Code of Civil Procedure §1161.1(a).

Lessor's Acceptance of any partial rent will not constitute a waiver of any of Lessor's rights, including any right the Lessor may have to recover possession of the property except that you will be given credit for the amount paid against the total amount owing.

Your payment should be made payable to Culver City Medical Tower, LLC and payment shall be delivered to: 11645 Wilshire Boulevard, Suite 901, Los Angeles, California 90025 no later than January 24, 2022 before 5:00 pm. Tel. # 818-882-5700

DATED:   January 19, 2022                              Brotman Physicians Plaza
                                                       LESSOR
                                                       BY: _Adrianne Robledo_
                                                       Adrianne Robledo, Accounting Department

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PROOF OF SERVICE

I, _Adrianne Robledo_ declare as follows;
I served the above Notice as follows: METHOD OF SERVICE: (check one)

1.   ✓   By handing a copy to person or party served or handing a copy with an adult at the premises described in the above mentioned address
     NAME OF PERSON THAT RECEIVED NOTICE: Rep- Front Office
     DATE OF DELIVERY: 1-19-22

2.   ✓   By mailing a copy to the person or party served, addressed to said person or party at the same premises described in the above mentioned notice by regular mail and certified mail; MAILING DATE: 1-19-22 .

3.   _____  By posting a copy on the door at the premises described in the above mentioned notice after finding no adult available at the premises to receive the notice POSTING DATE _____.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration is executed on
1-19-22 at Los Angeles, California.                    By: _Adrianne Robledo_

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT 3</u>**

## THREE-DAY NOTICE TO COMPLY WITH LEASE AND PAY RENT AND CHARGES OR QUIT

TO:    _Michael B. Kamiel, MD
Address:  _9808 Venice Blvd., Suite 503, Los Angeles, CA 90232

AND TO ALL TENANTS IN POSSESSION.

NOTICE IS HEREBY GIVEN that under the terms of the Lease under which you took possession of the premises located at _9808 Venice Blvd., Ste.503,Los Angeles, CA 90232, there is now due, owing and unpaid rent and other charges for the premises in the total amount of $28,098.79 as follows:

| Description | Amount |
|---|---|
| October 2021 Rent & November 2021 Rent | $9912.79 |
| Bounced Check #9774 | $2016.00 |
| Bounced Check #9775 | $2016.00 |
| Bounced Check #9512 | $2016.00 |
| Bounced Check #9513 | $2016.00 |
| December 2021 Rent | $4559.00 |
| January 2022 Rent | $5563.00 |

Within THREE (3) days after service of this notice, you are required to pay the above specified rent and other charges in full or deliver up occupancy and possession of the premises referenced above to the Lessor. Your Lessor hereby elects to declare a forfeiture of the Lease in the event you fail to pay the rent and other charges as set forth above.

If you fail to pay the rent and other charges as specified above, or deliver up occupancy and possession of the premises within THREE (3) days, legal proceedings may be commenced to recover possession of the premises, declare the Lease forfeited and recover damages, costs and other relief.  This notice supersedes all prior notices to pay or quit relating to the above-mentioned premises. The rent specified above claimed by Lessor is a reasonable estimate pursuant to California Code of Civil Procedure §1161.1(a).

Lessor's Acceptance of any partial rent will not constitute a waiver of any of Lessor's rights, including any right the Lessor may have to recover possession of the property except that you will be given credit for the amount paid against the total amount owing.

Your payment should be made payable to Culver City Medical Tower, LLC and payment shall be delivered to: _11645 Wilshire Boulevard, Suite 901, Los Angeles, California 90025 no later than January 24, 2022 before 5:00 pm. Tel. # 818-882-5700

DATED:   _January 19, 2022 _                    Brotman Physicians Plaza _
                                                 LESSOR
                                                 BY: _Adrianne Robledo_
                                                 Adrianne Robledo, Accounting Department

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                          PROOF OF SERVICE
I, _Adrianne Robledo_ declare as follows;
I served the above Notice as follows: METHOD OF SERVICE: (check one)

1.  _✓__By handing a copy to person or party served or handing a copy with an adult at the premises described in the above mentioned address
NAME OF PERSON THAT RECEIVED NOTICE: _Rep - Front Office_
DATE OF DELIVERY: _1-19-22_

2.  _✓__By mailing a copy to the person or party served, addressed to said person or party at the same premises described in the above mentioned notice by regular mail and certified mail; MAILING DATE: _1-19-22_.

3.  _____ By posting a copy on the door at the premises described in the above mentioned notice after finding no adult available at the premises to receive the notice POSTING DATE _____.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration is executed on _1-19-22_ at Los Angeles, California.              By: _Adrianne Robledo_

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>EXHIBIT 4</u>**

Electronically Received 03/28/2022 09:30 AM

Electronically Received 03/28/2022 09:30 AM

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS: 1725 Main St., Santa Monica, CA 90401

PLAINTIFF: Culver City Medical Tower, LLC

DEFENDANT: Michael B. Kamiel, M.D. and Does 1-10

**UNLAWFUL DETAINER STIPULATION AND JUDGMENT**

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles
03/31/2022
Sherri R. Carter, Executive Officer / Clerk of Court
By: _____ S. Hwang _____ Deputy

CASE NUMBER: 22SMCV00211
DEPT./DIV.: N

THE PARTIES STIPULATE (AGREE) AS FOLLOWS:

1.  Judgment shall be entered in favor of plaintiff as named in the complaint and against the following defendants:
    *(identify and name defendants exactly as judgment is to be entered. Do not abbreviate or use "etc." or et al.")*

    Michael B. Kamiel, M.D.

2.  Judgment shall be entered for:

    Past Due Rent          $ 29,961.25          ☑ Defendant(s) rights under lease or rental agreement are forfeited

    Holdover Damages       $ 0

    Attorney fees          $ 1,945.00           ☑ Plaintiff is awarded possession of the premises located at

    Costs                  $ 0         ⊞        (including apartment number, if applicable): 9808 Venice

    TOTAL                  $ 31,906.25          Blvd., Suite 503, Los Angeles, CA 90232

3.  Defendant(s) security deposit, if any:

    ☐ shall be returned or accounted for by plaintiff within 21 days after defendant(s) vacate the premises (Civ. Code, § 1950.5).

    ☑ shall be retained by the plaintiff and defendant(s) waive(s) any claim to its return.

4.  Judgment shall be entered:

    ☐ now

    ☑ now and stay enforcement of judgment as follows: a writ of possession may be issued forthwith, but no final lockout prior to
    May 1, 2022
    _____
    (date)

    ☐ only upon default by defendant(s) in the performance of any of the obligations required by this stipulation.

5.  ☑ Defendant(s) agree(s) to vacate the subject premises by ___April 30, 2022___, removing all personal property and perso[...]
    covered by this stipulation.

LACIV 136 (Rev. 01/07)
LASC Approved 09-05

DISTRIBUTION: Original – Court Case File    Copy – Plaintiff    Copy – Defendant
**UNLAWFUL DETAINER STIPULATION AND JUDGMENT**

Code Civ. Proc., §§ 415.46, 6[...]
Civ. Code,
Page 1 of

6.  Plaintiff and defendant(s) further stipulate as follows: Defendant agrees to pay $29,961.25 in past rent due,

$1,945 in attorney's fees to Plaintiff. Defendant is permitted to make monthly installment

payments of $2,658.86 each month due on the first of each month until balance is paid in

full.  In addition to the above monthly payments, Defendant agrees to pay the monthly rent

CAMS, taxes, and all other fees and expenses in the rental agreement in full by first of

each month.If Defendant fails to make any of the above payments in full and on time he will

be considered in breach of this agreement.Plaintiff will not issue the Writ of Possession

unless Defendant fails to make any of the above payments in full and on time.  Defendant is

permitted to remain in possession of the property so long as he timely makes the above

payments.  Time is of the essence and all terms of this agreement are material.

Defendant agrees to waive his rights to file an appeal and/or stay in this matter.

7.  ☑ Defendant(s) agree(s) to pay the amount set forth in Paragraph 2 on the schedule set forth below. In the event of default in
payment, a writ of execution may be issued for the remaining balance on the judgment creditor's verified application, without further
notice or hearing.

First payment is due on or before April 1, 2022.  Defendant to make monthly installments

of $2,658.86 on the first of each month.

8.  ☑ WAIVER OF RIGHTS: We, the undersigned defendants, understand that we have the following rights: (a) to be represented by
attorney of our own choice, at our own expense; and (b) to notice and an opportunity to be heard on the issue of any default in
payment of installments, or on any other alleged violation of conditions staying the enforcement of the judgment. We give up these
rights and freely agree that judgment may be entered against us in accordance with this stipulation.

9.  ☐ _____ acknowledge(s) receiving assistance from a
(name[s])
language interpreter in the preparation and execution of this stipulation.

Date: Mar 24, 2022      Edward G Hudson                    ► _____
                                                          (SIGNATURE OF PLAINTIFF OR ATTORNEY)
                        MICHAEL B. KAMEL, M.D.

Date: Mar 25 2022       _____          ► _michael B Kamel M.D.___
                        (TYPE OR PRINT NAME)                 (SIGNATURE OF DEFENDANT OR ATTORNEY)

Date: _____          _____          ► _____
                        (TYPE OR PRINT NAME)                 (SIGNATURE OF DEFENDANT OR ATTORNEY)

Date: _____          _____          ► _____
                        (TYPE OR PRINT NAME)                 (SIGNATURE OF DEFENDANT OR ATTORNEY)

☑ The Court hereby orders the above named parties to comply with the terms of the stipulation, and the clerk is directed to enter this
stipulation as judgment.

☑ Proof having been made to the satisfaction of the court, Plaintiff is also granted judgment as to all unnamed tenants.
(Code Civ. Proc., § 415.46.)

☐ The above named parties agree to abide by the terms of the stipulation which is approved by the court.  The case is calendared for
dismissal or entry of judgment on _____ at _____ in Department _____

                    03/31/2022                            Craig D. Karlan / Judge
                    _____                       _____
                    DATED                                 JUDICIAL OFFICER

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Culver City v. Michael Kamiel, M.D. | 22SMCV00211 |

### ATTACHMENT *(Number):* A

*(This Attachment may be used with any Judicial Council form.)*

Plaintiff will not issue the writ of possession and will allow the defendant to remain at the Property if he does not breach any of the following terms and conditions:

1) Defendant pays $2,658.86 on the first of each month until amount listed in paragraph 2 is paid in full;

2) Defendant pays all rent, expenses, CAMS, taxes, and all other fees, costs, and monies listed in the lease agreement in full on the first of each month;

3) Court to retain jurisdiction pursuant to CCP 664.6;

4) The record shall remain sealed unless there is a breach in the terms of this agreement;

5) All terms of this agreement are material;

6) Time is of the essence;

7) Case will be dismissed without prejudice if Defendant complies and fulfills all terms of this agreement;

8) The record shall remain sealed.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page _____ of _____

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
to Judicial Council Form

www.courtinfo.ca.gov

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

27489 Agoura Rd., Ste. 102, Agoura Hills, CA 91301

A true and correct copy of the foregoing document entitled (*specify*):   AMENDED
NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY
OR FOR ORDER CONFIRMING THAT THE  AUTOMATIC STAY DOES NOT APPLY UNDER 11 U.S.C. § 362(l)
(with supporting declarations)
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) June 16, 2022_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Raymond H. Aver - ray@averlaw.com, United States Trustee (SV) - ustpregion16.wh.ecf@usdoj.gov, Diane C Weil (TR) - dcweil@dcweillaw.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) June 16, 2022_____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Michael Barry Kamiel - 17844 Margate Street, Encino, CA 91316

Raymond H. Aver - 10801 National Boulevard, Suite 100, Los Angeles, CA 90064

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 16, 2022 | Shauna Wilcox | /S/ Shauna Wilcox |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.